## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **JOANNA A., individually and on behalf of her minor child J.A.,** | ) ) ) | |
| **Plaintiffs,** | ) | **Case No.** |
| **v.** | ) ) ) | |
| **MONROE TOWNSHIP BOARD OF EDUCATION; NEW JERSEY DEPARTMENT OF EDUCATION; KEVIN DEHMER, Interim Commissioner of Education; NEW JERSEY OFFICE OF ADMINISTRATIVE LAW; ELLEN S. BASS, Chief Administrative Law Judge; JEFFREY R. WILSON, Administrative Law Judge; JOHN S. KENNEDY, Administrative Law Judge; and, CATHERINE A. TUOHY, Administrative Law Judge; and DOES 1 – 250 SIMILARLY SITUATED ADMINISTRATIVE LAW JUDGES,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## <u>COMPLAINT</u>

NOW COME Plaintiffs JOANNA A., individually and on behalf of her minor child J.A.[1] ("J.A. Family" or "Plaintiffs"), by and through counsel, and for their Complaint against Defendants Monroe Township Board of Education ("MTBOE"); New Jersey Department of Education ("NJDOE"); Kevin Dehmer, Interim Commissioner of Education ("Dehmer"); New Jersey Office of Administrative Law ("OAL"); Ellen S. Bass, Chief Administrative Law Judge ("ALJ Bass"); Jeffrey R. Wilson, Administrative Law Judge ("ALJ Wilson"); John S. Kennedy, Administrative Law Judge ("ALJ Kennedy"); Catherine A. Tuohy, Administrative Law Judge ("ALJ Tuohy"); and Does 1 – 250 similarly situated Administrative Law Judges ("Doe ALJs"), hereby state as follows:

---

[1] Plaintiffs are identified by initials pursuant to Fed.R.Civ.P. 5.2(a)(3) so as to protect the identities of the minor child.

## TABLE OF CONTENTS

NATURE OF THE ACTION ....................................................................6

JURISDICTION AND VENUE ...............................................................6

PARTIES................................................................................................7

FEDERAL STATUTORY OVERVIEW ................................................11

  A.   The IEP.....................................................................................13

    i.   Evaluations of Disabilities ................................................13

    ii.  Procedural Safeguards / Due Process Rights in the IEP Process.............15

    iii. Parents' Rights to Review Their Child's Records ...................16

    iv. Development of the IEP .........................................................16

    v.  Parental Participation ...........................................................17

    vi. Prior Written Notice .............................................................19

  B.   Parents' Due Process Rights in an Administrative Hearing .....................19

    i.   Stay Put Rule aka Pendent Placement.....................................20

    ii.  30 Day Resolution Period ....................................................21

    iii. The 45 Day Rule ..................................................................22

    iv. The Adjournment Rule.........................................................22

    v.  The Evidence Rules..............................................................22

    vi. The Five-Day Exchange Rule ..............................................23

    vii. Requirements of Due Process Hearing Officers ...................24

    viii. Administrative Decisions and Remedies ............................24

NEW JERSEY'S REGULATORY SCHEME FOR SPECIAL EDUCATION DISPUTES .............................................................................26

  A.   Evaluations / IEEs ................................................................27

  B.   Parents' Due Process Rights in a NJ Administrative Hearing...................29

    i.   Parents' Rights to Review Their Child's Records ...................29

    ii.  Pleadings .............................................................................30

    iii. Stay Put Rule .......................................................................30

    iv. 30 Day Resolution Period ....................................................30

    v.  The 10 Day Peremptory Hearing Date..................................31

vi.   The 45 Day Rule ....................................................................31

vii.   Discovery ...........................................................................32

viii.   The Five-Day Exchange Rule ...........................................33

ix.   The Burden of Proof............................................................33

x.   Requirements of Due Process Hearing Officers .....................33

xi.   Administrative Decisions and Remedies ..............................34

FACTUAL BACKGROUND – DP CASE ......................................................51

A.   Background / Diagnoses / Evaluations of J.A...............................51

B.   5/3/16 IEP For 3rd Grade ....................................................55

C.   3rd Grade – School Year 2016-17...............................................57

D.   11/14/16 IEP For 3rd Grade ...........................................................59

E.   5/9/17 IEP Meeting and Proposed IEP.........................................64

F.   4th Grade – School Year 2017-18..................................................69

G.   Summer 2018 / 5th Grade School Year 2018-19 ..........................75

PROCEDURAL HISTORY – DP CASE .........................................................77

COUNT ONE – APPEAL: MTBOE'S DENIAL OF FAPE........................97

COUNT TWO – APPEAL: LEGAL ERRORS IN DP CASE ..................104

COUNT THREE – SYSTEMIC VIOLATION OF THE 10 DAY PEREMPTORY HEARING DATE ..........................................................................113

COUNT FOUR –SYSTEMIC VIOLATION OF THE FIVE-DAY EXCHANGE RULE .............................................................................................117

COUNT FIVE – SYSTEMIC VIOLATION OF THE ADJOURNMENT RULE ....................................................................................................122

COUNT SIX – SYSTEMIC VIOLATION OF THE 30 DAY RESOLUTION PERIOD ..........................................................................................128

COUNT SEVEN –SYSTEMIC VIOLATION OF THE ACCESS TO RECORDS PROCEDURAL SAFEGUARD...........................................................133

COUNT EIGHT –SYSTEMIC VIOLATION OF THE DISCOVERY RULES IN SPECIAL EDUCATION DUE PROCESS CASES...............................138

COUNT NINE –SYSTEMIC VIOLATION OF THE RULES OF EVIDENCE IN SPECIAL EDUCATION DUE PROCESS CASES...............................142

COUNT TEN – SYSTEMIC VIOLATION OF HEARING OFFICER QUALIFICATIONS ............................................................148

COUNT ELEVEN – SYSTEMIC VIOLATION OF THE INDEPENDENCE OF THE ADJUDICATING BODY OF SPECIAL EDUCATION DISPUTES .........154

COUNT TWELVE – SYSTEMIC VIOLATION OF THE 45 DAY RULE ........161

COUNT THIRTEEN – DECLARATORY JUDGMENT: FEDERAL PREEMPTION.................................................................................166

COUNT FOURTEEN – MTBOE'S VIOLATIONS OF §504.............................171

COUNT FIFTEEN – MTBOE'S VIOLATIONS OF THE ADA .........................175

COUNT SIXTEEN – MTBOE'S VIOLATIONS OF THE NJLAD ....................178

COUNT SEVENTEEN – STATE DEFENDANTS' VIOLATIONS OF §504....182

COUNT EIGHTEEN – STATE DEFENDANTS' VIOLATIONS OF THE ADA ...................................................................................................186

COUNT NINETEEN –SYSTEMIC VIOLATIONS OF §1983 AND CIVIL RIGHTS .......................................................................................187

COUNT TWENTY – SYSTEMIC MALICIOUS ABUSE OF PROCESS..........193

COUNT TWENTY-ONE – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS .......................................................................................198

COUNT TWENTY-TWO – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .......................................................................................200

## NATURE OF THE ACTION

1.     This matter arises as an appeal as of right from a Final Decision entered February 22, 2021 in the administrative due process matter captioned *J.A. and J.A. o/b/o J.A. v. Monroe Twp. Board of Education*, OAL Dkt. Nos. EDS 08588-17 and 11524-18 [Consolidated] ("DP case").

2.     This matter also arises from systemic flaws in NJDOE's system for resolving special education cases in the State of New Jersey and the OAL's and ALJs' illegal implementation of such system as explained below.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction over this action pursuant to federal question jurisdiction 28 U.S.C. §1331, premised upon the federal Individuals with Disabilities Education Act, 20 U.S.C. §1415(i)(3)(A) ("IDEA") wherein it provides that "The district courts of the United States shall have jurisdiction of actions brought under this section without regard to the amount in controversy"; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq.* ("§504"); and the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.* ("ADA"); and other federal laws.

4.     The appeal of the Final Decision in the DP case is timely as it is brought within 90 days of February 22, 2021.  20 U.S.C. §1415(i)(2)(B); N.J.A.C. §6A:14-2.7(v).

5.     This Court may order declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202.  The Court has supplemental jurisdiction to adjudicate any state claims, which may arise out of the same facts as the federal claims asserted herein pursuant to 28 U.S.C. §1367.

6.     Personal jurisdiction exists over the Defendants because they are all residents or arms of the government of the State of New Jersey.

7.     Venue is proper pursuant to 28 U.S.C. §1391 as all the events giving rise to the claims herein occurred in this District.

## **PARTIES**

8.     J.A., whose date of birth is 05/22/2008, is a child with a disability, primary diagnosis of Autism and other secondary diagnoses, including without limitation Central Auditory Processing Disorder ("CAPD").  She is eligible for special education and related services under the Individuals with Disabilities Education Act, 20 U.S.C. §§1400 et seq. ("IDEA") and protection under Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("§504"); the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.* ("ADA"); New Jersey's Special

Education Law, N.J.S.A. 18A:46-1 *et seq.*; and the New Jersey Law Against

Discrimination, N.J.S.A. §10:5-1 *et. seq.* ("NJLAD").

    9.    Joanna A. is J.A.'s mother and resides with J.A. at 1054 Baywood

Dr., Williamstown, Gloucester County, New Jersey.

    10.    Defendant Monroe Township Board of Education ("MTBOE") is a

public school system in Gloucester County, New Jersey, with its principal place of

business located at 75 East Academy Street, Williamstown, New Jersey 08094 and

as such is a Local Educational Agency ("LEA") as that term is defined by 20

U.S.C. §1401(19) and 34 CFR §300.28 and a public agency of the State of New

Jersey.  MTBOE receives federal funding under IDEA for special education and is,

therefore, responsible for ensuring compliance with all mandates arising under the

numerous federal statutes and New Jersey regulations for providing special

education to the school age students with disabilities residing within its district.

    11.    Defendant New Jersey Department of Education ("NJDOE") is a State

Educational Agency ("SEA") as that term is defined in 20 U.S.C. §1401(32); 34

C.F.R. §300.41; and a "public entity" as that term is defined in 42 U.S.C.

§12131(1); 28 C.F.R. §35.104; and otherwise receives federal funds for special

education under various federal statutes and, as such, is responsible for establishing

and maintaining a system for resolution of disputes and ensuring compliance with

all mandates arising under the numerous federal statutes for providing special

education through its Office of Special Education Policy and Procedure ("NJOSEP"). NJDOE has its principal place of business located at 100 River View Plaza, Trenton, Mercer County, New Jersey 08625-0500.

12. Kevin Dehmer, New Jersey's Interim Commissioner of Education ("Dehmer"), is the officer in charge of the NJDOE. Dehmer is named herein in his official capacity.

13. Defendant New Jersey Office of Administrative Law ("OAL") is an Executive Branch agency of the State of New Jersey designated by NJDOE to hear special education due process hearing requests ("due process complaints") pursuant to 20 U.S.C. §1415(f); N.J.A.C. §§1:6A-3.1 and 6A:14-2.7. OAL has its principal place of business located at 9 Quakerbridge Plaza, Mercerville (Hamilton Twp.), New Jersey 08619.

14. Defendant Ellen S. Bass, Chief Administrative Law Judge ("ALJ Bass") is a New Jersey Administrative Law Judge ("ALJ") employed by the OAL to hear cases, including special education cases, in its Newark, NJ location. ALJ Bass is a "hearing officer" as that term is defined in IDEA, 20 U.S.C. §1415(f)(3)(A) and 34 C.F.R. §300.511(c) and must meet the requirements of those sections. ALJ Bass was one of the hearing officers assigned to the underlying DP case and also hears numerous other special education due process cases. As Chief ALJ, ALJ Bass makes all policy and procedure decisions for the

OAL and ALJs that handle special education cases. ALJ Bass is named herein in her official capacity.

15. Defendant Jeffrey R. Wilson, Administrative Law Judge ("ALJ Wilson") is an ALJ employed by the OAL to hear cases, including special education cases, in its Atlantic City, NJ location. ALJ Wilson is a "hearing officer" as that term is defined in IDEA, 20 U.S.C. §1415(f)(3)(A) and 34 C.F.R. §300.511(c) and must meet the requirements of those sections. ALJ Wilson was one of the hearing officers assigned to the underlying DP case and also hears numerous other special education due process cases. ALJ Wilson is named herein in his official capacity.

16. Defendant John S. Kennedy, Administrative Law Judge ("ALJ Kennedy") is an ALJ employed by the OAL to hear cases, including special education cases, in its Atlantic City, NJ location. ALJ Kennedy is a "hearing officer" as that term is defined in IDEA, 20 U.S.C. §1415(f)(3)(A) and 34 C.F.R. §300.511(c) and must meet the requirements of those sections. ALJ Kennedy was one of the hearing officers assigned to the underlying DP case and also hears numerous other special education due process cases. ALJ Kennedy is named herein in his official capacity.

17. Defendant Catherine A. Tuohy, Administrative Law Judge ("ALJ Tuohy") is an ALJ employed by the OAL to hear cases, including special

education cases, in its Atlantic City, NJ location.  ALJ Tuohy is a "hearing officer" as that term is defined in IDEA, 20 U.S.C. §1415(f)(3)(A) and 34 C.F.R. §300.511(c) and must meet the requirements of those sections.  ALJ Tuohy was one of the hearing officers assigned to the underlying DP case and also hears numerous other special education due process cases.  ALJ Tuohy is named herein in her official capacity.

18.    Defendants Does 1 – 250 similarly situated Administrative Law Judges ("Doe ALJs") are as yet unidentified ALJs employed by the OAL to hear special education cases in its three locations – Newark, Mercerville, and Atlantic City.  Doe ALJs are "hearing officers" as that term is defined in IDEA, 20 U.S.C. §1415(f)(3)(A) and 34 C.F.R. §300.511(c) and must meet the requirements of those sections.  Doe ALJs are named herein in their official capacities.

19.    Doe ALJs are necessary parties to this action pursuant to Fed.R.Civ.P. 19 because without Doe ALJs this Court cannot grant full relief.

## FEDERAL STATUTORY OVERVIEW

20.    When a SEA receives federal funds under IDEA, it must guarantee that every child with a disability in its state receives a Free Appropriate Public Education ("FAPE") from his/her public school.  20 U.S.C. §1412(a)(1)(A).

21.    In responding to prior problems with the Education of the Handicapped Act – the precursor of IDEA, Congress did not content itself by

amending a simple funding statute. "Rather, [IDEA] confers upon disabled students an enforceable substantive right to public education in participating States, and conditions federal financial assistance upon a State's compliance with the substantive and procedural goals of the Act." *Honig v. Doe*, 484 U.S. 305, 310, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988)

22.    Similarly, a LEA is eligible to receive federal funds under IDEA if it likewise guarantees that every child with a disability in its school district receives a FAPE. 20 U.S.C. §1413(a)(1).

23.    FAPE is defined in IDEA as "special education and related services that have been provided at public expense, under public supervision and direction, and without charge; meet the standards of the State educational agency; include an appropriate preschool, elementary school, or secondary school education in the State involved; and are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. §1401(9).

24.    The U.S. Supreme Court has clarified the definition of FAPE as requiring that a disabled student's "educational program must be <u>appropriately ambitious</u> in light of his circumstances. . . . this standard is <u>markedly more demanding than the 'merely more than de minimis' test.</u>" *Endrew F v. Douglas County School Dist. RE-1*, 137 S. Ct. 988, 1000, 580 US __, 197 L. Ed. 2d 335 (2017) (emphasis added.)

25.    The U.S. Supreme Court has held that it is not only the child with the disability that has legal rights under IDEA, but the parents of that child are also entitled to assert legal rights on their own behalf under IDEA.  *Winkelman v. Parma City School Dist.*, 550 U.S. 516, 127 S.Ct. 1994, 1996 (2007).

A.    **The IEP**

26.    "The primary vehicle for implementing these congressional goals is the 'individualized educational program' (IEP), which [IDEA] mandates for each disabled child. Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child, the IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig*, 484 U.S. at 311.

27.    Procedures used to develop an IEP must be strictly reviewed.  *DB ex rel. HB v. Gloucester Tp. School Dist.*, 751 F. Supp. 2d 764, 771 (D.N.J. 2010).

*i.    Evaluations of Disabilities*

28.    A LEA has a continuing duty under IDEA to assess a student in "all areas of suspected disability."  20 U.S.C. §§1414(a)(1)(A) and (b)(3)(B) ("Each local educational agency shall ensure that . . . the child is assessed in all areas of suspected disability");  *see* 34 C.F.R. §300.304(c)(4) ("The child is assessed in all

areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities"); and 34 C.F.R. §300.304(c)(6) ("In evaluating each child with a disability . . . the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified.")  This is known as the "Child Find" obligation or obligation to evaluate.

29.    The evaluation procedures under IDEA have very stringent requirements and methodologies.  20 U.S.C. §§1414(b)(2) and (3).

30.    Evaluations are not simply the opinions of members of the IEP Team or school staff, but rather a scientific testing methodology as described in IDEA that includes "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent . . . [and the] use technically sound instruments."  20 U.S.C. §1414(b)(2).

31.    A teacher "assessment" or "screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services."  34 C.F.R. §300.302.

32.    A LEA's failure to comply with its obligation to evaluate may constitute a procedural violation of IDEA.  *DK v. Abington School Dist.*, 696 F.3d 233, 249 (3rd Cir. 2012).

33.    A parent of a child with a disability has the right to an Independent Educational Evaluation ("IEE") at public expense if the parent disagrees with an evaluation obtained by the public agency.  34 C.F.R. §300.502(b)(1).

### ii.    *Procedural Safeguards / Due Process Rights in the IEP Process*

34.    IDEA guarantees parents and their child with a disability numerous due process legal rights identified as "Procedural Safeguards".  *See* 20 U.S.C. §1415.

35.    SEAs and LEAs are required to "establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies."  20 U.S.C. §1415(a) (emphasis added.)

36.    SEAs, such as NJDOE, "must have in effect the policies and procedures, including sanctions that the State uses, to ensure that its policies and procedures [IDEA's regulations] are followed and that the requirements of the Act and the regulations in this part are met."  34 C.F.R. §300.626.

37.     LEAs, such as MTBOE, "must have in effect policies, procedures, and programs that are consistent with the State policies and procedures."  34 C.F.R. §300.201.

### iii.    Parents' Rights to Review Their Child's Records

38.     Another IDEA Procedural Safeguard is that parents of a child with a disability <u>shall</u> be given an "opportunity . . . to examine all records relating to such child."  20 U.S.C. §1415(b)(1).

39.     A LEA shall comply with the parents' right to examine records "without unnecessary delay" and prior to a Due Process hearing and "in no case more than 45 days after the request has been made."  34 C.F.R. §300.613(a).

### iv.    Development of the IEP

40.     An IEP must include "a statement of measurable annual goals, including academic and functional goals" and "<u>a description of how the child's progress toward meeting the annual goals . . . will be measured</u> and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided."  20 U.S.C. §1414(d)(1)(A)(i) (emphasis added).

41.     "In developing each child's IEP, the IEP Team must consider the strengths of the child; <u>the concerns of the parents</u> for enhancing the education of

their child;  the results of the initial or most recent evaluation of the child; and the

academic, developmental, and functional needs of the child."  20 U.S.C.

§1414(d)(3)(A) (emphasis added).

42.    Decisions regarding a child's IEP "is not limited to information about

the child's academic performance."  FAPE must be provided to any eligible child

with a disability, "even though the child has not failed or been retained in a course

or grade, and is advancing from grade to grade."  *U.S. Dept. of Education, Office of*

*Special Education and Rehabilitative Services, Letter to Clarke, Mar. 8, 2007.*

43.    A school district must periodically review a child's IEP, "but not less

than annually, to determine whether the annual goals for the child are being

achieved" and revise the IEP appropriately "to address any lack of expected

progress toward the annual goals . . . and in the general education curriculum, if

appropriate; the results of any reevaluation; information about the child provided

to, or by, the parents; the child's anticipated needs; or other matters."  20 U.S.C.

§1414(d)(4)(A) (emphasis added).

### *v.    Parental Participation*

44.    The parents of a child with a disability are mandatory members of the

IEP Team.  20 U.S.C. §1414(d)(1)(B)(i).

45.    "Envisioning the IEP as the centerpiece of the statute's education

delivery system for disabled children, and aware that schools had all too often

denied such children appropriate educations without in any way consulting their parents, Congress repeatedly emphasized throughout the Act the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig*, 484 U.S. at 311.

46.    Indeed, "the concerns of the parents for enhancing the education of their child" is critical in developing the child's IEP.  20 U.S.C. §1414(d)(3)(A)(ii); *see also Honig*, 484 U.S. at 311-12 ("various procedural safeguards that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate."); *Schaffer v. Weast*, 546 U.S. 49, 53, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005) (Parents play "a significant role" in the development of each child's IEP.)

47.    Parental participation is so vital, it is set forth twice in the IDEA regulations.  34 C.F.R. §§300.322 and 300.501.

48.    "The procedural requirements of the IDEA are essential to the fulfillment of its purposes. The Supreme Court has noted that it is 'no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process ... as it did upon the measurement of the resulting IEP against a substantive standard.'" *DB ex rel. HB v. Gloucester Tp.*

*School Dist.*, 751 F. Supp. 2d 764, 770 (D.N.J. 2010) *citing Hendrick Hudson Dist.*

*Bd. of Ed. v. Rowley*, 458 U.S. 176, 205-206, 102 S.Ct. 3034 (1982).

###### vi.    *Prior Written Notice*

49.    If a LEA proposes to change or refuses to change any aspect of the

identification, evaluation, or educational placement of the child, or the provision of

a free appropriate public education to the child, it must provide prior written notice

to the parents of the child.  20 U.S.C. §1415(b)(3).  This is known as "Prior

Written Notice or PWN".

50.    The PWN must contain *inter alia* "a description of the action

proposed or refused by the agency; an explanation of why the agency proposes or

refuses to take the action and a description of each evaluation procedure,

assessment, record, or report the agency used as a basis for the proposed or refused

action; . . . a description of other options considered by the IEP Team and the

reason why those options were rejected; and a description of the factors that are

relevant to the agency's proposal or refusal."  20 U.S.C. §1415(c)(1).

**B.**    **Parents' Due Process Rights in an Administrative Hearing**

51.    One of IDEA's key Procedural Safeguards guaranteed is "[a]n

opportunity for any party to present a complaint with respect to any matter relating

to the identification, evaluation, or educational placement of the child, or the

provision of a free appropriate public education to such child."  20 U.S.C.

§1415(b)(6) ("due process complaint").

        **i.**    ***Stay Put Rule aka Pendent Placement***

      52.    Under IDEA, students with disabilities are permitted to remain in their

current educational placement (a/k/a "pendent placement") throughout and until

completion of a dispute filed via a due process complaint.  20 U.S.C. §1415(j)

("during the pendency of any proceedings conducted pursuant to this section,

unless the State or local educational agency and the parents otherwise agree, the

child shall remain in the then-current educational placement of the child . . . until

all such proceedings have been completed.")  This is commonly known as the

'Stay Put' rule.

      53.    The Third Circuit has stated, "This provision, known as the IDEA's

'stay-put rule,' serves 'in essence, as an automatic preliminary injunction.'" *M.R. v.*

*Ridley School Dist.*, 744 F. 3rd 112, 117 (3rd Cir. 2014) *cert. denied*, No. 13-1547,

2015 WL 2340858 (S.Ct. May 18, 2015), *citing Drinker by Drinker v. Colonial*

*School Dist.*, 78 F. 3rd 859, 864 (3rd Cir. 1996).

      54.    The 'Stay Put' rule reflects Congress's conclusion that a child with a

disability is best served by maintaining her educational status quo until the

disagreement over her IEP is resolved.  *M.R.*, 744 F. 3rd at 117.

55.    After ascertaining a student's current educational placement, the parents are entitled to an order maintaining that placement without satisfaction of the usual prerequisites to injunctive relief. *M.R.*, 744 F. 3rd at 118 (emphasis added.)

56.    "The operative placement is not determined by the date the parents seek reimbursement for stay-put expenses, but by the date the dispute between the parents and the school district 'first arises' and proceedings conducted pursuant to the IDEA begin," *M.R.*, 744 F. 3rd at 124, *i.e.* the filing of a due process complaint. *See D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 492 (3rd Cir. 2012) ("By filing the [due process] petition, [the student] triggered the IDEA's 'stay-put' requirement.").

57.    "§1415(j) states that the child shall remain in the current educational placement until all [IDEA] proceedings have been completed." *M.R.*, 744 F. 3rd at 124.

### ii.    *30 Day Resolution Period*

58.    From the date of filing the due process complaint, the parties have thirty (30) days within which to settle or otherwise resolve the dispute.  20 U.S.C. §1415(f)(1)(B)(ii).  This is known as the "30 Day Resolution Period".

59.    "Day" within the meaning of IDEA is a calendar day and does not exclude weekends or holidays.  34 C.F.R. §300.11(a).

60.   IDEA provides three options for the parties during the 30 Day Resolution Period, namely, mediation, 20 U.S.C. §1415(e); a resolution meeting, 20 U.S.C. §1415(f)(1)(B); or a waiver of both, 20 U.S.C. §1415(f)(1)(B)(i)(IV); *see also* 34 C.F.R. §300.510(a).

61.   If the case is not resolved during the 30 Day Resolution Period, it proceeds to a hearing.  20 U.S.C. §1415(f)(1)(B)(ii).

### iii.   The 45 Day Rule

62.   After termination of the 30 Day Resolution Period, a final decision must be rendered in the due process case within forty-five (45) days.  34 C.F.R. §300.515(a) ("The public agency <u>must ensure that not later than 45 days</u> after the expiration of the 30 day period . . . A final decision is reached in the hearing;" emphasis added.)  This is commonly referred to as the "45 Day Rule".

63.   The timeline for the 45 Day Rule begins at the expiration of the 30 Day Resolution Period.  34 C.F.R. §§300.510(b)(2) and (c).

### iv.   The Adjournment Rule

64.   A hearing officer may grant specific adjournments beyond the 45 days "at the <u>request of either party</u>."  34 C.F.R. §300.515(c) (emphasis added.)

65.   There is no statutory or regulatory authority permitting a hearing officer to *sua sponte* grant an adjournment. *See* 34 C.F.R. §300.515(c).

### v.   The Evidence Rules

66.    Parents in a special education due process hearing have a right to "[p]resent evidence and confront, cross-examine, and compel the attendance of witnesses."  34 C.F.R. §300.512(a)(2).

67.    If parents obtain an IEE at their own expense and share the results with the LEA, the IEE report "[m]ay be presented by any party as evidence at a hearing on a due process complaint . . . regarding that child."  34 C.F.R. §300.502(c)(2).

### vi.    *The Five-Day Exchange Rule*

68.    The parties to a special education due process hearing must exchange and disclose documents and a list of witnesses and their anticipated testimony that each party intends to introduce at the hearing "not less than <u>5 business days prior to a hearing.</u>" 20 U.S.C. §1415(f)(2)(A) (emphasis added); 34 C.F.R. §300.512(b)(1). This is known as the "Five-Day Exchange Rule".

69.    "Business Day" is defined as "Monday through Friday, except for Federal and State holidays."  34 C.F.R. §300.11(b).

70.    Failure to comply with the Five-Day Exchange Rule carries serious consequences.  "A hearing officer may bar any party that fails to comply with [the Five-Day Exchange Rule] from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party."  20 U.S.C. §1415(f)(2)(B); 34 C.F.R. §300.512(b)(2).  "Any party to a [due process IDEA]

hearing . . . has the right to [p]rohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five business days before the hearing." 34 C.F.R. §300.512(a)(3) (emphasis added.)

### vii.    Requirements of Due Process Hearing Officers

71.    A hearing officer conducting a special education due process hearing "shall, at a minimum not be (I) an employee of the State educational agency or the local educational agency involved in the education or care of the child; or (II) a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. §1415(f)(3)(A)(i).

72.    In addition, a special education due process hearing officer "shall, at a minimum possess knowledge of, and the ability to understand, the provisions of this chapter, Federal and State regulations pertaining to this chapter, and legal interpretations of this chapter by Federal and State courts; possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice; and possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice." 20 U.S.C. §§1415(f)(3)(A)(ii) – (iv).

### viii.    Administrative Decisions and Remedies

73.    For allegations of substantive denials of FAPE, "a decision made by a hearing officer shall be made on substantive grounds based on a determination of

whether the child received a free appropriate public education." 20 U.S.C.

§1415(f)(3)(E)(i).  This applies the *Endrew F* standard.

74.    "In matters alleging a procedural violation, a hearing officer may find

that a child did not receive a free appropriate public education only if the

procedural inadequacies (1) impeded the child's right to a FAPE; (2) significantly

impeded the parents' opportunity to participate in the decision-making process

regarding the provision of FAPE to the child; or (3) caused a deprivation of

educational benefits." 20 U.S.C. §1415(f)(3)(E)(ii); *see also G.N. ex rel. J.N. v. Bd.

of Educ.*, 309 Fed.Appx. 542, 545-546 (3ʳᵈ Cir. 2009).

75.    When there is a finding of denial of FAPE, a hearing officer or court

"shall grant such relief as the court determines is appropriate."  20 U.S.C.

§1415(i)(2)(C)(iii).

76.    IDEA is a fee-shifting statute, whereby if parents are prevailing

parties (at any stage of the dispute) "the court, in its discretion, may award

reasonable attorneys' fees as part of the costs" in their favor.  20 U.S.C.

§1415(i)(3)(B)(i).

77.    If a court finds that the SEA or LEA unreasonably protracted the final

resolution of the special education due process case or violated IDEA's procedural

safeguards, the court may not reduce the attorney's fee award under IDEA.  20

U.S.C. §1415(i)(3)(G).

78.    "Any party aggrieved by the findings and decision made [in a due process hearing] shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy."  20 U.S.C. §1415(i)(2)(A).

## NEW JERSEY'S REGULATORY SCHEME FOR SPECIAL EDUCATION DISPUTES

79.    New Jersey has established a regulatory scheme for implementing IDEA and its procedural requirements.  *See* N.J.A.C. §§6A:14 *et seq.* and 1:6A *et seq.*

80.    The New Jersey regulations on Special Education were established to comply with the federal IDEA.  N.J.A.C. §§6A:14-1.1 *et seq.*

81.    "Since these rules are established in implementation of Federal law, they may not be relaxed except as specifically provided herein or pursuant to Federal law." N.J.A.C. §1:6A-1.1(c) (emphasis added.)

82.    The rules governing contested special education due process hearings were established to comply with IDEA.  If any of the rules in the New Jersey regulatory scheme conflict with Federal requirements, "the Federal requirements shall apply."  N.J.A.C. §1:6A-1.1(b).  This is known as the "Federal Preemption Doctrine" pursuant to the Supremacy Clause of the U.S. Constitution.  *See* U.S. Constitution, Article VI, Clause 2 (federal law "shall be the supreme law of the

land; and the judges in every state shall be bound thereby, anything in the

Constitution or laws of any State to the contrary notwithstanding.")

**A.    Evaluations / IEEs**

83.     New Jersey has promulgated regulations that deal with evaluations of

students with suspected or known disabilities.  *See* N.J.A.C. §§6A:14-2.5 and 3.4.

84.     The regulations to some extent expand the IDEA regulations on

evaluations.  For example, New Jersey requires, *inter alia*, that "each district board

of education shall [u]se a variety of assessment tools and strategies to gather

relevant functional and developmental information . . . [n]ot use any single

procedure as the sole criterion for determining whether a student is a student with a

disability or determining an appropriate educational program for the student; and

[u]se technically sound instruments that may assess the relative contribution of

cognitive and behavioral factors, in addition to physical or developmental factors,"

N.J.A.C. §6A:14-2.5(a); that the evaluation procedures are fair and

nondiscriminatory, N.J.A.C. §6A:14-2.5(b)(1); that standardized tests are properly

validated and administered according to protocols, N.J.A.C. §6A:14-2.5(b)(2); that

"[t]he student is assessed in all areas of suspected disability," N.J.A.C. §6A:14-

2.5(b)(3); that "[t]ests are selected, administered and interpreted so that when a

student has <u>sensory</u>, manual or <u>communication impairments</u>, the results <u>accurately</u>

<u>reflect the ability which that procedure purports to measure, rather than the</u>

impairment unless that is the intended purpose of the testing," N.J.A.C. §6A:14-2.5(b)(5); "[t]he evaluation is conducted by . . . other specialists who shall conduct the evaluation in accordance with the procedures in N.J.A.C. 6A:14-3. A minimum of one evaluator shall be knowledgeable in the area of the suspected disability," N.J.A.C. §6A:14-2.5(b)(6); and, "the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the suspected eligibility category," N.J.A.C. §6A:14-2.5(b)(7).

85.    "Upon completion of an initial evaluation or reevaluation, a parent may request an independent evaluation if there is disagreement with the initial evaluation or a reevaluation provided by a district board of education. A parent shall be entitled to only one independent evaluation at public expense each time the district board of education conducts an initial evaluation or reevaluation with which the parent disagrees. The request for an independent evaluation shall specify the assessment(s) the parent is seeking as part of the independent evaluation request." N.J.A.C. §6A:14-2.5(c).

86.    "Such independent evaluation(s) shall be provided at no cost to the parent unless the school district initiates a due process hearing to show that its evaluation is appropriate and a final determination to that effect is made following the hearing." N.J.A.C. §6A:14-2.5(c)(1) (emphasis added.)

87.    An ALJ may also order an IEE "[f]or good cause and after giving the parties an opportunity to be heard."  N.J.A.C. §1:6A-14.4(a).

**B.    Parents' Due Process Rights in a NJ Administrative Hearing**

88.    Special education Procedural Safeguards fall under N.J.A.C. §6A:14-2 *et seq.*, including due process hearings.  N.J.A.C. §6A:14-2.7.

89.    NJDOE is responsible for monitoring "all programs and services required by this chapter for compliance with New Jersey statutes, the New Jersey Administrative Code, the approved special education plan and Federal requirements under the Individuals with Disabilities Education Act (IDEA)."  N.J.A.C. §6A:14-9.1(a).

90.    NJDOE is also responsible for enforcing compliance with the regulations.  N.J.A.C. §§6A:14-9.1(d) - (h) and 14-9.2.

91.    "The rules in this chapter shall apply to the notice and hearing of matters arising out of the Special Education Program of the Department of Education, pursuant to N.J.A.C. 6A:14."  N.J.A.C. §1:6A-1.1(a).

*i.    Parents' Rights to Review Their Child's Records*

92.    New Jersey also requires that "All student records shall be maintained according to N.J.A.C. 6A:32" and that parents, the adult student, or a duly appointed representative "shall be permitted to inspect and review the contents of the student's records maintained by the district board of education under N.J.A.C.

6A:32 without unnecessary delay and before any meeting regarding the IEP."

N.J.A.C. §6A:14-2.9.

### ii.   Pleadings

93.    In New Jersey, a special education due process hearing may be requested when there is a dispute "regarding identification, evaluation, reevaluation, classification, educational placement, the provision of a free, appropriate public education, or disciplinary action."  N.J.A.C. §6A:14-2.7(a).

94.     A due process hearing is initiated when a person files a written complaint with NJOSEP.  N.J.A.C. §6A:14-2.7(c).

95.    In general, the party against whom the complaint is filed must file an answer within 10 days.  N.J.A.C. §§6A:14-2.7(d) and (e).

### iii.   Stay Put Rule

96.    The New Jersey regulations do not contain a rule regarding pendent placement a/k/a the 'Stay Put' rule.

### iv.   30 Day Resolution Period

97.    The New Jersey regulations also provide for the 30 Day Resolution Period.  N.J.A.C. §§6A:14-2.6(d)(3) and 2.7(h).

98.    If the due process complaint is not resolved within 30 days, NJDOE transmits the case to OAL.  N.J.A.C. §§6A:14-2.7(h)(4) and 1:6A-3.1 ("Upon unsuccessful conclusion of the resolution process or mediation, as provided in

N.J.A.C. 6A:14-2.7, the Office of Special Education Programs shall immediately transmit the matter with the transmittal form to the Office of Administrative Law.")

### v.    *The 10 Day Peremptory Hearing Date*

99.    "Upon unsuccessful conclusion of the resolution process or mediation, as provided in N.J.A.C. 6A:14-2.7, the representative of the Office of Special Education Programs shall immediately contact the Clerk of the Office of Administrative Law and <u>the Clerk shall assign a peremptory hearing date</u>. <u>The hearing date</u> shall, to the greatest extent possible, be convenient to all parties but <u>shall be approximately 10 days from the date of the scheduling call</u>."  N.J.A.C. §1:6A-3.1 (emphasis added.)  This is known as the "10 Day Peremptory Hearing Date".

100.    "Peremptory" is not defined in the New Jersey regulations, but Black's Law Dictionary defines "peremptory" as: "Imperative; absolute; not admitting of question, delay, or reconsideration. Positive; final; decisive; not admitting of any alternative. Self-determined ; arbitrary; not requiring any cause to be shown."[2]

### vi.    *The 45 Day Rule*

---

[2] https://thelawdictionary.org/peremptory/.

101.   Once the case is transmitted to OAL, "A final decision shall be rendered by the administrative law judge not later than 45 calendar days after the conclusion of the resolution period . . . unless specific adjournments are granted by the administrative law judge in <u>response to requests by either party to the dispute</u>." N.J.A.C. §6A:14-2.7(j) (emphasis added.)  This is known as the "Adjournment Rule".

102.   The 45 day period begins to run at the expiration of the 30-day resolution period.  N.J.A.C. §6A:14-2.7(j)(1).

103.   The reason for the 30 Day Resolution Period, the 10 Day Peremptory Hearing Date, the Five-Day Exchange Rule, and informal discovery is to ensure compliance with the 45 Day Rule.

### vii.   *Discovery*

104.   There is no formal discovery in due process cases.  "Discovery shall, to the greatest extent possible, consist of the informal exchange of questions and answers and other information.  <u>Discovery may not include requests for formal interrogatories, formal admissions or depositions</u>." N.J.A.C. §1:6A-10.1(d) (emphasis added.)

### viii.    *The Five-Day Exchange Rule*

105.    New Jersey has adopted the Five-Day Exchange Rule.  N.J.A.C.

§1:6A-10.1 (including "documentary evidence and summaries of testimony

intended to be introduced at the hearing.")

106.    The New Jersey regulations empower the OAL and ALJs to bar

evidence when there is a violation of the Five-Day Exchange Rule.  "Upon

application of a party, the judge shall exclude any evidence at hearing that has not

been disclosed to that party at least five business days before the hearing."

N.J.A.C. §1:6A-10.1(c) (emphasis added.)

### ix.    *The Burden of Proof*

107.    In special education due process cases, LEAs / school districts bear

the burden of proof and the burden of production.  N.J.S.A. §18A:46-1.1.

### x.    *Requirements of Due Process Hearing Officers*

108.    "A due process hearing is an administrative hearing conducted by an

administrative law judge."  N.J.A.C. §6A:14-2.7(a).

109.    An ALJ is defined as ""a person appointed pursuant to N.J.S.A.

52:14F-4 [appointment, salary, retirement] or N.J.S.A. 52:14F-5(m) [temporary or

emergency appointment] and assigned by the Director of the Office of

Administrative Law to preside over contested cases and other proceedings."

N.J.A.C. §1:1-2.1.

110.   The only qualifications specified in the New Jersey statutes are that ALJs, appointed after 1981, must be "attorneys-at-law of [New Jersey] for a minimum of five years" and "qualified in the field of administrative law or in a subject matter relating to the hearing functions of a State agency."  N.J.S.A. §§52:14F-5(l) and (m).

### xi.   *Administrative Decisions and Remedies*

111.   "The decision made by an administrative law judge in a due process hearing shall be made on substantive grounds based on a determination of whether the child received a free, appropriate public education (FAPE)."  N.J.A.C. §6A:14-2.7(k).

112.   If a due process complaint alleges procedural violations, the ALJ may find a denial of FAPE only if the violations: "(1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or (3) caused a deprivation of educational benefits." N.J.A.C. §6A:14-2.7(k).

113.   "The decision of the administrative law judge is final, binding on both parties and to be underlined implemented without undue delay unless stayed according to N.J.A.C. 1:6A."  N.J.A.C. §6A:14-2.7(l).

114.   "Any party may appeal the decision of an administrative law judge in a due process hearing."  N.J.A.C. §6A:14-2.7(v).

## ABOUT NJDOE

115.   States can receive federal funding for special education "if the State submits a plan that provides assurances to the [U.S. Secretary of Education] that the State has in effect policies and procedures <u>to ensure that the State meets each of the following conditions</u>:  Free Appropriate Public Education ("FAPE") is available to all children with disabilities residing in the State between the ages of 3 and 21 . . . Children with disabilities and their <u>parents are afforded the procedural safeguards</u> required by section 1415 of this title" among other rights.  20 U.S.C. §1412(a)(6)(A) (emphasis added.)

116.   Upon information and belief, NJDOE submitted a plan to the United States Secretary of Education ensuring that it has procedural safeguards in place for children with disabilities in the State of New Jersey.

117.   Between the Fiscal Years 2005 and 2020 NJDOE received in excess of $173 billion from the USDOE for IDEA funding, and therefore must comply with the statute's provisions.  (True and correct copies of USDOE funding letters to NJDOE from 2005 to 2020, except 2013, are attached hereto as Group Exhibit A.)

118.   NJDOE is responsible for general supervision of the entire special education system – including the OAL, ALJs, and LEAs / school districts – within the State of New Jersey.  20 U.S.C. 1412(a)(11) ("The State educational agency is

responsible for ensuring that the requirements of [IDEA] are met . . . including all such programs administered by any other State agency or local agency"); 34 C.F.R. §300.500 ("Each SEA must ensure that each <u>public agency</u> establishes, maintains, and implements procedural safeguards that meet the requirements" of the regulations.")

119.   Ensuring compliance with IDEA is accomplished via an interagency agreement or other mechanism for interagency coordination.  "The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency [the OAL] . . . and the State educational agency [NJDOE], in order to ensure that all services described [below] that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute."  20 U.S.C. 1412(a)(12)(A).

120.   An interagency relationship for ensuring compliance may be met through State statute or regulation; signed agreements between respective agency officials that clearly identify the responsibilities of each agency relating to the provision of services; or other appropriate written methods as determined by the Chief Executive Officer of the State or designee of the officer and approved by the Secretary."  20 U.S.C. 1412(a)(12)(C).

121.  Congress abrogated state sovereign immunity "from suit in Federal court for a violation of [IDEA]."  20 U.S.C. §1403(a).

122.  "In a suit against a State for a violation of [IDEA], remedies (including remedies both at law and in equity) are available for such a violation to the same extent as those remedies are available for such a violation in the suit against any public entity other than a State."  20 U.S.C. §1403(b).

## ABOUT THE OAL

123.  OAL "was established in 1979 to create a central independent agency to conduct administrative hearings, thus promoting due process, expediting the just conclusion of contested cases, and improving the quality of administrative justice." (From the OAL website, https://www.nj.gov/oal/, as of May 3, 2018[3].)

124.  "OAL is an Executive Branch agency."  (OAL website.)

125.  "OAL employs a corps of administrative law judges ('ALJ') who hear contested cases for state agencies and issue initial decisions."  (OAL website.)

126.  NJDOE has designated OAL as the agency to conduct the administrative hearing for special education disputes.  N.J.A.C. §6A:14-2.7.

127.  An interagency agreement, called the "Memorandum of Understanding between the Office of Administrative Law and the Office of Special

---

[3] Hereinafter, "OAL website".

Education Programs (MOU)", is executed every year between NJDOE and the OAL to institute such relationship.  The MOU provides that it is executed "to ensure that cases transmitted to the [OAL] by the Office of Special Education Programs (OSEP) are heard within the timeframe mandated by the [IDEA]," *i.e.* the 45 Day Rule.

128.   NJDOE designated $150,000 in each of the years 2016, 2017, and 2018 to the OAL from the federal funds to manage due process cases and in 2020 provided $1 million to ensure compliance with IDEA.  (True and correct copies of the MOUs are attached hereto as Group Exhibit B.)

129.   NJDOE has acknowledged that it shares responsibility for compliance with the OAL.  (A true and correct copy of the NJDOE presentation "New Jersey's Special Education Dispute Resolution System" is attached hereto as Exhibit C; *see* p. NJDOE008614 "New Jersey's System Involves Two State Agencies", including the OAL.)

130.   OAL hears cases for most state agencies, including special education due process cases for the NJDOE.  Thus, OAL has a substantial docket covering most of the New Jersey executive branch agencies.  OAL is not dedicated solely to handling cases arising under IDEA or other similar statutes which provide legal rights to children with disabilities and their families.

131.    OAL, either in conjunction with NJDOE or on its own volition, instituted a program in approximately 2015 whereby a "pre-hearing" date was scheduled shortly after transmission of a special education due process case from NJDOE.  The "pre-hearing" is conducted as a settlement conference[4] with an ALJ presiding and the parties present, but designated as a "hearing date" within OAL's docketing system.

132.    When NJOSEP transmits a due process case to the OAL, it issues a standard form "Hearing Notice" with a date set which contains the following language:

a.    "Parents and Guardians have a right to examine relevant school records relating to their child. If you have not seen those records, contact the Board of Education immediately.";

b.    "All evidence including documents and summaries of expected testimony that either party intends to use at the hearing must be disclosed to the other party at least 5 days before the hearing. If you do not comply with this requirement, you may be prevented from presenting the evidence at the hearing.";

c.    "A judge will decide the case based only on what is presented at the hearing. If you would like the judge to consider any papers, you must have them at the hearing. If you want any witnesses to testify, you must arrange for their attendance at the hearing. If you are not sure that they will attend the hearing, you should serve them with a

---

[4] Indeed, this practice violates the New Jersey Administrative Code as the Special Education Program Rules do not authorize ALJs to conduct settlement conferences.  *See* N.J.A.C. §1:6A-4.1(a) ("The scheduling of a hearing shall not preclude voluntary ongoing efforts by the parties to settle the matter before or at the hearing"; emphasis added.)

subpoena and the appropriate fee. This should occur within a reasonable time before the hearing, and if possible, at least three days before the hearing.";

d.  "Legal briefs and other memoranda or argument cannot be submitted after the hearing. <u>You should be prepared to offer these submissions at the hearing</u> with the final argument.";

e.  "<u>If you do not attend the hearing, the judge may dismiss your case</u> or order that an action requested by the other side be granted."; and

f.  "The procedure for this hearing is fully set out in the Uniform Administrative Procedure rules . . . ."

(A true and correct copy of NJDOE's form "Notice of Due Process Hearing Transmittal To The Office of Administrative Law" is attached hereto as Exhibit D; emphasis added.)

133.  This OAL practice of using the initial hearing date as a settlement conference occurs on Thursdays, alternating between the Newark and Mercerville (Trenton) OAL locations, and is commonly referred to as "Settlement Thursday" by the OAL and school district bar.[5]  Every Thursday on the OAL calendar is blocked off as unavailable for a hearing date because nearly every ALJ is conducting "Settlement Thursday".

---

[5] There are law firms and counsel that regularly represent a majority of the school districts in the State of New Jersey and will be referred to as the "school district bar".

134.   "Settlement Thursday" was begun to enable OAL to distort the timeline and to cover up its historic violations of the 45 Day Rule and fraudulently assert that the delays to final decision were the result of adjournments requested by the parties and/or granted by the ALJ.

135.   If parties to a special education due process case do not settle the case during "Settlement Thursday", the OAL assigns the case to a new ALJ[6] who will conduct the hearing.  The newly-assigned ALJ will set an initial status conference for the case during which the ALJ will schedule the actual hearing dates.  Those hearing dates are based on the OAL calendar and the available dates on that individual ALJ's calendar.  The hearing dates are almost universally beyond the deadline of the 45 Day Rule.

136.   "Settlement Thursday" violates the New Jersey Code of Judicial Conduct which discourages judges from acting as mediators.  *See* CJC Canons 3(C)(1) and 4(A) (a "judge should not act as an arbitrator or mediator or otherwise perform judicial functions apart from the judge's official duties unless expressly authorized by law.")

---

[6] The "Settlement Thursday" practice precludes the "settlement ALJ" from presiding over the hearing because they have now been privy to settlement negotiations, including possible admissions against interest, of the parties.

137.    Rarely, if ever, can an ALJ schedule a hearing for two or more consecutive days due to the OAL and Doe ALJs' calendars, especially because of "Settlement Thursday".  Typically, special education hearing dates are spread out, non-consecutively, over two or more months because of calendar issues and other responsibilities of Doe ALJs.  In most cases, hearing dates are scheduled five (5) or more months out from the pre-hearing date.

138.    NJDOE has admitted that an "area to consider under current system" of due process cases in New Jersey is that there are "non-consecutive hearing days – it can be months in between hearing days."  (Exh. C, NJDOE008638; emphasis added.)

139.    Doe ALJs and the OAL are unable to grant brief adjournments, *e.g.* illness of a party or witness, death in the family, or scheduling conflict of a party, because of the OAL system and Settlement Thursday.  Most adjournments are typically for several weeks or months because of the individual ALJ's or the OAL's schedule.

140.    NJDOE has admitted that another "area to consider under current system" of due process cases in New Jersey is that "adjournments are granted summarily" (Exh. C, NJDOE008638) regardless of who makes the request or the reason therefor.

141.   NJDOE has illegally limited the jurisdiction of the OAL.  "[T]he OAL is part of the executive, not the judicial, branch and the OAL is not a "court' within the intent of . . . the IDEA. ALJs are executive branch judges." *D.T. o/b/o L.T. v. Willingboro Township Board of Education, et al.*, OAL Dkt. Nos. EDS9218-14, EDS9219-14, EDS11302-14, EDS12445-14 (ALJ Robert Bingham II Decision Oct. 27, 2014).  The "OAL does not have jurisdiction to determine who is a prevailing party, for purposes of a party's intent to seek attorney's fees [under IDEA] later in a Federal District Court." *Id.*  There is no basis for this jurisdictional limitation in either IDEA or the New Jersey Administrative Code. Indeed, the Third Circuit has suggested that ALJs do have the authority to rule on prevailing party status and attorney's fees. *S.D. v. Haddon Heights Bd. of Educ.*, U.S.C.A. 3rd Circuit No. 15-1804 (January 31, 2018) [Not Precedential] (attorney's fees are appropriate forms of relief that an IDEA hearing officer may award, *citing Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, F.3d 176, 185 (3rd Cir. 2009).)

142.   Another problem caused by "Settlement Thursday" and the jurisdictional limitation on the OAL is it disincentivizes school districts from resolving cases during the 30 Day Resolution Period.  School districts will rarely, if ever, offer attorney's fees and costs as part of a settlement during the 30 Day Resolution Period or even at a "Settlement Thursday" because they know that

ALJs will not (and cannot) compel them, even though the Third Circuit has stated that a settlement offer that excludes attorney's fees and costs in a special education case may properly be rejected by parents. *See Rena C. v. Colonial School Dist.*, 890 F. 3d 404, 420 (3rd Cir. 2018) (Held, "a parent is substantially justified in rejecting [a settlement] offer that does not include the payment of reasonable attorney's fees when the school district cannot reasonably believe that no attorney's fees have accrued.")

143.   Upon information and belief, ALJs do not receive and NJDOE or the OAL provides adequate training or instruction on IDEA or its regulations or the New Jersey regulations, specifically the rigors of the 10 Day Peremptory Hearing Date, the Five-Day Exchange Rule, and the 45 Day Rule, and therefore do not meet IDEA's requirements for hearing officers.

144.   In addition, ALJs do not manage their cases properly.  Upon information and belief, they permit discovery and duplicative and irrelevant evidence to be submitted at the hearing.  NJDOE has admitted that another "area to consider under current system" of due process cases in New Jersey is that there are "unlimited number of witnesses/unlimited amount of testimony – often not relevant.  Unwieldy amounts of exhibits – often not relevant."  (Exh. C, NJDOE008638.)

145.   Parents must wait until their OAL case has been exhausted before they can pursue other forms of relief, including attorney's fees, or appeal an ALJ decision under the NJDOE system.  This typically means that parents may not be able to appeal an administrative decision for more than a year.  Strict adherence to the timelines is critical to the legal rights of the parties.

## THE PRACTICAL EFFECTS OF NJDOE'S APPOINTMENT OF THE OAL AS ARBITERS OF SPECIAL EDUCATION DISPUTES

146.   In 2016, the New Jersey Special Education Practitioners ("NJSEP")[7] created a task force to study the State of New Jersey's compliance with the 45 Day Rule.  The study was extensive and reviewed NJDOE's own statistics on special education cases and their timelines.  The final report was submitted to New Jersey Governor Phil Murphy with copies to then-Commissioner of Education Lamont Repollet ("Repollet"); then-Acting OAL Director and Chief ALJ Lisa James-Beavers ("Beavers"); and, John Worthington, then-Director of NJOSEP; among others, on March 21, 2018 ("45 Day Report").  (A true and correct copy of the 45 Day Report is attached hereto as Exhibit E.)

147.   The NJSEP 45 Day Report found that, despite the federal and state law requirements that special education cases brought pursuant to IDEA should be

---

[7] NJSEP consists of more than one hundred (100) attorneys and professional advocates in the State of New Jersey who represent exclusively children with disabilities and their parents in special education disputes.

decided within 45 days after the 30-day resolution period and transmittal to the

OAL, <u>on average</u> such cases took **three hundred twelve (312) days**[8] to be

adjudicated. (Exh. E, p. 10.)

148.    The 45 Day Report found New Jersey was noncompliant with the 45

Day Rule dating back to 2011.  NJSEP called upon those with authority - Governor

Murphy, the NJDOE, then-Commissioner Repollet, and then-Acting OAL Director

Beavers, to take immediate action to rectify noncompliance.  (Exh. E, p. 15, *fn.*

37.)

149.    In addition, the 45 Day Report findings disclosed that overall school

districts in New Jersey prevailed in 70% of the special education due process cases

before the OAL.  In cases where parents appeared *pro se*, the school districts

prevailed in 93% of the decisions.  (Exh. E, p. 5, *fn.* 13.)

150.    Concerns about NJDOE's and OAL's compliance with the 45 Day

Rule were communicated to the USDOE via letters in 2017 and the USDOE sent

an inquiry to NJDOE about the concerns.  (True and correct copies of the letters

are attached hereto as Group Exhibit F.)

151.    By letter dated November 1, 2017, John Worthington, then-Director

of NJOSEP, responded to the USDOE inquiries and argued that NJDOE was in

---

[8] This number reflects cases that did not seek emergent relief or were not filed as
expedited due process matters.

compliance with the 45 Day Rule and blamed any delays on the parties seeking

adjournments.  (A true and correct copy of the 11/1/17 letter is attached hereto as

Exhibit G.)

152.   On May 6, 2019, after an investigation conducted by the United States

Department of Education Office of Special Education and Rehabilitative Services

("OSERS"), Laurie VanderPloeg, the U.S. Director of the Office of Special

Education Programs ("USOSEP") issued a letter to Repollet finding that the

NJDOE was noncompliant on the 45 Day Rule.  Specifically, USOSEP found that

NJDOE improperly used a system of "Federal days" instead of calendar days to

calculate the 45-day timeline.  However, NJDOE "was unable to provide its

definition of 'Federal day' or method for calculating the 45-day timeline, and

acknowledged that it does not have a mechanism for ensuring that ALJs who serve

as hearing officers are reaching hearing decisions and mailing a copy of the

decision to the parties within the 45-day timeline.  Proper calculation of the due

process hearing decision timeline using calendar days is essential to ensuring the

timely resolution of due process complaints filed by parents and school districts on

matters relating to the identification, evaluation, educational placement of a child

with a disability, or the provision of a free appropriate public education to the

child."  Further, USOSEP found that NJDOE has "no mechanism to ensure that

adjournments are granted at the request of a party and that the ALJ specifies either

the length of the adjournment or the date by which the decision will be mailed to

the parties."  The noncompliance letter concludes that "[US]OSEP determined that

[NJDOE] does not have procedures for ensuring that decisions in due process

hearings are issued within the 45-day timeline or within allowable extensions . . .

and [NJDOE] does not have procedures for ensuring that ALJs who serve as

hearing officers grant adjournments, as set forth in N.J.A.C. 1:6A-9.2, consistent

with the provision for granting extensions of the 45-day timeline in 34 C.F.R.

§300.515(c) for a specific period of time and at the request of a party.

Consequently, NJDOE has failed to exercise its general supervisory and

monitoring responsibility in 20 U.S.C. §§1412(a)(11) and 1416(a) and 34 C.F.R.

§§300.149 and 300.600 and 20 U.S.C. §1232d(b)(3)(A) to ensure that due process

hearing decisions are issued within the 45-day timeline or within an allowable

extension, as required by 34 C.F.R. §300.515(a) and (c)."  (A true and correct copy

of the 5/6/19 USDOE Report is attached hereto as Exhibit H.)

153.   To date and despite two pending class actions on the 45 Day Rule,

namely, *J.A.,[9] et al. v. New Jersey Dept. of Educ., et al.*, U.S.D.C. D.N.J. Civil No.

1:18-cv-09580-NLH-KMW and *C.P., et al. v. N.J. Dep't of Education,* U.S.D.C.

D.N.J. Civil No. 1:19-cv-12807-NLH-KMW, Defendants NJDOE, OAL and the

---

[9] The "J.A. Family" in the pending purported class action case is the same as
Plaintiffs herein.

ALJs have taken virtually <u>zero</u> steps to remedy noncompliance. Indeed, the

NJDOE and OAL continue to use the phrase "Federal days" despite the USDOE's

explicit instruction to cease and desist the practice.

154. Because of the systemic violation of IDEA, the federal regulations,

and the New Jersey Administrative Code, and noncompliance with directives from

the USDOE, there is great harm to children with disabilities and their families

because they are being denied a Free Appropriate Public Education ("FAPE"), to

which they are entitled, for long periods of time and made to suffer with

inadequate IEPs, services, and therapies; inaccurate evaluations; failure to

implement IEPs; and/or incurring substantial attorney's fees in the process. This is

a great harm to Plaintiffs and to the education system in the State of New Jersey as

a whole.

155. This Court has previously ruled that "a significant delay in providing

a due process hearing – one measured in months beyond expiration of the 45 Day

Rule – constitutes a substantive as opposed to procedural harm, and therefore,

constitutes a denial of a FAPE." *C.P., et al. v. N.J. Dep't of Education,* Civil No.

1:19-cv-12807, Judge Hillman, op. at 28 (D.N.J. May 22, 2020) *citing Blackman v.

D.C.*, 382 F. Supp. 2d 3, 9 (D.D.C. 2005) (holding that a delay of 158 days after

filing the initial due process complaint "unquestionably constitutes denial of [the

student's] right to a Free Appropriate Public Education ("FAPE") and therefore irreparable harm.")

156.    In addition, counsel for LEAs use the delays inherent in the systemic flaws of NJDOE's system for resolving special education disputes as a strategic advantage knowing that most families (a) lack adequate financial resources to engage counsel to represent them; (b) lack adequate financial resources to endure a lengthy legal dispute beyond 45 days; (c) develop 'litigation fatigue' and will compromise their claims less favorably than they would if they received a decision in compliance with the 45 Day Rule; and (d) lack knowledge of IDEA's legal protections and legal expertise to conduct a special education dispute in accordance with legal procedures and principles, thereby laying a proper foundation for appeal if necessary.

157.    LEAs, and in this case MTBOE, use the broken system in New Jersey to deny and/or delay services to eligible children because they know that families will have to challenge their decisions in due process and will  (a) face known delays; (b) incur substantial attorney fees or navigate the complex system of dispute resolution *pro se*; (c) face well-financed and sophisticated school district counsel; (d) be assigned to ALJs who are not qualified to handle IDEA and special education civil rights cases; and (e) lose at least 70% of the time.  This is a systemic failure and denial of due process of law.

## FACTUAL BACKGROUND – DP CASE

**A.    Background / Diagnoses / Evaluations of J.A.**

158.    MTBOE is a public school system in the State of New Jersey and receives federal funding under IDEA.

159.    Plaintiffs have resided in the MTBOE school district the entire relevant time.

160.    J.A. was diagnosed with Autism and apraxia at the age of 19 months.

161.    Mariko Nakanishi, M.D., of Children's Hospital of Philadelphia ("CHOP"), reconfirmed the diagnoses of Autism, feeding disorder, and developmental delays for J.A. just prior to her 3rd birthday.

162.    Dr. Nakanishi, in her Initial Evaluation dated December 22, 2009, made numerous recommendations for J.A.'s special education and related services in school, including an "Intensive behavioral intervention program," "Individualized speech and language therapy," "Occupational therapy," and a "Formal audiology evaluation."

163.    Joanna A. submitted Dr. Nakanishi's Initial Evaluation of J.A. to MTBOE.

164.    On June 15, 2011, MTBOE accepted Dr. Nakanishi's evaluative data and diagnosis, but did not accept her recommendations for services.

165.   Joanna A. requested an IEP meeting with the district on September 15, 2011, submitting an Occupational Therapy Evaluation of J.A. dated August 8, 2011 from Cynthia Marx, OTR/L, at CHOP Atlantic County, that contained numerous recommendations to be implemented in school for J.A.

166.   On October 12, 2011, MTBOE accepted Marx's evaluative data and diagnosis from the 2011 OT Evaluation, but did not accept her recommendations for services for J.A.

167.   David Bruner, M.D., of Advocare Laurel Pediatrics, reconfirmed J.A.'s diagnoses of Autism and Apraxia on June 15, 2015.

168.   Dr. Bruner noted that J.A. has a tendency to overstuff her mouth with food which creates a choking hazard and recommended adult supervision during J.A.'s lunch periods at school.

169.   Joanna A. submitted Dr. Bruner's letter to MTBOE.

170.   MTBOE just ignored Dr. Bruner's letter, but did assign an aide to sit with J.A. during lunch.

171.   Joanna A. filed two prior due process complaints against MTBOE, one during J.A.'s pre-Kindergarten year and one during either Kindergarten or first grade.

172.   One of the prior cases was settled with additional services provided by MTBOE.  The second case went to hearing and Plaintiffs lost.

173.    John Lee Bersh, MTBOE's Supervisor of Special Services ("Bersh") was involved in both of those prior due process cases and became increasingly antagonized that Joanna A. was challenging him on special education decisions relating to J.A.

174.    Joanna A. noticed her relationship with MTBOE and Bersh began to decline after the prior cases and she feels her input at IEP meetings after that was less and less valued.

175.    Joanna A. took J.A. for an independent Central Auditory Processing Evaluation ("CAPE") at Audiology Partners, LLC on October 21, 2015.

176.    The CAPE was performed by Doctor of Audiology Ruth W. Brenner, Au.D., FAAA, and Erin Mack, Doctoral Student of Audiology.

177.    The 2015 CAPE found that J.A. had a severe auditory processing disorder in the areas of Decoding and Tolerance Fading Memory.

178.    "Decoding is the student's ability to quickly and accurately decode speech sounds.  Problems associated with DEC are difficulty following directions, poor phoneme manipulation, poor receptive language, word-finding problems, and difficulty with sound recognition and auditory closure. She may be trying to fill in the missing parts as best she can, but rapid speech will result in confusion. The academic implications are difficulty with phonics, reading, and spelling. There can

be word accuracy errors, difficulty with dialects, learning a foreign language and problems following oral directions."

179.   "The disorder in TFM indicates <u>reduced speech intelligibility in the presence of background noise and/or reduced short-term memory</u>. In order for a student to understand in the presence of background noise the brain must acquire information from both ears and squelch the competing noise. [J.A.] can have difficulty tolerating the background noise and her attention to the background noise and speech will be equal. Also, when she is in a reverberant situation, such as a classroom, speech discrimination will deteriorate as sound is reflected around the room. This can have a significant impact on a child that also has a DEC disorder. A short-term memory disorder is also associated with this category. We feel this is a significant problem for [J.A.]. A child with TFM may have difficulty maintaining attention to the task; she forgets what to do. She could have difficulty with reading comprehension; the poor comprehension may be a memory issue. She may appear to be an impulsive responder. Academically, the child with a TFM disorder will have difficulty maintaining her attention to the task, will be distractible, can have reading comprehension problems, difficulty following directions, reduced spelling and sometimes poor handwriting (motor planning)."

180.   The 2015 CAPE made several recommendations to remediate J.A.'s disorders, including a Phonemic Training Program, Phonemic Synthesis, Speech-

in-Noise desensitization training, rote memory drills, "Some Classroom Strategies that might be helpful to Julia are: Having a classroom teacher who speaks clearly and usually conducts a quiet classroom. Writing new words, key words or difficult words on the board should help her get a better grasp of the words that may be incorrectly perceived. Instructions and assignments should be written down.  If given orally she will have difficulty understanding and following the directions," and small group instruction.

181.   Joanna A. submitted the 2015 CAPE to MTBOE.

182.   On November 13, 2015, MTBOE accepted only the diagnosis, but did not accept the evaluative data or the recommendations for services set forth in the 2015 CAPE.

## B.   5/3/16 IEP For 3rd Grade

183.   On May 3, 2016, an IEP meeting was held for J.A. and an IEP developed for third grade.

184.   Joanna A. participated in the 5/3/16 IEP meeting, but felt her input was not valued.

185.   The 2015 CAPE is referenced in the 5/3/16 IEP, but none of the other outside evaluations provided by Plaintiffs to MTBOE are mentioned.

186.   Placement offered to J.A. in the 5/3/16 IEP was in the Co-Teach Third Grade classroom at Oak Knoll Elementary School where J.A. would be in the presence of general education students for 80% or more of the school day.

187.   Joanna A. voiced a number of parental concerns during the 5/3/16 IEP meeting which are noted in the IEP, but in particular "shares that [J.A.'s] report card indicates that in the area of General Development, for the second trimester which includes multiple school breaks, she regressed in the areas of following directions, working independently, and staying on task. This suggests that regression exists in her functional skills which supports the need for an academic based ESY program which will allow [J.A.] to continue to participate in an academic environment and work independently."

188.   MTBOE denied J.A. Extended School Year ("ESY") services in the 5/3/16 IEP despite Joanna A.'s request and no PWN was issued explaining the basis for this decision.

189.   Joanna A. also requested "a copy of therapy reports from speech, OT consultation, and counseling after each session."

190.   Joanna A. testified that she would receive these reports "for the most part" during J.A.'s 3rd grade.

191.   J.A.'s 5/3/16 IEP provided for **26 goals** – 7 in Reading; 2 in Writing; 3 in Mathematics; 2 in Speaking / Listening; 6 in Speech / Language; 4 in Social /

Emotional / Behavioral; and 2 in Motor Skills.  To support those goals, J.A. would

receive **45** yearly sessions of Group Speech-Language Therapy for 30 minutes

each; 27 yearly sessions of Individual Occupational Therapy Consultation for 15

minutes each; 18 yearly sessions of Group Counseling Services for 30 minutes

each; and Curb to Curb Transportation on a Bus with an Attendant.

192.   Joanna A. approved and consented to the 5/3/16 IEP for J.A.

**C.**   **3rd Grade – School Year 2016-17**

193.   J.A. began Third Grade in the Co-Teach classroom at Oak Knoll

Elementary School ("Oak Knoll"), one of MTBOE's elementary schools, for the

2016-17 school year.

194.   Third Grade Co-Teach classroom had 20-21 students, 8 of which had

IEPs, including J.A.

195.   Only one of the teachers in the MTBOE Co-Teach classroom was a

certified special education teacher.

196.   Ms. Trotter testified that J.A. received high average to average grades,

but admitted that she was testifying from memory and not from a document.

197.   Ms. Trotter testified that J.A. had a tendency to "overthink" things,

which could be from Autism.

198.   Ms. Trotter testified that she assessed J.A. based on classroom

observations, which are not evaluations under the strict requirements of IDEA.

199.   Although Ms. Trotter testified that J.A. was one of her better students and did not exhibit any problems, she admitted that she had to constantly move about her classroom to see where her students were and that she didn't have any documents presented which confirmed her testimony.

200.   Ms. Trotter testified that J.A. was bothered by the noise during the time students packed and unpacked their bags and had access to her headphones and that it was left up to J.A. to make the decision on whether she needed them, but didn't use the headphones except when students were unpacking their bags. Ms. Trotter admitted that J.A. may have refused to use the headphones because she didn't want to appear weird or different to her peers.

201.   Ms. Medlock testified that J.A. would use the "squeeze machine" at school and that sometimes it did have a positive effect on J.A., sometimes not.

202.   Ms. Medlock admitted her testimony was from memory and there were no documents to confirm her testimony.

203.   Ms. Medlock agreed that the apparent disconnect between what was observed in school and Joanna A.'s observations could be because students let their true emotions out when they get home as their safe place.

204.   Ms. Medlock admitted that the "Friday Folder" that went home with J.A.'s homework did not have specific links to the goals in her IEP.

D.    <u>11/14/16 IEP For 3rd Grade</u>

205.    An "assess progress" IEP meeting was held for J.A. on November 14, 2016 and a revised IEP was developed on that date.

206.    Joanna A. participated in the 11/14/16 IEP meeting, but again felt her input was not valued.

207.    The 2015 CAPE is again referenced in the 11/14/16 IEP, but none of the other outside evaluations provided by Plaintiffs to MTBOE are mentioned.

208.    J.A.'s placement in the 11/14/16 IEP continued in the Co-Teach Third Grade classroom.

209.    Joanna A. voiced a number of additional parental concerns during the 11/14/16 IEP meeting which are noted in the IEP, but in particular "shares that [J.A.] does not like the <u>noise of the hand dryer</u> in the bathroom," "noticed [J.A.] is <u>substituting her 'W' for 'L',</u>" "observes [J.A.] <u>not using her helping hand when writing,</u>" "With regards to social skills, Joanna A. is concerned that <u>[J.A.] can be a 'pushover'</u>. She will allow others to push her out of the way or take things from her without," "that [J.A.] continues to <u>struggle with eye contact and appropriate space,</u>" and "asked Ms. Cayer-Johnson for resources and or homework for social skills."

210.    Teachers indicated that most of these concerns are "not observed" in the school environment, but are noted and in some cases MTBOE staff indicate

they will pay more attention to these issues.  Ms. Cayer-Johnson indicated she has no social skills curriculum.

211.   Joanna A. again requested "a copy of therapy reports from speech, OT consultation, and counseling after each session."

212.   J.A.'s 11/14/16 IEP retained the same **26 goals** from the 5/3/16 IEP and same services of **45** yearly sessions of Group Speech-Language Therapy for 30 minutes each; 18 yearly sessions of Group Counseling Services for 30 minutes each; and Curb to Curb Transportation on a Bus with an Attendant, but Individual Occupational Therapy Consultation was reduced to 12 yearly sessions of 15 minutes each.

213.   Joanna A. said that the testimonies of MTBOE's witnesses regarding J.A. during the third grade, her report cards, and the Progress Reports were not matching what she was observing about J.A. at home.

214.   Joanna A. observed that J.A. was exhibiting notable difficulties at home with homework and had mentioned she was having problems in class at school.

215.   J.A. told Joanna A. that the noise at school was causing her problems.

216.   Joanna A. said she notified J.A.'s teachers of these issues, but their response was that they were not observing it in school.

217.   Because MTBOE's teachers said they were not observing J.A.'s challenges with noise and homework in school, they did not change or suggest a change in J.A.'s placement or classroom environment.

218.   During the first part of the 2016-17 school year, Joanna A. would regularly visit J.A. during her lunch period and had classroom observations of J.A. a few times a month.  However, MTBOE began to limit those visits down to once a month and then to once or twice a marking period.

219.   On February 24, 2017, Bersh wrote a letter to Joanna A. notifying her that her observations of J.A. in the classroom would be limited to one per marking period and that Principal Deal believed her prior observations "were disrupting the education of the other students."  Bersh also informed Joanna A. that her scheduled classroom observation for February 16, 2017 was cancelled by MTBOE because she visited J.A. during lunch on February 14, 2017.  He invited Joanna A. to review the district policies on MTBOE's website.

220.   The MTBOE policy on School Visitors does not limit the number of classroom observations by a parent.  The policy does indicate that "Any visitor to the school whose presence or conduct is disruptive, or whose behavior, past or present suggests that he/she intends or is likely to become disruptive, may be requested to leave the school premises. If the visitor so addressed does not

withdraw, the Principal may summon assistance from the local law enforcement agency."

221.   Joanna A.'s classroom observations were not disrupting students.

222.   Joanna A. was a "parent helper" at the Oak Knoll School three to four days a week for several hours each day, but never in J.A.'s classroom in that role.

223.   Several witnesses, including Bersh, admitted that prior to the February 24, 2017 letter that Joanna A. had never been told her observations were disrupting students, had never been written up or formally warned about it, and that the police had never been called on Joanna A.

224.   Joanna A. did not agree with the Progress Reports coming home and requested to see data that showed that J.A. was progressing or achieving the goals in her 11/14/16 IEP.

225.   Joanna A. would often work with J.A. on her homework assignments and help when needed.

226.   Joanna A. testified that she was making J.A.'s teachers aware of J.A.'s struggles with homework at home.  In particular, Joanna A. said that J.A. struggled more with math word problems, than with straight numerical math problems.  On one homework assignment with math word problems, Joanna A. wrote a note on the homework that "[J.A.] needed help with all but the first problem."  J.A.'s

teacher simply wrote back, "Please have her leave her problem solving work on the page this way I can see where she is struggling."

227. There was another "assess progress" IEP meeting on February 10, 2017, but Joanna A. did not remember much about the meeting or why it was called. She did testify that it was unusual to have a progress IEP meeting in February.

228. Joanna A. does not believe or recall if she consented to the 2/10/17 proposed IEP.

229. On March 9, 2017, Charles Earling, Superintendent of Schools for MTBOE, wrote a letter to Joanna A. with nearly identical information as in Bersh's February 24, 2017 letter.

230. Patrice Christensen, MTBOE's Speech-Language therapist for J.A. during the 2016-17 and 2017-18 school years, knows what a "discrete trial" is her field of expertise. A "discrete trial" is to "do ten trials of whatever this task may be, and then you -- you continue to teach it." She did not use discrete trials with J.A. and there is consequently no documentation of it.

231. During the 2016-17 school year, the Speech-Language therapy "Summary" sheets sent home to Joanna A. did not explain or identify the goal being pursued and did not indicate the level of progress or measurement towards

criteria listed in the IEP. These sheets did not advise Joanna A. how J.A. was progressing on her speech-language goals.

232.   Ms. Medlock testified that her relationship with Joanna A. was amicable at the beginning of the 2016-17 school year, but deteriorated later because of "excessive emails". Ms. Medlock testified that by "excessive emails" she meant 2-3 per week. She testified further that Bersh instructed J.A.'s 3rd grade teachers to stop interacting with Joanna A. via email and that they should go through him and he would answer her emails.

**E.     5/9/17 IEP Meeting and Proposed IEP**

233.   Prior to the 5/9/17 IEP meeting, Joanna A. continued to request data to support the Progress Reports on the goals, but was no data was provided by MTBOE.

234.   On May 9, 2017, the annual IEP meeting was held for J.A. and an IEP was proposed for fourth grade.

235.   Joanna A. participated in the 5/9/17 IEP meeting, but her input was virtually ignored.

236.   The 2015 CAPE is referenced in the 5/9/17 proposed IEP, but none of the other outside evaluations provided by Petitioners to MTBOE are mentioned.

237.   The most recent evaluations performed by MTBOE were those from 2015, more than one year and 6 months prior to the 5/9/17 IEP meeting.

238.   Placement offered to J.A. in the 5/9/17 proposed IEP was in the Co-Teach Fourth Grade classroom at Oak Knoll where J.A. would be in the presence of general education students for 80% or more of the school day.

239.   There were only two options for Least Restrictive Environment ("LRE") for students with disabilities at MTBOE, namely (a) the Co-Teach classroom or (b) the "LD" (Learning Disabled) classroom.  The LD classroom was not appropriate for J.A. as she was higher functioning than that classroom's environment.  There were no other options for J.A. in the MTBOE school system and MTBOE refused to individualize J.A.'s placement or services.

240.   J.A.'s 5/9/17 proposed IEP provided for **9 goals** – 2 in Reading; 0 in Writing; 2 in Mathematics; 0 in Speaking / Listening; 4 in Speech / Language; 1 in Social / Emotional / Behavioral; and 0 in Motor Skills.  To support those goals, J.A. would receive **27** yearly sessions of Group Speech-Language Therapy for 30 minutes each; 10 yearly sessions of Individual Occupational Therapy Consultation for 15 minutes each; 18 yearly sessions of Group Counseling Services for 30 minutes each; and Curb to Curb Transportation on a Bus with an Attendant.

241.   The 5/9/17 IEP made significant reductions in services and goals from the 11/14/16 IEP as follows:

| Services / Goals | 11/14/16 IEP | 5/9/17 IEP |
|---|---|---|
| Speech Language Therapy | 45x Yearly 30 min. | 27x Yearly 30 min. |
| Occupational Therapy | 12x Yearly 15 min. | 10x Yearly 15 min. |
| Goals | 26 | 9 |

242.   Joanna A. voiced a number of parental concerns during the 5/9/17 IEP meeting which are noted in the IEP, but in particular she was "concerned about the documentation towards [J.A.'s] IEP goals," has "concerns that when [J.A.] is pulled-out for speech therapy, she is receiving therapy in a one : one setting with no background noises . . . [and] background noise with a heater" and the impact on J.A.'s "listening comprehension and auditory processing skills," that Plaintiffs "do not agree with the recommendation to decrease speech services," that "J.A. has social concerns at home," have concerns about confusions in speech such as mixing up "much" and "many" and "sew" and "saw", that "during counseling sessions, [the therapist] give more role play opportunities, allowing [J.A.] opportunities to speak up during sessions," that J.A. has exhibited impulsive anger at home and that "feelings of frustration and anger to be worked on at school," and that MTBOE had "not put[ ] small group instruction into the accommodations / modifications."  Perhaps most importantly, "Parents requested to hold the IEP meeting at another date."

243.   Joanna A. requested another IEP meeting to further discuss the goals for J.A., but MTBOE's school psychologist left the IEP meeting to go speak to Bersh about the request.  The school psychologist returned and stated that there

would not be a continued IEP meeting and that Plaintiffs had 15 days to file for due process.

244.   MTBOE offered the 5/9/17 proposed IEP on a "take it or leave it basis" without considering the input of Joanna A.

245.   MTBOE did not issue a PWN regarding its refusal to change its proposed 5/9/17 IEP for J.A.

246.   Two days after the 5/9/17 IEP meeting, Bersh wrote a letter to Joanna A. contesting her request for data and information that would support J.A.'s grades and progress towards goals and stated that "grades are not directly related to goals," "Similarly, homework is not related to IEP goals," suggesting that Joanna A. was confused about her "request of grades and which IEP goals they addressed" which are provided in the Progress Reports and that MTBOE's "current database does not provide the opportunity to view a 'grade book'" and "[J.A.'s] Julia's teachers were given permission to send to you their traditionally kept, paper and pencil grading, and that is the extent of what will be offered."  He stated, "please be sensitive to the fact that this action could be construed/perceived as a retaliatory measure for the teachers having been called earlier this year to testify regarding [J.A.'s] academic performance that was current at the time of that proceeding," and "the appearance of [J.A.'s parents] acting as pro-se attorney in the matter of questioning of staff will lead to the addition in such meetings of our solicitor."

The letter further states, "[g]oing forward please make all requests for information from [J.A.'s] teachers through the building principal," restricting Joanna A.'s access to J.A.'s teachers.

247.   The 5/11/17 letter from Bersh contradicted several of MTBOE's witnesses that the "Friday Folders" contain the data related to goals and that Bersh could have printed out information from the LinkIt software and provided it to Plaintiffs at no cost.

248.   The 5/11/17 letter from Bersh came after two requests for raw data about J.A.'s progress towards goals and what Ms. Medlock was referring to when Bersh cut off email communication between Joanna A. and J.A.'s teachers.

249.   On May 24, 2017, Plaintiffs paid for another independent Central Auditory Processing Re-Evaluation ("CAPE #2") at Audiology Partners, LLC.

250.   CAPE #2 was performed by Doctor of Audiology Ruth W. Brenner, Au.D., FAAA, and Haley McDonald, Doctoral Student of Audiology.

251.   CAPE #2 indicated an improvement from her prior evaluation, but still found that J.A. had an auditory processing disorder in the areas of Decoding and Tolerance Fading Memory.

252.   CAPE #2 had similar recommendations for J.A.'s education and to help with her disorder as to the first CAPE.

253.    Joanna A. presented CAPE #2 to MTBOE, but they took no action relating to it.

254.    J.A. was not prepared to move on to fourth grade because she was not demonstrating that she had achieved or adequately progressed in her goals from her 11/14/16 IEP.

255.    The Progress Report for J.A. for the 2016-17 school year showed 26 goals that were being implemented.  While the June 27, 2017 Progress Report was generated after Plaintiffs had filed for due process on May 24, 2017, it indicates that J.A. had only achieved 9 of the 26 goals, where the legend indicates "A" stands for "Achieved".

256.    Despite that data, MTBOE matriculated J.A. to the 4th grade and failed to demonstrate that J.A. had met the goals in her 11/14/16 Stay Put IEP.

**F.    4th Grade – School Year 2017-18**

257.    J.A. entered Fourth Grade in the Co-Teach classroom at Oak Knoll for the 2017-18 school year.

258.    The Fourth Grade Co-Teach classroom had 20-21 students, 8 of which had IEPs, including J.A.

259.    Many of the 8 students with IEPs had different disabilities and each IEP had 4-5 different goals.

260.    J.A. was not doing well in the Fourth Grade Co-Teach classroom.

261.   Out of concern for J.A.'s capabilities, Joanna A. paid for an independent evaluation at Huntingdon in July and August 2017, which resulted in a report dated August 8, 2017.

262.   The Huntingdon evaluation, using "nationally recognized tests," found that J.A. had not performed at grade level in either reading or math.  The Huntingdon criteria was that the student must score 90% or better to be at grade level.  On four of the six tests, J.A. score 50% or below.  On the remaining two tests, she scored 70% and 80% respectively.

263.   Joanna A. provided the Huntingdon evaluation to MTBOE on August 14, 2017.

264.   On September 19, 2017, MTBOE again did not accept the Huntingdon evaluation's recommendations.

265.   Joanna A. became concerned that MTBOE was not following the 11/14/16 IEP, which she believed was the Stay Put IEP due to filing her due process complaint on May 24, 2017, but instead using the goals and services of the 5/9/17 proposed IEP because she received a Welcome Note from Patrice Christensen for Speech-Language Therapy for the 2017-18 school year which indicated that J.A. would receive services one day a week for 30 minutes which worked out to be 27 yearly sessions.  Joanna A. recalled that the 11/14/16 IEP required 45 sessions yearly of Speech-Language Therapy.

266.    On September 25, 2017, Joanna A. wrote a letter to Bersh indicating the concern about not following the 'Stay Put' IEP of 11/14/16 due to Ms. Christensen's Welcome Letter and advising Bersh to make sure all of MTBOE's personnel were following the 11/14/16 IEP under "stay put".

267.    Bersh spoke with Ms. Christensen about that and ensured that J.A. was to receive 45 yearly sessions of Speech-Language Therapy, not 27.

268.    Bersh's testimony conflicts with most of the other witnesses who, throughout testimony at the hearing, repeatedly admitted that they were implementing the goals and services of the 5/9/17 proposed IEP and not the 11/14/16 Stay Put IEP:

| Testimony of Meilahn, Oct. 2, 2020 [Administrative Record] | |
|---|---|
| p. 86 | 8 MR. THURSTON: R-14, which is the May 9th, 2017<br>9 IEP.<br>10 BY MR. THURSTON:<br>11 Q So I guess the first question I have for you<br>12 is, is this the IEP that you reviewed for the fourth<br>13 grade school year?<br>14 A Yes.<br>15 Q And are you -- were you familiar with this<br>16 one prior to J.A.'s school year starting that year?<br>17 A Yes.<br>18 Q Okay. Now, did you discuss the goals with<br>19 your coteacher for J.A.?<br>20 A Yes.<br>21 Q Okay. The goal sheets, did you create those<br>22 at the beginning of the year based on the IEP?<br>23 A Yes. We do that for all our students' IEP's. |
| p. 89 | 6 Q Okay. All right. So now I'm going to go<br>7 down to page 22 I believe it is. We looked at these<br>8 before. Woops. All right. So this is page 22. I'll |

|  | 9 come back to this and then page 23, okay? <u>So is it</u> <u>10 fair to say 22 and 23 contain the goals for this</u> <u>IEP?</u> 11 A <u>Yes</u>. |
|---|---|
| p. 90 | 7 Q Okay. Let me first ask you, <u>you weren't</u> <u>8 responsible for goals from prior IEP's, co?</u> 9 A <u>No</u>. 10 Q Okay. <u>So you're only responsible for the</u> <u>11 goals that are in this IEP, correct?</u> 12 A <u>Yes</u>. |

Testimony of Jennifer Cayer-Johnson, Oct. 23, 2020 [Administrative Record]

| p. 85 | 16 A So, like I said, when I received J. for counseling 17 during her second grade year, she had a lots of goals, 18 so it probably took us 2 years to get through all of 19 <u>those goals. By the time she was going into the</u> <u>fourth</u> <u>20 grade, we reduced those significantly and we were</u> <u>21 working on it, just those two specific goals, her</u> <u>22 fourth grade year. For her fifth grade year, I do</u> <u>not</u> <u>23 believe that J. needed continued counseling</u>, do -- 24 because I do believe her being removed from the 25 classroom causes her distress. Because when she has to |
|---|---|
| p. 86 | 1 come back, she has to catch up, she has to get 2 organized, she's missing, kids are ahead of her. But I 8 A <u>So I did reduce it</u>. 9 Q -- <u>IEPs counseling</u> with -- 10 A <u>Yeah. Yeah. So I reduced it for her fourth grade</u> <u>11 year. I gave her four sessions to transition her</u> <u>12 because it's a transition year for all those fourth</u> <u>13 grade students</u>. |

Testimony of Patrice Christensen, Oct. 23, 2020 [Administrative Record]

| p. 163 | 12 We worked on understanding and using idioms. And we |
|---|---|

| | |
|---|---|
| | 13 also worked on comparing and contrasting, using a Venn<br>14 diagram. And she achieved all of those goals, except<br>15 for the T-H. So I carried that goal over to the -- to<br>16 the next year. |
| p. 166 | 9 Q Yes, thank -- Yes, thank you. Now, you said<br>10 that -- if I just heard you, you said that -- that you<br>11 had discussed the goals in third grade, and you said<br>12 that it was your opinion that you thought that she had<br>13 completed all the goals by third grade, and there was<br>14 only one left?<br>15 A Oh. It is definitely is a fact that she mastered<br>16 her language goals. The only goal that she needed to<br>17 carry over was the -- for the articulation one, which<br>18 was the T-H. |
| p. 167 | 10 Q Okay. And then that -- And was that the only<br>11 goal you had for her that you felt she needed to<br>12 address for her fourth grade year?<br>13 A Yes. Well, that -- I had more goals. But the<br>14 other ones she had mastered, so I didn't, obviously,<br>15 carry them over. |
| p. 214-15 | 20 Q Okay. Okay. Now, at some point were you<br>21 told that the third grade IEP for J. was her stay-put<br>22 IEP? Do you know what that means?<br>23 A Can you -- That it wasn't changing? Can you<br>24 elaborate?<br>25 Q Yes. Okay. So I'll just explain what a<br>1 stay-put IEP means. And it basically means, that's the<br>2 IEP that's in place. It can't be changed. Okay?<br>3 There's a court that says you cannot change it. That's |

```
   4 the one you have to keep using, until either the
     parent
   5 consents to a change or the court says you can
     change
   6 it. Okay? So that's just by way of explanation. Did,
   7 at any point, you become aware that the third grade
     IEP
   8 for J. was her stay-put IEP, the one that can't be
   9 changed?
  10 A I don't recall.
  11 Q Okay. And I think you testified that you
  12 developed some new goals for fourth grade. Correct?
  13 A Correct.
  14 Q Were you ever told that you were not to
  15 implement new goals for J. for fourth grade?
  16 A I don't recall that.
  17 Q Okay. Were you ever told that, you know, you
  18 should not be providing services that are different
  19 than her third grade IEP?
  20 A I don't recall that.
```

269.    There were only **9** goals that were being implemented for Fourth

Grade for J.A., not 26 under the 11/14/16 IEP.

270.    In addition, Bersh, MTBOE's expert on FAPE, although opining that

MTBOE provided J.A. with a FAPE and that he had reviewed all of J.A.'s records

prior to his testimony at the hearing, was not clear as to how many goals were

being pursued in 4th grade.  Initially, he testified that it was the 26 goals from the

11/14/16 IEP; then upon cross-examination he testified that those goals were

modified to the 9 goals; then he testified that it might have been 35 goals; then he

testified that he wasn't sure about how many goals were being implemented for

Fourth Grade for J.A.

271.   Ms. Meilahn didn't feel it was her job as a classroom teacher to ensure that J.A. comply with the IEP provision that J.A. use her headphones during noisy parts of the day because it involved background noise that the teachers could not hear.  Ms. Meilahn relied on J.A. to self-advocate if the noise bothered her.  "If she had expressed to us that she was having a problem and that she wanted to put them on, of course we would say that we made sure they were available to her but, you know, we did not force her to put them on."

272.   J.A. was not capable of self-advocating because J.A. would not be able to identify if there was a problem or even what the problem was.

273.   As Fourth Grade progressed, J.A. didn't want to go to school more and more because of the noise and she began to avoid school and be absent more frequently.

274.   Joanna A. did not believe J.A. was prepared for 5th grade because J.A. still had problems with the grade level work.

275.   Yet, MTBOE matriculated J.A. to the 5th grade and failed to demonstrate that J.A. had met the goals in her 11/14/16 Stay Put IEP.

**G.    Summer 2018 / 5th Grade School Year 2018-19**

276.   During the summer of 2018, Joanna A. took J.A. a few times to Advocare Laurel Pediatrics to discuss noise issues at school, J.A.'s Auditory Processing Disorder, and her anxiety.

277.   On August 20, 2018, Ellen Del Moro, M.D., Advocare Laurel
Pediatrics, wrote a letter identifying J.A. as her patient with the diagnoses of
Autism and Central Auditory Processing Disorder.  Dr. Del Moro also wrote,
"[J.A.] also has severe anxiety.  Her central auditory processing contributes to her
auditory fatigue.  She gets worsening anxiety and overwhelmed in a noisy,
crowded environment, which in turn can lead to school avoidance and occasional
missed time from school.  Based on [J.A.'s] diagnoses, I would recommend
homebound instruction at this time."

278.   Joanna A. provided MTBOE with Dr. Del Moro's August 20, 2018
letter.

279.   MTBOE advised Joanna A. that there was paperwork that must be
filled out for homebound instruction.  Joanna A. believes MTBOE sent the
paperwork to Dr. Del Moro and that it was filled out and faxed back to MTBOE.

280.   Shortly thereafter, MTBOE agreed to homebound instruction for J.A.

281.   In addition, sometime prior to September 12, 2019, MTBOE offered
and Joanna A. consented to additional social skills classes for J.A.

282.   J.A. has been on homebound instruction since Fall of 2018 and
throughout Fifth, Sixth, and into Seventh Grade, to the present day.  This is a direct
result of both J.A.'s anxieties caused by noise in the school environment and the
unnecessarily extended 'Stay Put' in this case.

283.   There were some efforts to try to get J.A. back into in-person school, but that did not last long – perhaps a couple of weeks – due to the noise and anxiety in the school environment.

284.   There have been other IEP meetings in the interim, but Joanna A.'s input was not considered.  MTBOE presents Joanna A. with a draft IEP at the beginning of the IEP meeting and the draft – goals, services, and placement – are not changed during the meeting, even when Joanna A. disagrees with them.

285.   Joanna A. paid for all of the outside evaluations provided to MTBOE.

286.   MTBOE never tested J.A. for Central Auditory Processing Disorder or did an audiology test of J.A.

## PROCEDURAL HISTORY – DP CASE

287.   The original Request for Due Process Hearing was filed by Plaintiffs *pro se* with NJOSEP on May 24, 2017.  Plaintiffs requested mediation in their due process complaint.  (A true and correct copy of NJDOE's Case Processing Form is attached hereto as Exhibit I.)

288.   On May 25, 2017, Cathy Anthony, NJOSEP's Coordinator of Dispute Resolution, sent an acknowledgment of the Due Process Request to Plaintiffs and copied to Charles Earling, then Superintendent of MTBOE, Bersh, and John J. Armano, Esq., then counsel for MTBOE, and stated that "no change can be made to the student's classification, program or placement, unless both parties agree to

the change."  (A true and correct copy of Cathy Anthony's 5/25/17 letter is attached hereto as Exhibit J.)

289.   Effective May 25, 2017, the 'Stay Put' rule was invoked and that neither J.A.'s placement nor the 11/14/16 IEP could be changed unless both Plaintiffs and MTBOE agreed.

290.   The May 25, 2017 acknowledgement letter enclosed the "Parent Packet".  The Parent Packet confirms that the Five-Day Exchange Rule, ALJ qualifications, the Adjournment Rule, and the 45 Day Rule apply to the DP case. (*See* Exh. J.)

291.   Mediation was held in the DP case on June 19, 2017 at 10:00 a.m. at the Oak Knoll Elementary School, part of the MTBOE, with Susan Huntley as Mediator.  Susan Huntley is an employee of NJDOE.  (True and correct copies of Mediation Conference notice, service list, and Mediation Attendance sign-in sheet are attached hereto as Group Exhibit K.)

292.   Mediation was unsuccessful in the DP case, so it was transmitted from NJDOE to the OAL on June 19, 2017, indicating the 30 Day Resolution Period ended on that date and triggering the 45 Day Rule timeline.  (A true and correct copy of the transmittal letter is attached hereto as Exhibit L.)

293.   The 45 Day Rule requires that a final decision in the DP case was due on or before August 3, 2017.

294.   The DP case was scheduled for hearing on July 6, 2017 at 10:00 a.m. before Administrative Law Judge Lisa James-Beavers ("ALJ Beavers") at OAL's offices in Trenton, NJ.  July 6, 2017 was the 10 Day Peremptory Hearing Date in the DP case.  (Exh. L.)

295.   July 6, 2017 was a Settlement Thursday at the OAL.

296.   The June 19, 2017 transmittal letter does not indicate that the July 6, 2017 date was for a settlement conference.  The term "settlement conference" does not appear anywhere on the transmittal letter.  Rather, the term "hearing" is used fifteen (15) times.  (Exh. L.)

297.   The June 19, 2017 transmittal letter advises Plaintiffs they have a right to examine relevant school records of J.A.; of the Five-Day Exchange Rule and the consequences of non-compliance; that no legal briefs or closing arguments may be submitted after the hearing; if they don't attend the hearing, the case can be dismissed or MTBOE granted its relief; and that the Uniform Administrative Procedure rules apply to the DP case.  (Exh. L.)

298.   On that same date, NJDOE transmitted the casefile for the DP case to the OAL.  (True and correct copies of the casefile transmittal page, the then-current service list, and the Case Information sheet for the DP case are attached hereto as Exhibit M.)

299.   The casefile transmitted from NJDOE to the OAL confirms the July 6, 2017 hearing date; that DP case has the legal requirement of "45 day completion" for an "Agency Decision" as a Special Education Hearing; that "Fed. Days Expended" is blank; and does not include the term "settlement conference" anywhere.  (Exh. M.)

300.   ALJ Beavers did not hold a hearing in the DP case on July 6, 2017. Instead, ALJ Beavers held a settlement conference in the DP case on July 6, 2017, but the DP case did not settle and was reassigned to ALJ Wilson.

301.   A final decision in the DP case was not issued on or before August 3, 2017.

302.   No party to the DP case requested an adjournment between June 19, 2017 and August 3, 2017.

303.   ALJ Wilson scheduled a "prehearing conference" in the DP case for September 27, 2017, which was **100 days** after the DP case was transmitted to the OAL.

304.   No party to the DP case requested an adjournment between July 6, 2017 and September 27, 2017.  The September 27, 2017 prehearing conference in the DP case was scheduled in accordance with ALJ Wilson's availability.

305.   On October 3, 2017, ALJ Wilson executed a Prehearing Order in the DP case and mailed it to Plaintiffs on October 4, 2017.[10]  (True and correct copies of the Prehearing Order and cover letter are attached hereto as Exhibit N.)

306.   The October 3, 2017 Prehearing Order scheduled the hearing in the DP case for January 8, 2018 at 10:00 a.m. at the OAL's offices in Atlantic City, New Jersey; includes the Five-Day Exchange Rule language for the DP case and that "Upon application of a party, the judge shall exclude any evidence at hearing that has not been disclosed to that party at least five business days before the hearing, unless the judge determines that the evidence could not reasonably have been disclosed within that time"; confirms that MTBOE has both the burden of proof and of production in the DP case; sets a deadline for motions for summary decision in the DP case at December 8, 2017; and sets the deadline for "all other motions" in the DP case at "ten (10) days prior to the start of the hearing," which makes the deadline December 29, 2017.  (Exh. N.)

307.   No party to the DP case requested an adjournment between September 27, 2017 and January 8, 2018.  The January 8, 2018 hearing date in the DP case was scheduled in accordance with ALJ Wilson's availability.  ALJ Wilson's

---

[10] It is not known why ALJ Wilson mailed the Prehearing Order in the DP case to the Office of the Attorney General instead of John Armano, Esq., MTBOE's counsel at the time who had participated in all proceedings up to and including the prehearing conference.

availability was limited due to his other duties at the OAL and the OAL's scheduling, including but not limited to Settlement Thursday.

308.   January 8, 2018 is 203 days after the termination of the 30 Day Resolution Period in the DP case on June 19, 2017.

309.   On November 17, 2017, Plaintiffs filed a Motion to Enforce Stay Put and for Sanctions in the DP case, which included the Affidavit of Joanna A., seeking to enforce the 11/14/16 IEP as Stay Put and a ruling that MTBOE had violated Stay Put.  The motion did not seek or request an adjournment.  (A true and correct copy of the Motion to Enforce Stay Put and for Sanctions excluding exhibits is attached hereto as Exhibit O.)

310.   MTBOE was not implementing J.A.'s 11/14/16 stay put IEP, but rather it was implementing the unapproved 5/9/17 IEP despite Plaintiffs having timely filed their due process complaint on May 22, 2017 invoking the Stay Put rule.

311.   Also on November 17, 2017, Plaintiffs filed a Motion to Amend their due process complaint in the DP case to preserve some claims and clarify claims because the original complaint was filed *pro se*, but Plaintiffs now had counsel. "Plaintiffs can and are willing to abide by the current schedule set by ALJ Wilson on October 3, 2017 and are not requesting an adjournment at this time."  (A true

and correct copy of the Motion to Amend the Complaint excluding exhibit is attached hereto as Exhibit P.)

312.   Instead of ruling on the pending motions, ALJ Wilson scheduled a status conference with counsel in the DP case for December 20, 2017.  (A true and correct copy of the Notice of Status Conference is attached hereto as Exhibit Q.)

313.   During the December 20, 2017 Status Conference in the DP case, ALJ Wilson set lengthy briefing schedules for Plaintiffs' motions that extended beyond the January 8, 2018 hearing date.  MTBOE's counsel requested extended time to brief the pending motions.

314.   ALJ Wilson scheduled another Status Conference in the DP case for March 12, 2018, which was **266 days** after the DP case was transmitted to the OAL.  (A true and correct copy of the Notice of Status Conference is attached hereto as Exhibit R.)

315.   ALJ Wilson did not hold a hearing in the DP case on January 8, 2018. No party to the DP case requested an adjournment between January 8, 2018 and March 12, 2018.  The adjournment was to accommodate ALJ Wilson's schedule. ALJ Wilson did not rule on the motions on March 12, 2018.

316.   Because so much time had passed, ALJ Wilson had still not held a hearing in the DP case, and MTBOE was not accepting J.A.'s outside evaluations (IEEs), all of which was having a devastating impact on J.A.'s education, Plaintiffs

filed a Motion for Independent Educational Evaluation on January 8, 2018. (A true and correct copy of a portion of the Motion for IEE is attached hereto as Exhibit S.)

317. In response to Plaintiffs' Motion for Independent Educational Evaluation, MTBOE filed an opposition containing inappropriate and improper materials. Upon information and belief, MTBOE did so to further delay the hearing and to take advantage of the 'unholy alliance' between NJDOE, the OAL, the ALJs, and school districts.

318. Plaintiffs filed a Motion to Strike the inappropriate materials from MTBOE's opposition and for sanctions for intentionally filing a response for improper reasons. (A true and correct copy of a portion of the Motion to Strike is attached hereto as Exhibit T.)

319. ALJ Wilson scheduled a hearing in the DP case for March 27, 2018. But, instead of holding a hearing, ALJ Wilson conducted a status conference on that date despite the language of the notice that it was to be a "hearing". (A true and correct copy of the Notice of Hearing is attached hereto as Exhibit U.)

320. March 27, 2018 is **281 days** after the DP case was transmitted to the OAL. No party to the DP case requested an adjournment prior to March 27, 2018.

321.   During the March 27, 2018 telephonic hearing in the DP case, ALJ Wilson heard argument on the pending motions and took them under advisement. He did not rule on the motions on that date.

322.   Once again, instead of ruling on the motions or holding a hearing in the DP case, ALJ Wilson scheduled a further status conference for June 11, 2018 at 10:30 a.m. to be conducted via telephone.  (A true and correct copy of the Notice of Hearing is attached hereto as Exhibit V.)

323.   Plaintiffs filed a Request for Emergent Relief with ALJ Wilson on April 30, 2018 seeking to enforce the 11/14/16 IEP as Stay Put.

324.   MTBOE was repeatedly violating the Stay Put rule and refusing to implement the 11/14/16 IEP.  Upon information and belief, MTBOE staff were implementing their own goals and services under the direction of Bersh.

325.   June 11, 2018 is **357 days** after the DP case was transmitted to the OAL.  No party to the DP case requested an adjournment prior to June 11, 2018.

326.   Having heard nothing from ALJ Wilson on the DP case since March 27, 2018, Plaintiffs' counsel wrote a letter inquiring about the status of the pending motions and asserting the 45 Day Rule.  The letter was sent on May 1, 2018 at 7:31 a.m.  (A true and correct copy of the 5/1/18 letter with fax confirmation sheet is attached hereto as Exhibit W.)

327.   Five hours later, ALJ Wilson issued his Order On Motion To Amend Request For Due Process Hearing And Motion To Enforce Stay Put And For Sanctions And Motion To Strike Materials And For Sanctions And Motion For Independent Educational Evaluation in the DP case via email.  (True and correct copies of the 5/1/18 email and Order are attached hereto as Exhibit X.)

328.   ALJ Wilson denied all of the pending motions except the Motion to Enforce Stay Put, affirming that the 11/14/16 IEP for J.A. was stay put for the pendency of the DP case, granted J.A. compensatory education for violation of stay put by MTBOE, but did not grant any sanctions.  (*See* Exh. X.)

329.   Upon information and belief, ALJ Wilson issued the May 1, 2018 Order out of spite and in retaliation for Plaintiffs asserting objections based on the 45 Day Rule.

330.   On May 22, 2018, Plaintiffs filed a second Request for Due Process Hearing because MTBOE had additional IDEA violations subsequent to the first due process complaint and ALJ Wilson had delayed the DP case for so long and denied amendment of the first complaint.  The second due process petition was assigned NJDOE Agency Reference 2018-28138.

331.   Plaintiffs filed a class action suit on May 23, 2018 in the U.S. District Court for the District of New Jersey captioned *J.A., et al. v. Monroe Twp. Board of Educ., et al.*, Civil No. 1:18-cv-09580-NLH-KMW (the "J.A. Class Action"),

naming ALJ Wilson as a defendant due to his spiteful May 1, 2018 ruling and violations of numerous IDEA due process rights including the 45 Day Rule.

332.    ALJ Wilson did not hold a hearing in the DP case on June 11, 2018.

333.    On June 13, 2018, ALJ Wilson recused himself from the DP case because he was a named defendant in the J.A. Class Action.  (A true and correct copy of the 6/13/18 letter is attached hereto as Exhibit Y.)

334.    Shortly after ALJ Wilson recused himself, ALJ Kennedy was assigned to the DP case sometime between June 13, 2018 and June 27, 2018.

335.    Mediation for the second due process complaint Agency Reference 2018-28138 was scheduled by NJDOE for and held on August 2, 2018 at 10:00 a.m. at Oak Knoll Elementary, MTBOE. (True and correct copies of the Mediation Notice and Mediation Attendance sheet are attached hereto as Exhibit Z.)

336.    However, MTBOE did not act in good faith at the mediation, refused to mediate or discuss any terms of resolution, and the mediation was terminated within minutes.

337.    Since the parties did not reach an agreement at mediation, the second due process case was transmitted from NJDOE to the OAL on August 9, 2018. Included in the casefile transmittal is the casefile transmittal page form, the service list at the time, the Case Information sheet, the August 9, 2018 transmittal letter, and the OSEP Mediation – OAL Conference Scheduling Form.  Due process case

Agency Reference 2018-28138 has the legal requirement of "45 day completion" for an "Agency Decision" as a Special Education Hearing. "Fed. Days Expended" is blank, but the Case Information sheet states "0 Federal Days Used". (A true and correct copy of a portion of the casefile transmittal, excluding the due process complaint and answer filed, is attached hereto as Exhibit AA.)

338.   The 30 Day Resolution Period terminated and the 45 Day Rule was triggered in due process case Agency Reference 2018-28138 on August 2, 2018. Due process case Agency Reference 2018-28138 was scheduled for a hearing before ALJ Bass on August 16, 2018 at 9:00 a.m. at the OAL offices in Quakerbridge (Trenton). August 16, 2018 was the 10 Day Peremptory Hearing Date in the second due process case. (Exh. AA.)

339.   August 16, 2018 was a "Settlement Thursday" at the OAL's Trenton offices.

340.   The 45 Day Rule requires that a final decision in due process case Agency Reference 2018-28138 was due on or before September 17, 2018.

341.   The August 9, 2018 transmittal letter does not indicate that the August 16, 2018 date was for a settlement conference. The term "settlement conference" does not appear anywhere on the transmittal letter. Instead, the term "hearing" is used fifteen (15) times. (Exh. AA.)

342.   The August 9, 2018 transmittal letter advises Plaintiffs they have a right to examine relevant school records of J.A.; of the Five-Day Exchange Rule and the consequences of non-compliance; that no legal briefs or closing arguments may be submitted after the hearing; if they don't attend the hearing, the case can be dismissed or MTBOE granted its relief; and that the Uniform Administrative Procedure Rules apply to the DP case.  (Exh. AA.)

343.   In the meantime, on June 27, 2018, ALJ Kennedy scheduled hearings in the DP case for October 1, 2018, October 5, 2018, October 15, 2018, and October 29, 2018 at the OAL offices in Atlantic City, New Jersey.   No party to the DP case requested an adjournment between June 27, 2018 and October 1, 2018. The hearing dates for the DP case were scheduled in accordance with ALJ Kennedy's availability. The notice includes the Five-Day Exchange Rule language. (A true and correct copy of the Notice of Hearing is attached hereto as Exhibit AB.)

344.   October 1, 2018 is **469 days** after the DP case was transmitted to the OAL.

345.   On August 14, 2018, MTBOE filed a motion to consolidate the second due process complaint with the DP case.  Despite Plaintiffs' opposition filed on the same date on the basis that the two complaints were for different school years and different claims, ALJ Kennedy ordered both cases consolidated

the same day.  The Order did not change the hearing dates already scheduled for the DP case.  (A true and correct copy of the Order of Consolidation is attached hereto as Exhibit AC.)

346.   As a result of the consolidation, ALJ Bass did not hold a hearing in the second due process case Agency Reference 2018-28138 on August 16, 2018.

347.   A final decision in the second due process case Agency Reference 2018-28138 was not issued on or before September 17, 2018.

348.   There were no requests for adjournment by the parties to the second due process case Agency Reference 2018-28138.

349.   On September 24, 2018, Plaintiffs served their Five-Day Exchange binder on MTBOE's counsel.   (A true and correct copy of the Acknowledgement Receipt of the binder dated September 24, 2018 at 4:50 p.m. is attached hereto as Exhibit AD.)

350.   September 24, 2018 is five (5) business days prior to October 1, 2018.

351.   MTBOE did not submit its Five-Day Exchange binder until September 25, 2018 in the DP case.  (A true and correct copy of an email from Linda Caspermeyer, Paralegal to John Armano, Esq., counsel for MTBOE dated September 25, 2018 at 4:58 p.m. is attached hereto as Exhibit AE.)

352.   September 25, 2018 is four (4) business days prior to October 1, 2018.

353.   On September 25, 2018, Plaintiffs file a Motion to Exclude Evidence against MTBOE for violation of the Five-Day Exchange Rule.  (A true and correct copy of the Motion to Preclude Evidence is attached hereto as Exhibit AF.)

354.   MTBOE did not file an opposition to the Motion to Preclude Evidence prior to October 1, 2018.

355.   On the first day of hearing in the DP case, October 1, 2018, ALJ Kennedy heard oral argument on Plaintiffs' Motion to Preclude Evidence.  During oral argument, ALJ Kennedy indicated he would permit MTBOE to present evidence and would issue an order to that affect.  He permitted MTBOE to argue the motion, even though they had not opposed it prior to the hearing.  He also allowed MTBOE to file their written opposition on October 2, 2018.  Plaintiffs then orally moved to stay the case pending interlocutory appeal of the ruling on the Motion to Preclude Evidence.

356.   ALJ Kennedy issued his Order and ruling on October 2, 2018 denying Plaintiffs' Motion to Exclude Evidence and staying the case pending the appeal. (A true and correct copy of the Order is attached hereto as Exhibit AG.)

357.   ALJ Kennedy's Order dated October 2, 2018 did not enforce the Five-Day Exchange Rule or the 5 days language and warning in the hearing notices issued in the DP case.  (*See e.g.* Exhs. L, N, AA, AB.)

358.   Plaintiffs filed an interlocutory appeal of ALJ Kennedy's October 2, 2018 Order in the DP case on October 10, 2018 in the U.S. District Court for the District of New Jersey bearing Civil No. 1:18-cv-14838 ("Interlocutory Appeal").

359.   During the pendency of the Interlocutory Appeal, MTBOE was further violating the Stay Put Order entered by ALJ Wilson on May 1, 2018 and not implementing J.A.'s 11/14/16 IEP.  MTBOE was implementing its own goals and later proposed IEPs that were not consented to by Plaintiffs.

360.   On August 22, 2019, Plaintiffs filed a second Request for Emergent Relief because MTBOE was not providing services to J.A. in accordance with the Stay Put 11/14/16 IEP and the consented additions of homebound instruction and social skills classes.

361.   ALJ Kennedy entered an Order dated September 12, 2019, stating in pertinent part: "It is ORDERED that the November 15, 2016 [sic], IEP along with the consented to changes of homebound instruction and an additional social skills class shall remain as Stay-Put during the pendency of this proceeding.  It is Further ORDERED that an award for compensatory education is not appropriate at this time as a full hearing has yet to be conducted. Compensatory education shall be considered after a full hearing is conducted.  It is Further ORDERED that this tribunal shall reserve a finding of whether MTBOE has provided J.A. a Free and Appropriate Public Education until after the hearing in this matter is completed."

(A true and correct copy of the Order on Application for Emergent Relief is attached hereto as Exhibit AH.)

362.   MTBOE ignored this Order and continued to violate the Stay Put Rule.

363.   The DP case was stayed until U.S. District Judge Hillman ordered the parties to return to the OAL to complete the hearing on these consolidated cases on July 22, 2020, dismissing the interlocutory appeal without prejudice.  (A true and correct copy of the Text Order from the Interlocutory Appeal is attached hereto as Exhibit AI.)

364.   Plaintiffs notified ALJ Kennedy of Judge Hillman's ruling and remand on July 23, 2020.  (A true and correct copy of the 7/23/2020 letter is attached hereto as Exhibit AJ.)

365.   Shortly after the DP case was remanded to the OAL, Plaintiffs' counsel became aware of an *ex parte* communication between ALJ Kennedy and MTBOE's counsel, John Armano, Esq., in one of the prior due process cases filed by Plaintiffs *pro se* (and discussed *supra*.)  Plaintiffs requested that ALJ Kennedy recuse himself from the DP case because of this new fact.  (A true and correct copy of the 7/30/2020 letter is attached hereto as Exhibit AK.)

366.   Almost immediately after the July 30, 2020 letter, ALJ Kennedy recused himself from the DP case and it was reassigned to ALJ Tuohy.

367.    ALJ Tuohy scheduled a hearing in the DP case for August 13, 2020. The notice includes the Five-Day Exchange Rule language.  (A true and correct copy of the Notice of Hearing is attached hereto as Exhibit AL.)

368.    Accounting for the stay during the Interlocutory Appeal, August 13, 2020 is **491 days** after the DP case was transmitted to the OAL.  No party to the DP case requested an adjournment between July 22, 2020 and August 13, 2020.

369.    But instead of holding a hearing, ALJ Tuohy conducted a status conference on August 13, 2020 despite the language of the notice that it was to be a "hearing".  (*See* Exh. AL.)

370.    During the status conference on August 13, 2020, ALJ Tuohy requested that the parties' counsel provide her with a summary of the issues in the DP case and how to proceed with the hearing.  ALJ Tuohy permitted MTBOE's counsel to dictate the hearing dates based on his scheduled as a municipal prosecutor since Mr. Armano argued the hearing could only proceed on Mondays and Fridays because his duties occurred on Tuesdays, Wednesdays, and Thursdays. Plaintiffs objected to the hearing dates being dependent upon Mr. Armano's work schedule, but ALJ Tuohy blocked out hearing dates of 9/21; 10/2; 10/23; 11/6; 11/16; 11/20; 12/4; and 12/11 to work around Mr. Armano's other responsibilities and not from a specific request by a <u>party</u>.  The hearing dates set by ALJ Tuohy in

the DP case were to accommodate John Armano's municipal prosecution schedule and ALJ Tuohy's schedule.

371.   Plaintiffs' counsel sent a letter to ALJ Tuohy dated August 14, 2020, outlining the issues, but more importantly asserting numerous objections about the DP case.  The objections included *inter alia* violation of the 45 Day Rule, failure to enforce the Five-Day Exchange Rule, violation of the Adjournment Rule, and the proposed hearing dates.  (A true and correct copy of the 8/14/2020 letter is attached hereto as Exhibit AM.)

372.   ALJ Tuohy disregarded all of the objections, kept the same hearing dates, and instructed the parties to advise on which documents had been exchanged with counsel prior to September 24, 2018.  (A true and correct copy of ALJ Tuohy's 8/31/2020 letter is attached hereto as Exhibit AN.)

373.   Hearings were held in the DP case before ALJ Tuohy via Zoom on September 21, 2020; October 2, 2020; October 23, 2020; November 16, 2020; November 20, 2020; and December 4, 2020.

374.   During the hearings, MTBOE's witnesses admitted that their testimonies about J.A.'s progress were based entirely on memory.  No documents were submitted into evidence to support their testimony, such as progress reports, report cards, graded schoolwork, or other data to support their testimonies or show that J.A. had achieved the goals in her 11/14/16 IEP.

375.    Despite numerous requests for documentation to show that J.A. was achieving her goals or to support MTBOE's representations to that effect, Joanna A. was never provided with such supporting data.

376.    No data or recent evaluations were presented during the hearings in the DP case that supports the reduction of services and goals in J.A.'s proposed IEPs after the 11/14/16 IEP.

377.    At the close of the hearings on December 4, 2020, ALJ Tuohy directed the parties to submit closing briefs by December 11, 2020, over Plaintiffs' objections to final briefs as further violating the 45 Day Rule.

378.    Accounting for the stay during the Interlocutory Appeal, December 11, 2020 is **612 days** after the DP case was transmitted to the OAL.  No party to the DP case requested an adjournment between August 13, 2020 and December 11, 2020.

379.    Plaintiffs requested the transcripts for the hearings almost immediately after the hearing date.  (True and correct copies of the requests for transcripts are attached hereto as Exhibit AO.)

380.    Plaintiffs received the transcripts as follows:

| Date of Hearing | Date Requested | Date Received |
| --- | --- | --- |
| 09/21/2020 | 09/22/2020 | 11/04/2020 |
| 10/02/2020 | 10/02/2020 | 11/04/2020 |
| 10/23/2020 | 10/24/2020 | 11/04/2020 |
| 11/16/2020 | 11/16/2020 | 01/18/2021 |
| 11/20/2020 | 12/08/2020 | 02/09/2021 |

| 12/04/2020 | 12/08/2020 | 02/09/2021 |

(*See* Exh. AO.)

381.    As soon as Plaintiffs received the transcripts, they were forwarded on to ALJ Tuohy and MTBOE's counsel.

382.    On February 22, 2021, ALJ Tuohy issued her Final Decision in the DP case.

383.    February 22, 2021 is **73 days** after the closing briefs were submitted on December 11, 2020, which by itself violates the 45 Day Rule.

384.    Accounting for the stay during the Interlocutory Appeal, February 22, 2021 is **685 days** after the DP case was transmitted to the OAL.  No party to the DP case requested an adjournment between December 11, 2020 and February 22, 2021.

## COUNT ONE – APPEAL: MTBOE'S DENIAL OF FAPE
### (Defendant MTBOE)

385.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

386.    MTBOE violated IDEA and its regulations and substantively denied J.A. a FAPE as follows:

a.    By failing to design an appropriately ambitious IEP for J.A. after November 14, 2016 in light of her circumstances, including without limitation failing to address J.A.'s Central Auditory Processing

Disorder (CAPD) and her lack of progress on the goals in her 11/14/16 IEP;

b.    By disregarding and not seriously considering the outside evaluations provided by Plaintiffs to MTBOE and its Child Study Team about J.A.'s disabilities;

c.    By violating the Child Find obligation under IDEA, including without limitation properly evaluating J.A. in all areas of suspected disability and identifying all of J.A.'s needs as a result of her disability;

d.    By relying upon teacher assessments, anecdotal information, and report cards to determine the impact of J.A.'s disabilities on her education instead of formal evaluations as required under IDEA;

e.    For predetermination of placement and services for J.A., specifically in the Co-Teach environment at Oak Knoll Elementary School, instead of developing an IEP and placing J.A. in an individualized program;

f.    By failing to change J.A.'s placement from the Co-Teach environment at Oak Knoll Elementary School when it was apparent that J.A. was not making adequate progress and the environment was not appropriate for her given her disabilities;

g.    For ignoring and failing to consider J.A.'s parents' input and denying meaningful parental participation in J.A.'s education and development of her IEP;

h.    By failing to offer Extended School Year (ESY) services to J.A. when she was clearly exhibiting regression and entitled to ESY;

i.    By failing to heed the recommendations and evaluations of outside medical professionals and licensed providers;

j.    By repeatedly violating the Stay Put Rule and implementing unapproved IEP services and goals and not following the 11/14/16 IEP;

k.    By failing to provide Plaintiffs with a properly issued Prior Written Notice as required by IDEA for services and actions that were taken by MTBOE without consent and services and actions that were denied by MTBOE despite Plaintiffs' requests;

l.    By failing to provide J.A. with the special education, related services, transportation, accommodations, and other supports that were provided in her 11/14/16 IEP;

m.    By J.A.'s classroom teachers having to manage a classroom of 21 students, 8 of which had IEPs, such that J.A. did not receive the individualized educational program to which she was entitled;

n.    By reducing J.A.'s services and goals such that she could not achieve or master her goals or the curriculum at grade level;

o.    By matriculating J.A. to the next grade multiple times based on observations and anecdotal information, unsupported by actual data, when she had not achieved grade level to support such matriculation;

p.    By forcing Plaintiffs to obtain outside services and incur substantial expense in order to help J.A. progress in her goals and classroom work;

q.    By ignoring the symptoms of J.A.'s disabilities simply because the teachers "did not see them" or "could not hear" the sounds that were affecting J.A.'s CAPD and thereby negatively impacting her ability to receive education, ultimately resulting in her having substantial anxiety and being prescribed homebound services by her physician;

r.    By having MTBOE's attorney attend IEP meetings to intimidate Plaintiffs against USDOE policy when Plaintiffs did not have an attorney present;

s.    By failing to negotiate in good faith during the mediation, which MTBOE agreed to, in violation of IDEA's requirements regarding mediation knowing that it had the broken New Jersey system of resolving special education disputes on its side;

t.    By failing to determine that the Co-Teach environment at Oak Knoll Elementary School was not the Least Restrictive Environment in which to place J.A. due to her disabilities;

u.    By setting J.A. up for failure, instead of teaching her ways to cope with her disabilities, including without limitation social skills and self-advocacy; and

v.    By intentionally denying J.A. services or an appropriate placement knowing that Plaintiffs would have to file for due process and likely lose due to the broken system of special education dispute resolution in New Jersey and did so either intentionally or with deliberate indifference to the impact on J.A. and her family.

387.    As a direct and proximate result of these violations, J.A. has been denied a FAPE by MTBOE.

388.    As a direct and proximate result of these violations, J.A. is not at grade level with any of her core subjects.

389.    As a direct and proximate result of these violations, J.A. has been matriculated to the next grades when she was not prepared for same.

390.    As a direct and proximate result of these violations, J.A.'s anxiety due to the school environment increased to a level requiring Plaintiffs to seek homebound instruction, where J.A. has been since the 2018-19 school year.

391.   As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded J.A.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to J.A., and caused a deprivation of educational benefits to J.A.

392.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP case.

393.   As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on  February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against MTBOE as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that MTBOE substantively denied J.A. a FAPE;

C.    Finding that MTBOE violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

D.    Finding that MTBOE did not negotiate in good faith during the 30 Day Resolution Period because it knew that the OAL and ALJ

Beavers would treat the July 6, 2017 peremptory hearing date in the first due process case and ALJ Bass would treat the August 16, 2018 peremptory hearing date in the second due process case as "Settlement Thursday" conferences;

E.    Finding that MTBOE did not negotiate in good faith during the 30 Day Resolution Period because it knew that New Jersey's system for resolving special education disputes is broken and that Plaintiffs had less than a 30% chance of winning a due process case;

F.    Finding that MTBOE should have been barred from presenting evidence in its case due to violation of the Five-Day Exchange Rule;

G.    Finding that MTBOE could not meet its burden of proof in the DP case;

H.    Finding that Plaintiffs are the prevailing parties in the DP case;

I.    An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

J.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

K.    For such other and further relief as the Court deems equitable and just.

## <u>COUNT TWO – APPEAL: LEGAL ERRORS IN DP CASE</u>
### (All Defendants except Doe ALJs 1 - 250)

394.  Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

395.  Defendants NJDOE, the OAL, ALJ Bass, ALJ Wilson, ALJ Kennedy, and ALJ Tuohy violated IDEA and committed the following legal errors in the DP case:

    a.    Failure to enforce Plaintiffs' rights to review J.A.'s records (*see supra* ¶¶297, 306, 342, 372, 374-76);

    b.    Failure to enforce the 30 Day Resolution Period (*see supra* ¶¶291-92, 300, 335-38);

    c.    ALJs holding settlement conferences when that is prohibited by the NJ Code of Judicial Conduct (*see supra* ¶¶300, 337-39, 341);

    d.    The OAL and ALJs employing "Settlement Thursdays" in the DP case which caused unnecessary delays, incentive for MTBOE not to resolve the dispute during the 30 Day Resolution Period, and violating the 10 Day Peremptory Hearing Date regulation, the Adjournment Rule, and the 45 Day Rule (*see supra* ¶¶133-39, 142, 295-96, 300, 307, 339, 341);

e.  ALJs holding "prehearing conferences" and "status conferences" when such is not contemplated in the regulations and unnecessarily delays the DP case and gives an advantage to MTBOE (*see supra* ¶¶303, 305-06, 312-14, 319, 322, 325, 367-72);

f.  ALJs relying upon and employing the New Jersey Uniform Administrative Procedure Rules, N.J.A.C. §1:1 *et seq.*, when those rules do not and cannot apply because they cause inherent violation of the 45 Day Rule, *e.g.* motion scheduling (*see supra* ¶¶297, 303, 305-06, 313, 321, 337, 342, 382 and the Final Decision in the DP case);

g.  Using the term "Federal Days" when that term does not appear in IDEA or the regulations and which the USDOE has told the NJDOE to cease and desist using that term as it violates the 45 Day Rule by using appearance days instead of calendar days (*see supra* ¶¶152-53, 298-99, 337);

h.  Repeated failure to enforce the Stay Put Rule and requiring Plaintiffs to file motions to enforce, when the rule is automatic from the date of filing the due process complaint, and failing to recognize that a failure to enforce Stay Put is a *per se* denial of

FAPE (*see supra* ¶¶288-89, 309-10, 323-24, 330, 359-62, 382 and the Final Decision in the DP case);

i.  Violating and failure to enforce the 10 Day Peremptory Hearing Date (*see supra* ¶¶294-96, 299, 300, 303, 305-07, 312-15, 319, 325, 332, 337-39, 341-43, 346);

j.  Violating and failure to enforce the Adjournment Rule (*see supra* ¶¶290, 302-07, 312-15, 319-20, 325, 328, 332, 338-43, 348, 367-73, 377-84);

k.  Failure to permit Plaintiffs to amend their due process complaint when the additional claims were based on the same set of events to ensure exhaustion of remedies (*see supra* ¶¶311, 327-29, 330);

l.  Wrongfully consolidating due process complaints very late in the DP case when the new complaint involved a completely different set of events and facts and further complicated the DP case hearing, doing the complete opposite of what ALJ Wilson ruled on the motion to amend, and constituting legal error because they are different claims (*see supra* ¶¶327, 330, 345);

m.  Failure to enforce the Five-Day Exchange Rule and exclude MTBOE's evidence from the hearing (*see supra* ¶¶290, 297,

306, 342-43, 349-57, 367, 371-72, 382 and the Final Decision

in the DP case);

n.  Violating and failure to enforce rules of evidence by, *inter alia*,

allowing MTBOE to introduce duplicative evidence, overruling

objections on evidence, and accepting verbal testimony to

override contradicting documents (*see supra* ¶¶306, 317-18,

342, 355-56, 361, 372, 374-76, 382 and the Final Decision in

the DP case);

o.  Violating and failure to enforce the burden of proof (*see supra*

¶¶306, 327-29, 342, 345, 355-56, 361, 372, 374-76, 382 and the

Final Decision in the DP case);

p.  Failure to enforce IDEA's requirement that MTBOE issue a

PWN (*see supra* ¶382 and the Final Decision in the DP case);

q.  Failure to grant Plaintiffs' motion for an IEE when the motion

had proper legal grounds and basis and MTBOE's defense was

legally insufficient (*see supra* ¶¶316-18, 327-29);

r.  Failure to timely grant motions and manage the DP case to

avoid unnecessary delays such that it caused a violation of the

45 Day Rule (*see supra* ¶¶316-21, 325-29, 355, 370-74, 377-

82);

s.    When finally ruling on motions, the rulings were retaliatory

because the ALJs did not like that Plaintiffs were asserting their

rights in a zealous manner (*see supra* ¶¶326-29, 331, 355-56,

370-72, 374-77, 382 and the Final Decision in the DP case);

t.    Violating and failure to enforce the 45 Day Rule (*see supra*

¶¶290, 293, 299, 301, 302-08, 312-15, 319, 321, 325-29, 332,

337-44, 346-48, 367-73, 377-84);

u.    Denying Plaintiffs' motion for directed verdict at the close of

MTBOE's case as it had not met its burden of proof (*see*

administrative record);

v.    Requiring closing briefs after the hearing when their own form

prohibits it (*see supra* ¶¶297, 337, 342, 377, 382-83);

w.    Failure to properly apply the U.S. Supreme Court's holding in

*Endrew F* as to the standard of FAPE (*see supra* ¶¶374-76, 382

and the Final Decision in the DP case);

x.    Failure to properly apply the law regarding parental

participation in the IEP process (*see supra* ¶¶374-76, 382 and

the Final Decision in the DP case);

y.    Failure to obtain proper and adequate training or education to

qualify as hearing officers under IDEA before presiding over

the DP case (*see supra* ¶¶290, 337, and all of the preceding

referenced procedural violations); and

z.    Delaying a final decision in the DP case knowing that it would

take substantial time to receive the transcripts thereby

exacerbating the violation of the 45 Day Rule and the purpose

of limiting testimony during the hearing (*see supra* ¶¶379-81).

396.   Defendants NJDOE, the OAL, ALJ Bass, ALJ Wilson, ALJ Kennedy,

and ALJ Tuohy egregiously violated the 45 Day Rule because accounting for

adjournments requested by the parties in the DP case, a Final Decision was not

issued until **685 days** after transmittal to the OAL.

397.   NJDOE and OAL are responsible for the legal errors made by ALJs in

special education due process cases.

398.   Defendant MTBOE abetted and took advantage of the legal errors in

the DP case by causing unnecessary delay, including without limitation asking ALJ

Tuohy to accommodate Armano's municipal duties and scheduling, filing a late

motion to consolidate cases that should not have been consolidated, and failure to

mediate in good faith.  MTBOE's actions were done intentionally because it knows

the New Jersey system for special education dispute resolution is broken and that it

would not have to settle the case and had a 70% chance of winning the case at

hearing, which it also knew would cause Plaintiffs substantial harm in time lost in J.A.'s education and incurring attorney's fees.

399.   As a direct and proximate result of these violations, J.A. has been denied a FAPE by these Defendants.

400.   As a direct and proximate result of these violations, Plaintiffs have been denied due process of law by these Defendants.

401.   As a direct and proximate result of these violations, J.A. is not at grade level with any of her core subjects.

402.   As a direct and proximate result of these violations, J.A. has been denied an education due to the delays in the dispute resolution system as described throughout this Complaint.

403.   As a direct and proximate result of these violations, J.A. has been matriculated to the next grades when she was not prepared for same.

404.   As a direct and proximate result of these violations, J.A.'s anxiety due to the school environment increased to a level requiring Plaintiffs to seek homebound instruction, where J.A. has been since the 2018-19 school year.

405.   As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded J.A.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making

process regarding the provision of FAPE to J.A., and caused a deprivation of educational benefits to J.A.

406.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP case.

407.   As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

408.   As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedures and Final Decision in the DP case had an overwhelming number of legal errors.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants except Doe ALJs 1-250 as follows:

A.   Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.   Finding that these Defendants substantively denied J.A. a FAPE;

C.   Finding that these Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

D.   Finding that these Defendants violated Plaintiffs' due process rights;

E.      Finding that MTBOE did not negotiate in good faith during the 30 Day Resolution Period because it knew that the New Jersey system for special education dispute resolution is broken and skewed in favor of school districts;

F.      Finding that these Defendants have systemically violated IDEA's protections and requirements to ensure Plaintiffs' rights in exchange for receiving billions of dollars in federal funding;

G.      Finding that MTBOE should have been barred from presenting evidence in its case due to violation of the Five-Day Exchange Rule;

H.      Finding that MTBOE did not, could not meet, and should not have met its burden of proof in the DP case and it was legal error to find otherwise;

I.      Finding that Plaintiffs are the prevailing parties in the DP case;

J.      An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

K.      An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

L.      For such other and further relief as the Court deems equitable and just.

## COUNT THREE – SYSTEMIC VIOLATION OF THE 10 DAY PEREMPTORY HEARING DATE
### (All Defendants)

409.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

410.   Upon information and belief, the OAL changed the first hearing date to a settlement conference with the assigned ALJ in approximately 2015 and this practice became known as "Settlement Thursday".

411.   Upon information and belief, since 2015 the OAL has never held a hearing on the first assigned hearing date after transmittal from NJDOE.  Upon information and belief, since 2015 every first assigned hearing date after transmittal from NJDOE has been used a settlement conference, which if unsuccessful requires the transfer of the due process case to another ALJ who cannot schedule a hearing for months.  (*See* Exhs. C, D, L, and AA.)

412.   By instituting the "Settlement Thursday" practice, the OAL is and has been violating the New Jersey regulation on the 10 Day Peremptory Hearing Date since 2015.

413.   Doe ALJs, by adopting and using the "Settlement Thursday" practice, are and have been violating the New Jersey regulation on the 10 Day Peremptory Hearing Date since 2015.

414.   Upon information and belief, the OAL and ALJs have not been trained on the 10 Day Peremptory Hearing Date.

415.   NJDOE, by allowing the OAL to institute and maintain the "Settlement Thursday" practice, is and has been violating the New Jersey regulation on the 10 Day Peremptory Hearing Date since 2015 and failing in its legal duty to enforce IDEA, the federal regulations, and the New Jersey Administrative Code.

416.   As a direct and proximate result of these violations, J.A. did not receive a hearing on the 10 Day Peremptory Hearing Date for either of the two due process complaints in the DP case.  Instead, in the first due process complaint, ALJ Beavers held a settlement conference.  In the second due process complaint, ALJ Bass didn't hold a hearing because ALJ Kennedy consolidated it with the first due process complaint, but no hearing occurred for months.

417.   As a direct and proximate result of these violations, J.A. has been denied a FAPE by these Defendants.

418.   As a direct and proximate result of these violations, Plaintiffs have been denied due process of law by these Defendants.

419.   As a direct and proximate result of these violations, J.A. has been denied an education due to the delays in the dispute resolution system as described throughout this Complaint.

420.   As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded J.A.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to J.A., and caused a deprivation of educational benefits to J.A.

421.   As a direct and proximate result of these violations, Plaintiffs have been harmed because failing to enforce the 10 Day Peremptory Hearing Date disincentivizes all school districts, MTBOE in this case, from resolving the dispute within the 30 Day Resolution Period because they know the first scheduled hearing date in a due process case will be used as a settlement conference thereby hindering opportunities for Plaintiffs to settle before going to a hearing.

422.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP case.

423.   As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on  February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final

Decision as error;

B.    Finding that these Defendants substantively denied J.A. a FAPE;

C.    Finding that these Defendants violated numerous procedural

safeguards under IDEA that resulted in a denial of FAPE;

D.    Finding that these Defendants violated Plaintiffs' due process rights;

E.    Finding that MTBOE did not negotiate in good faith during the 30

Day Resolution Period because it knew that the New Jersey system

for special education dispute resolution is broken and skewed in favor

of school districts;

F.    Finding that these Defendants have systemically violated IDEA's

protections and requirements to ensure Plaintiffs' rights in exchange

for receiving billions of dollars in federal funding;

G.    Finding that MTBOE did not, could not meet, and should not have

met its burden of proof in the DP case and it was legal error to find

otherwise;

H.    Finding that Plaintiffs are the prevailing parties in the DP case;

I.    An award of compensatory education and/or an education fund for

private tutoring for J.A. that covers the school years from 2017-2020

to help J.A. achieve grade-level performance;

J.      An award of compensatory damages in the amount of $1.5 million;

K.      Injunctive relief terminating the OAL practice of "Settlement Thursday";

L.      Injunctive relief that all Defendants comply with and enforce the 10 Day Peremptory Hearing Date and all deadlines created thereby *instanter*;

M.      Injunctive relief that all ALJs that handle special education due process cases be trained on the 10 Day Peremptory Hearing Date regulation and the why and how it must be implemented;

N.      An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

O.      For such other and further relief as the Court deems equitable and just.

## COUNT FOUR –SYSTEMIC VIOLATION OF THE FIVE-DAY EXCHANGE RULE
### (All Defendants)

424.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

425.    The Five-Day Exchange Rule requires the parties to exchange their evidence for the due process hearing five business days before the first scheduled hearing date, *i.e.* the 10 Day Peremptory Hearing Date.  This requirement was

confirmed in notices issued in the DP case. (*See supra* ¶¶68-70, 105-06, 290, 306, 342-43, 367 and Exhs. J, L, N, AA, AB, and AL.)

426.   Not only did ALJs Kennedy and Tuohy not enforce the Five-Day Exchange Rule in the DP case, upon information and belief the OAL and the ALJs have not been properly enforcing the Five-Day Exchange Rule for many years in New Jersey.  (*See supra* ¶¶103, 349-57, 371-72, and Exhs. AD-AG.)

427.   Upon information and belief, the OAL and ALJs have never been properly trained on the Five-Day Exchange Rule, its inseparable connection with the 10 Day Peremptory Hearing Date, and the necessity of its enforcement.  (*See supra* ¶143.)

428.   By systemically violating the New Jersey regulation of the 10 Day Peremptory Hearing Date by treating it as "Settlement Thursday", the OAL and ALJs have been systemically violating the Five-Day Exchange Rule.

429.   NJDOE, by allowing the OAL and ALJs to consistently violate the Five-Day Exchange Rule, is and has been violating and failing in its legal duty to enforce IDEA, the federal regulations, and the New Jersey Administrative Code.

430.   Plaintiffs complied with the Five-Day Exchange Rule by timely providing its documents and list of witnesses intended to be introduced at the hearing to MTBOE.

431.   MTBOE did not comply with the Five-Day Exchange Rule.

432.    ALJs Kennedy and Tuohy did not enforce the Five-Day Exchange Rule against MTBOE when they should have and barred all of MTBOE's evidence.  Thus, MTBOE should have not been able to present any documents or testimony in the DP case and would have not been able to meet its burden of proof.

433.    MTBOE intentionally and willfully disregarded Plaintiffs' attempts to have MTBOE provide documents that would be potentially included in Plaintiffs' Five-Day Exchange.

434.    Plaintiffs properly and timely filed a Motion to Bar Evidence based on the Five-Day Exchange Rule because of MTBOE's violation of the Rule.  The motion was denied and MTBOE was permitted to present evidence contrary to the Rule and the notices issued in the DP case.

435.    Thus, following the pattern and lack of training of all ALJs at the OAL, ALJs Kennedy and Tuohy violated the Five-Day Exchange Rule in the DP case.

436.    As a direct and proximate result of these violations, Plaintiffs suffered harm by having their Motion to Bar Evidence denied, their Five-Day Exchange compliance ignored, and allowing MTBOE to present evidence in the DP case when it should have been barred from doing so.

437.    As a direct and proximate result of these violations, Plaintiffs have been harmed because MTBOE had the statutory burden of proof in the DP case

and Plaintiffs should have won the case because MTBOE would not have met its burden of proof with no evidence to present.

438.   As a direct and proximate result of these violations, J.A. has been denied a FAPE by Defendants.

439.   As a direct and proximate result of these violations, Plaintiffs have been denied due process of law by Defendants.

440.   As a direct and proximate result of these violations, J.A. has been denied an education due to the delays in the dispute resolution system as described throughout this Complaint.

441.   As a direct and proximate result of these violations, Plaintiffs have been harmed by having to fund and endure a lengthy hearing with numerous witnesses and documents presented by MTBOE, which further delayed the hearing in the DP case, caused egregious violation of the 45 Day Rule, and incur costs and expenses related thereto.

442.   As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded J.A.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to J.A., and caused a deprivation of educational benefits to J.A.

443.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP case.

444.   As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on  February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that these Defendants violated Plaintiffs' due process rights;

C.    Finding that these Defendants substantively denied J.A. a FAPE;

D.    Finding that these Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

E.    Finding that MTBOE did not comply with the Five-Day Exchange Rule because it knew that the New Jersey system for special education dispute resolution is broken and skewed in favor of school districts;

F.    Finding that these Defendants have systemically violated IDEA's protections and requirements to ensure Plaintiffs' rights in exchange for receiving billions of dollars in federal funding;

G.   Finding that MTBOE did not, could not meet, and should not have met its burden of proof in the DP case and it was legal error to find otherwise;

H.   Finding that Plaintiffs are the prevailing parties in the DP case;

I.   An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

J.   An award of compensatory damages in the amount of $1.5 million;

K.   Injunctive relief that all Defendants comply with and strictly enforce the Five-Day Exchange Rule *instanter*;

L.   Injunctive relief that all ALJs that handle special education due process cases be trained on the Five-Day Exchange Rule and the why and how it must be implemented;

M.   An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

N.   For such other and further relief as the Court deems equitable and just.

## COUNT FIVE – SYSTEMIC VIOLATION OF THE ADJOURNMENT RULE
### (All Defendants)

445.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

446.   The Adjournment Rule provides that a due process case may be adjourned for specific amounts of time only at the request of a party, not by a hearing officer or an ALJ and not to accommodate the schedule of the OAL. (*See supra* ¶¶64-65, 101 and Exh. J.)

447.   Not only did the Defendants violate the Adjournment Rule in the DP case over and over again, upon information and belief the Defendants have been violating the Adjournment Rule for many years in New Jersey by ALJs scheduling hearings to accommodate their schedules which nearly always violated the 45 Day Rule.  (*See supra* ¶¶139-40, 151-52, 290, 302, 304, 307, 309, 311, 315, 320, 325, 343, 348, 368, 371, 378, 384, and Exhs. C, G, H, P, AB, and AM.)

448.   Upon information and belief, the OAL and ALJs have never been properly trained on the Adjournment Rule and its inseparable connection with the 45 Day Rule, and the necessity of its strict enforcement.  (*See supra* ¶143.)

449.   NJDOE, by allowing the OAL to ignore the Adjournment Rule and schedule hearings to accommodate ALJs' commitments instead of honoring the 45 day timeline, is and has been violating the Adjournment Rule and failing in its legal duty to enforce IDEA, the federal regulations, and the New Jersey Administrative Code.

450.   MTBOE wrongfully relied upon and used the OAL and ALJs violations of the Adjournment Rule to its advantage and thereby knew the case

would be adjourned *sua sponte* by the presiding ALJs and therefore did not comply with any of the deadlines according to IDEA, the federal regulations, or the New Jersey Administrative Code.

451.    As a direct and proximate result of these violations, Plaintiffs suffered harm by having the DP case repeated delayed and adjourned by the ALJs to accommodate their schedules and the OAL calendar so that final decisions in the consolidated two due process complaints were not reached in 45 days after transmittal from NJDOE.

452.    As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE taking advantage of the delays and adjournments to prepare its case with duplicative evidence that should have been excluded and cause Plaintiffs to incur substantial attorney's fees and costs to contest MTBOE's actions in the DP case.

453.    As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE's counsel seeking and receiving by order of ALJ Tuohy a hearing schedule to accommodate his municipal prosecution duties that extended the hearing in the DP case for several months in violation of the 45 Day Rule and continuing the denial of FAPE of J.A.

454.    As a direct and proximate result of these violations, Plaintiffs suffered harm by having to resort to homebound services for J.A. which have continued on

far beyond the typical 60 day period for homebound services and to rely upon enforcing Stay Put for an egregiously extended period of time.

455.   As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE not negotiating in good faith during the 30 Day Resolution Periods or thereafter knowing that the OAL and the ALJs would grant adjournments "summarily" and thereby using that as leverage against Plaintiffs knowing they would have to continue incurring attorney's fees and costs without resolution of the FAPE issue for J.A.

456.   As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE not providing the documents or evidence it presumably had to prepare its due process complaint in the DP case prior to hearing because MTBOE knew that the OAL and the ALJs would grant adjournments "summarily" and/or without a request to do so and thereby allowing MTBOE to delay providing evidence to the Plaintiffs to allow them to prepare their case.

457.   As a direct and proximate result of these violations, Plaintiffs suffered harm by having the DP case adjourned without a request to do so and thereby allowing MTBOE to present evidence in the DP case when it should have been barred from doing so.

458.   As a direct and proximate result of these violations, Plaintiffs have been harmed because MTBOE had the statutory burden of proof in the DP case

and Plaintiffs should have won the case because MTBOE would not have met its burden of proof with no evidence to present.

459.   As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on  February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that Defendants violated Plaintiffs' due process rights;

C.    Finding that Defendants substantively denied J.A. a FAPE;

D.    Finding that Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

E.    Finding that MTBOE did not comply with the Adjournment Rule because it knew that the New Jersey system for special education dispute resolution is broken and skewed in favor of school districts;

F.    Finding that Defendants have systemically violated the Adjournment Rule;

G.   Finding that Defendants have systemically violated IDEA's protections and requirements to ensure Plaintiffs' rights in exchange for receiving billions of dollars in federal funding;

H.   Finding that MTBOE wrongfully abused the Adjournment Rule to its advantage;

I.   Finding that Plaintiffs are the prevailing parties in the DP case;

J.   An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

K.   An award of compensatory damages in the amount of $1.5 million;

L.   Injunctive relief that all Defendants comply with and strictly enforce the Adjournment Rule *instanter*;

M.   Injunctive relief that all ALJs that handle special education due process cases be trained on the Adjournment Rule and the why and how it must be implemented;

N.   An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

O.   For such other and further relief as the Court deems equitable and just.

## COUNT SIX – SYSTEMIC VIOLATION OF THE 30 DAY RESOLUTION PERIOD
### (All Defendants)

460.  Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

461.  IDEA, its regulations, and the NJ regulations are clear that when a due process complaint is filed by a parent, there are three options that may occur. Those options include a resolution meeting between just the parties to the due process complaint; mediation between the parties and an independent mediator; or waiver by both parties of the resolution period.  If the parties decide not to waive the resolution period, they have 30 days in which to try to resolve the dispute.  This is known as the 30 Day Resolution Period. (*See supra* ¶¶58-61, 97-98, 103, 142.)

462.  While the 30 Day Resolution Period does not require the parties to settle the dispute, it does have an inherent requirement that the parties act in good faith in negotiations.

463.  MTBOE did not waive the 30 Day Resolution Period for either of the two due process complaints later consolidated into the DP case.  In both complaints, the parties agreed to mediation provided by NJDOE. (*See supra* ¶¶291-92, 335-37, and Exhs. K, L, Z, and AA.)

464.  MTBOE did not act in good faith in negotiations during either 30 Day Resolution Period because it and its counsel knew that the OAL would follow its

practice of "Settlement Thursday" and there would be further delays in the due

process case from adjournments and ALJs' schedules such that there was no

pressure on MTBOE to resolve the disputes.  During the mediation of the second

due process complaint, MTBOE's counsel terminated the mediation without any

discussion of resolution.  MTBOE knew it would not ever have to make a good

faith attempt to resolve the disputes with Plaintiffs because MTBOE has better

financial resources and insurance to fight long due process cases than Plaintiffs and

that even if the case went to hearing, MTBOE had a 70% chance of winning at the

administrative level.  (*See supra* ¶¶133-40, 142, 149, 157, 294-96, 338-41, 398,

and 410.)

465.   Upon information and belief, LEAs rarely settle due process cases

during the 30 Day Resolution Period.

466.   Upon information and belief, Defendants regularly violate the 30 Day

Resolution Period because they never honor the 10 Day Peremptory Hearing Date

and always use it as a settlement conference.

467.   By limiting the jurisdiction of the OAL, the NJDOE has

disincentivized LEAs from resolving due process cases during the 30 Day

Resolution Period because, for example, the OAL does not have the jurisdiction to

award or enforce attorney's fees as part of a settlement contrary to Third Circuit

law.  (*See supra* ¶¶141-42.)

468.   Upon information and belief, the OAL and ALJs have never been properly trained on the 30 Day Resolution Period and its inseparable connection with the 10 Day Peremptory Hearing Date, and the necessity of its strict enforcement.  (*See supra* ¶143.)

469.   NJDOE, by allowing the OAL to ignore the 10 Day Peremptory Hearing Date and conduct "Settlement Thursdays", has failed to adequately enforce the 30 Day Resolution Period and is and has been violating its legal duty to enforce IDEA, the federal regulations, and the New Jersey Administrative Code.

470.   As a direct and proximate result of these violations, Plaintiffs suffered harm by not having a fair opportunity to resolve either of the two due process complaints because MTBOE could rely upon "Settlement Thursdays" and further delays without having to negotiate in good faith.

471.   As a direct and proximate result of these violations, Plaintiffs suffered harm by having the DP case go to hearing after all of the other procedural violations when hearing would have been avoided if the 30 Day Resolution Period was adequately honored.

472.   As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE taking advantage of the failure of NJ's system to enforce the 30 Day Resolution Period and cause Plaintiffs to incur substantial attorney's fees and costs to contest MTBOE's actions in the DP case.

473.    As a direct and proximate result of these violations, Plaintiffs suffered harm by having to resort to homebound services for J.A. which have continued on far beyond the typical 60 day period for homebound services and to rely upon enforcing Stay Put for an egregiously extended period of time.

474.    As a direct and proximate result of these violations, Plaintiffs have been harmed because they had to go to an unfair hearing and have ALJ Tuohy issue her Final Decision on  February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that Defendants violated Plaintiffs' due process rights;

C.    Finding that Defendants substantively denied J.A. a FAPE;

D.    Finding that Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

E.    Finding that MTBOE did not negotiate in good faith during the 30 Day Resolution Period because it knew that the New Jersey system for special education dispute resolution is broken and skewed in favor of school districts;

F.   Finding that Defendants systemically fail to enforce the 30 Day Resolution Period;

G.   Finding that Defendants have systemically violated IDEA's protections and requirements to ensure Plaintiffs' rights in exchange for receiving billions of dollars in federal funding;

H.   Finding that MTBOE wrongfully abused the 30 Day Resolution Period to its advantage;

I.   Finding that Plaintiffs are the prevailing parties in the DP case;

J.   An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

K.   An award of compensatory damages in the amount of $1.5 million;

L.   Injunctive relief that all Defendants comply with and strictly enforce the 30 Day Resolution Period and require the parties to negotiate in good faith *instanter*;

M.   Injunctive relief that all ALJs that handle special education due process cases be trained on the 30 Day Resolution Period and the why and how it must be implemented;

N.   An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

O.    For such other and further relief as the Court deems equitable and just.

## COUNT SEVEN –SYSTEMIC VIOLATION OF THE ACCESS TO RECORDS PROCEDURAL SAFEGUARD
### (All Defendants)

475.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

476.    IDEA's Procedural Safeguard of parents' right to access their child's educational records is separate and distinct from the Procedural Safeguard of the right to file a due process case.  The right to access a child with a disability's education records is fundamental and not "discovery".  (*See supra* ¶¶38-39, 92, 132, 297, 306, 342, 374-76, and Exhs. D, L, and AA.)

477.    The reason for this fundamental due process right is twofold: (1) "Through the child-study team, the [school district] board generally has extensive records pertaining to a handicapped child," *Lascari v. Board of Educ.*, 116 N.J. 30, 45, 560 A. 2d 1180 (N.J. 1989), not the parents; and (2) parents are entitled to prepare for a school district's argument in a special education dispute and the Five-Day Exchange Rule if there are records that the parents wish to present as evidence.  (*See supra* Exhs. D, L, and AA.)

478.    MTBOE violated Plaintiffs' right to access J.A.'s records in sufficient time prior to a due process hearing as guaranteed by IDEA and therefore violated the referenced Procedural Safeguard.  *See* 34 C.F.R. §300.613(a).

479.   As a direct and proximate result of these violations, Plaintiffs were not able to adequately prepare for their cases in accordance with IDEA's timeline while MTBOE was permitted to present evidence that violated the Five-Day Exchange Rule.

480.   Upon information and belief, LEAs rarely comply with the full and proper access to the records of a child with a disability, such as emails that discuss the child's progress or as in the DP case MTBOE failed to provide basic data on J.A.'s progress or documents that evidenced that MTBOE was measuring that progress against J.A.'s IEP goals.

481.   Upon information and belief, Defendants rarely if ever enforce a parents' rights to access their child's records even though it states that right explicitly in the due process case transmittal documents.

482.   Upon information and belief, Defendants tell parents and/or parents' counsel that they should serve discovery requests on LEAs to get access to the documents, when that is in contradiction of the law.

483.   Upon information and belief, the OAL and ALJs have never been properly trained on the access to records Procedural Safeguard and its inseparable connection with preparation for hearing and the 45 Day Rule, and the necessity of its strict enforcement.  (*See supra* ¶143.)

484.   Defendants, by failing to enforce parents' fundamental right to access their child's records, have been violating their legal duty to enforce IDEA, the federal regulations, and the New Jersey Administrative Code.

485.   As a direct and proximate result of these violations, Plaintiffs suffered harm by not having a fair opportunity to review J.A.'s records and prepare their due process case for hearing.

486.   As a direct and proximate result of these violations, Plaintiffs suffered harm by having the DP case go to hearing after all of the other procedural violations when hearing may have been avoided if they were given proper access to J.A.'s records.

487.   As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE taking advantage of the failure of NJ's system to enforce the right to access records and cause Plaintiffs to incur substantial attorney's fees and costs to contest MTBOE's actions in the DP case.

488.   As a direct and proximate result of these violations, Plaintiffs have been harmed because they had to go to an unfair hearing and have ALJ Tuohy issue her Final Decision on February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that Defendants violated Plaintiffs' due process rights;

C.    Finding that Defendants substantively denied J.A. a FAPE;

D.    Finding that Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

E.    Finding that MTBOE failed to provide Plaintiffs with proper and full access to J.A.'s records because it knew that the New Jersey system for special education dispute resolution is broken and skewed in favor of school districts;

F.    Finding that Defendants are systemically violating the Procedural Safeguard of parents' right to access their child's education records on a timely basis by failing to enforce the Procedural Safeguard and/or ensure that the OAL is enforcing the Procedural Safeguard as required by IDEA;

G.    Finding that because Defendants are systemically violating the Procedural Safeguard of parents' right to access their child's education records, school districts, and specifically MTBOE in the DP case, can control to which documents parents have access to prepare for a due process hearing;

H.    Finding that Defendants have systemically violated IDEA's protections and requirements to ensure Plaintiffs' rights in exchange for receiving billions of dollars in federal funding;

I.    Finding that Plaintiffs are the prevailing parties in the DP case;

J.    An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

K.    An award of compensatory damages in the amount of $1.5 million;

L.    Injunctive relief that Defendants strictly comply and enforce the Procedural Safeguard of parents' right to access their child's education records *instanter*;

M.    Injunctive relief that all ALJs that handle special education due process cases be trained on the parents' right to access records and the why and how it must be implemented;

N.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

O.    For such other and further relief as the Court deems equitable and just.

## COUNT EIGHT –SYSTEMIC VIOLATION OF THE DISCOVERY RULES IN SPECIAL EDUCATION DUE PROCESS CASES
### (All Defendants)

489.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

490.    The New Jersey procedural rules for special education due process cases are located in N.J.A.C. §§6A:14-2.7 and 1:6A, not N.J.A.C. §1:1 because application of the latter would inherently and inevitably violate the 45 Day Rule.

491.    Discovery in special education due process cases is intended to be an informal process and pursuant to the express language of the New Jersey Administrative Code may not include formal discovery requests.

492.    The reason that discovery is informal is to ensure compliance with the 10 Day Peremptory Hearing Date and the 45 Day Rule and prevent drawn-out discovery disputes and motions in special education due process cases.

493.    Despite these rules, the ALJs presiding over the DP case referenced "discovery" numerous times – ALJ Wilson in a Prehearing Order; ALJs Kennedy and Tuohy in their rulings on the Five-Day Exchange Rule and motions to exclude. (*See supra* ¶¶305-06, 355-57, 370-72, and Exhs. N, AG, AM, and AN.)

494.    MTBOE relied upon these discovery references and its counsel used typical litigation tactics for discovery.  Indeed, MTBOE refused to provide Plaintiffs with access to all of J.A.'s records because it deemed Plaintiffs' requests

as "discovery requests" rather than a Procedural Safeguard separate from the rules of special education due process cases. Such reliance is a violation of the New Jersey Administrative Code rules that apply to special education due process cases.

495. Upon information and belief, the OAL and ALJs routinely issue prehearing orders with discovery schedules and permit formal discovery and motions in special education due process cases and thereby systemically violate IDEA and the New Jersey regulations.

496. NJDOE has failed in its legal obligation to oversee the OAL and all ALJs to ensure they are not imposing formal discovery schedules and discovery in special education due process cases and therefore has failed in ensuring compliance with IDEA, the federal regulations, the New Jersey regulations, and the New Jersey Administrative Rules. NJDOE is therefore systemically violating its oversight duties under IDEA.

497. As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE's delay in providing Plaintiffs access to J.A.'s records informally and thereby preventing Plaintiffs from adequately preparing for the DP case.

498. As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE claiming Plaintiffs' access to J.A.'s records was a "discovery request" and thereby being able to escape enforcement by the presiding ALJs in the DP case.

499.   As a direct and proximate result of these violations, Plaintiffs suffered harm by having the DP case go to hearing after all of the other procedural violations when hearing may have been avoided if they were given proper enforcement of the special education due process case regulations.

500.   As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE taking advantage of the failure of NJ's system to enforce the special education due process case regulations on discovery and cause Plaintiffs to incur substantial attorney's fees and costs to contest MTBOE's actions in the DP case.

501.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs.

502.   As a direct and proximate result of these violations, Plaintiffs have been harmed because they had to go to an unfair hearing and have ALJ Tuohy issue her Final Decision on February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that Defendants violated Plaintiffs' due process rights;

C.     Finding that Defendants substantively denied J.A. a FAPE;

D.     Finding that Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

E.     Finding that MTBOE relied upon and thereby violated the special education due process case regulations regarding discovery because it knew that the New Jersey system for special education dispute resolution is broken and skewed in favor of school districts;

F.     Finding that Defendants are systemically violating parents' due process rights by failing to enforce the special education due process case regulations on discovery and/or ensure that the OAL is enforcing the Procedural Safeguard as required by IDEA;

G.     Finding that Defendants have systemically violated IDEA's protections and requirements to ensure Plaintiffs' rights in exchange for receiving billions of dollars in federal funding;

H.     Finding that Plaintiffs are the prevailing parties in the DP case;

I.     An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

J.     An award of compensatory damages in the amount of $1.5 million;

K.  Injunctive relief that Defendants strictly comply and enforce the special education due process case regulations *instanter*;

L.  Injunctive relief that all ALJs that handle special education due process cases be trained on the special education due process case regulations and that N.J.A.C. §§1:1 rules on discovery do not apply in special education cases;

M.  An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

N.  For such other and further relief as the Court deems equitable and just.

## COUNT NINE –SYSTEMIC VIOLATION OF THE RULES OF EVIDENCE IN SPECIAL EDUCATION DUE PROCESS CASES
### (All Defendants)

503.  Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

504.  IDEA provides very specific rights on evidence to parties in a special education due process hearing.  (*See supra* ¶¶66-67, 70, 132, 306 and *e.g.* Exhs. D and N.)

505.  IDEA permits Plaintiffs to present IEEs as expert reports in the DP case.

506.  "The judge's decision [in a special education due process case] shall be based on the preponderance of the credible evidence, and the proposed action of

the board of education or public agency <u>shall not be accorded any presumption of correctness</u>." N.J.A.C. §1:6A-14.1 (emphasis added.)

507.   ALJs should err on the side of admissibility without the formality of foundational proof.  *Delguidice v. New Jersey Racing Commission*, 100 N.J. 79, 494 A.2d 1007 (1985) ("In an administrative hearing, all relevant evidence is admissible"); *Mazza v. Cavicchia*, 105 A. 2d 545, 15 N.J. 498, 509 (1954) ("In a hearing before an administrative tribunal technical rules of evidence are not controlling"); *RB ex rel. Parent v. Mastery Charter School*, 762 F. Supp. 2d 745, 747 at *fn. 3* (E.D.Pa. 2010) (Administrative hearings may introduce hearsay and other relevant evidence similar to injunction proceedings in federal court where the rules of evidence are relaxed); *HM ex rel. BM v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 448 (D.N.J. 2011) (Admissibility of evidence is different than the weight accorded evidence and should be allowed in an administrative hearing, but it is up to the hearing officer to determine the weight applied); *Council Rock Sch. Dist. v. M.W. ex rel. Marc W.*, No. 11-4824, 2012 WL 3055686, at *6 (E.D.Pa. July 26, 2012) ("Special education hearing officers are not strictly bound by the Federal Rules of Evidence"); *see also JN v. South Western School Dist.*, 55 F. Supp. 3d 589 (M.D.Pa. 2014).

508.   Despite the relaxation of evidence rules in special education due process cases, the presiding ALJs in the DP case repeatedly limited Plaintiffs'

evidence based on strict evidentiary rules and restricted Plaintiffs' use of IEEs obtained at their own expense yet provided to MTBOE.

509.   The presiding ALJs in the DP case, but in particular ALJ Tuohy, allowed MTBOE to present unlimited number of witnesses, all of which provided duplicative and unsupported testimony to which Plaintiffs' cross-examination was hindered due to MTBOE's failure to provide requested J.A.'s records.  (*See supra* ¶¶374-76, 452.)

510.   During the hearings, Plaintiffs made numerous evidentiary objections because ALJ Tuohy had shown that she was applying strict evidentiary rules, but nearly all of Plaintiffs' objections were denied.  ALJ Tuohy's evidentiary rulings were one-sided in favor of MTBOE.

511.   MTBOE relied upon ALJ Tuohy's evidentiary rulings to its own advantage knowing that Plaintiffs would not be able to confront MTBOE's evidence.

512.   MTBOE's reliance upon ALJ Tuohy's evidentiary rulings is a violation of the fundamental fairness built into IDEA, the federal regulations, the New Jersey Administrative Code, and caselaw regarding evidence in special education due process cases.

513.   Upon information and belief, the OAL and ALJs routinely and similarly issue erroneous evidentiary rulings in special education due process cases

and thereby systemically violate IDEA, the federal regulations, the New Jersey

Administrative Code, and caselaw regarding evidence.  (*See supra* ¶144 and Exh.

C.)

514.  NJDOE has failed in its legal obligation to oversee the OAL and all

ALJs to ensure they are not imposing erroneous evidentiary rulings in special

education due process cases and therefore has failed in ensuring compliance with

IDEA, the federal regulations, the New Jersey regulations, and the New Jersey

Administrative Rules.  NJDOE is therefore systemically violating its oversight

duties under IDEA.

515.  As a direct and proximate result of these violations, Plaintiffs suffered

harm by not being able to present relevant and admissible evidence in the DP case.

516.  As a direct and proximate result of these violations, Plaintiffs suffered

harm by not being able to "[p]resent evidence and confront, cross-examine, and

compel the attendance of witnesses."

517.  As a direct and proximate result of these violations, Plaintiffs suffered

harm because MTBOE was unfairly allowed to present evidence that was

duplicative and unsupported by documents or other proof and was essentially

conjecture or "memory".

518.  As a direct and proximate result of these violations, Plaintiffs have

been harmed because Plaintiffs incurred substantial attorney's fees and costs.

**Page 145 of 202**

519.    As a direct and proximate result of these violations, Plaintiffs have been harmed because they had to go to an unfair hearing and have ALJ Tuohy issue her Final Decision on February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that Defendants violated Plaintiffs' due process rights;

C.    Finding that Defendants substantively denied J.A. a FAPE;

D.    Finding that Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

E.    Finding that MTBOE relied upon and thereby violated the evidence rules in special education due process cases because it knew that the New Jersey system for special education dispute resolution is broken and skewed in favor of school districts;

F.    Finding that Defendants are systemically violating parents' due process rights by failing to apply equally the special education due process case regulations on evidence and/or ensure that the OAL is enforcing the rules as required by IDEA;

G.     Finding that Defendants have systemically violated IDEA's protections and requirements to ensure Plaintiffs' rights in exchange for receiving billions of dollars in federal funding;

H.     Finding that Plaintiffs are the prevailing parties in the DP case;

I.     An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

J.     An award of compensatory damages in the amount of $1.5 million;

K.     Injunctive relief that Defendants strictly comply and enforce the special education due process case regulations and rules of evidence *instanter*;

L.     Injunctive relief that all ALJs that handle special education due process cases be trained on the special education due process case regulations and rules on evidence in special education cases;

M.     An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

N.     For such other and further relief as the Court deems equitable and just.

## COUNT TEN – SYSTEMIC VIOLATION OF HEARING OFFICER QUALIFICATIONS
### (All Defendants except MTBOE)

520.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

521.   As described at length above, State Defendants have failed to comply with IDEA, the federal regulations, and the New Jersey Administrative Code in numerous respects.

522.   NJDOE's systemic design flaw by using the OAL as the adjudicative body to resolve special education disputes has resulted in a denial of FAPE to children with disabilities and their families in the State of New Jersey.

523.   As described at length above, NJDOE's system for resolving special education disputes has resulted in the denial of FAPE to Plaintiffs.

524.   By selecting OAL as the body to handle special education disputes in the State of New Jersey and knowing that the OAL had a limited number of ALJs, the ALJs have little or no training in special education law, and do not have the jurisdiction to award all forms of relief under special education laws, NJDOE knew or should have known that its system for resolving special education disputes was flawed *ab initio*.

525.   Upon information and belief, most of the ALJs assigned to special education cases by the OAL in New Jersey do not have special training in or

possess knowledge of the provisions of IDEA, its regulations, or the New Jersey regulations for special education due process cases.  Further, by its own admission, the OAL, as an executive branch agency instead of a judicial branch court, does not have jurisdiction to make legal interpretations of or conduct hearings in special education cases in accordance with standard legal practice.

526.   Upon information and belief, some ALJs have received special education training at Lehigh University by Perry Zirkel, but that training is highly skewed to favor school districts and LEAs and against parents.[11]  Indeed, Mr. Zirkel's curriculum vitae[12] indicates that he is a former Spanish teacher in New York City and worked for the Connecticut State Department of Education, but is not admitted to practice law in any state and has never been a special education practitioner in any state, especially not New Jersey.

527.   Upon information and belief, any special education training of ALJs has not emphasized the requirements of strict compliance with the 10 Day Peremptory Hearing Date, the Five-Day Exchange Rule, the Adjournment Rule, the rules of evidence in special education due process cases, or the 45 Day Rule.

---

[11] After a brief search, Perry Zirkel's website revealed "Mar. 26 – Training session for New Jersey IDEA administrative law judges [virtual]."  *See* https://perryzirkel.com/upcoming-presentations/.

[12] PDF file available at https://perryzirkel.files.wordpress.com/2020/06/zirkel_vita_june2020.pdf.

Any such training has not focused specifically on NJ's implementation of IDEA and regulations of due process cases.

528.  As a direct and proximate cause of the lack of adequate training of ALJs on special education law, the rulings in the DP case by the presiding ALJs' conflict with the express language of IDEA, its regulations, and the New Jersey regulations for special education due process cases.

529.  Upon information and belief, the OAL and ALJs routinely issue erroneous rulings in special education due process cases because of the lack of training and thereby systemically violate IDEA, the federal regulations, the New Jersey regulations, and caselaw regarding evidence.

530.  The OAL and ALJs that preside over NJ special education due process cases do not meet the qualifications of hearing officers as required by IDEA and therefore are systemically violating IDEA and its regulations.

531.  NJDOE has failed in its legal obligation to oversee the OAL and all ALJs to ensure they are properly and adequately trained on special education due process cases to meet the qualifications of IDEA hearing officers and therefore has failed in ensuring compliance with IDEA and its regulations.  NJDOE is therefore systemically violating its oversight duties under IDEA.

532.  Because ALJs lack training, knowledge, and jurisdiction, NJDOE's system of assigning special education disputes to the OAL is flawed and broken.

533.    As a direct and proximate result of these violations, Plaintiffs are harmed by this lack of training and expertise in special education law because they have received invalid rulings to their detriment in the DP case.

534.    As a direct and proximate result of these violations, Plaintiffs are harmed by this lack of training and expertise in special education law because MTBOE benefitted from invalid rulings that enabled it to win the DP case.

535.    NJDOE's systemic violations of IDEA have caused Plaintiffs damages.  Specifically, Plaintiffs have been denied a FAPE for procedural violations in the DP case sent to the OAL, which does not meet the statutory qualifications for hearing officers.  Plaintiffs are entitled to all appropriate relief as a result of this harm.

536.    As a direct and proximate result of these violations, Plaintiffs suffered harm by not being able to present relevant and admissible evidence in the DP case and to "[p]resent evidence and confront, cross-examine, and compel the attendance of witnesses."

537.    As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs.

538.    As a direct and proximate result of these violations, Plaintiffs have been harmed because they had to go to an unfair hearing and have ALJ Tuohy

issue her Final Decision on February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that Defendants violated Plaintiffs' due process rights;

C.    Finding that Defendants substantively denied J.A. a FAPE;

D.    Finding that Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

E.    Finding that the presiding ALJs in the DP case made erroneous rulings directly because of their lack of adequate training and qualifications as IDEA hearing officers;

F.    Finding that because of the lack of qualifications of the presiding ALJs in the DP case as IDEA hearing officers, they harmed Plaintiffs by an inequal adjudicating body skewed in favor of school districts;

G.    Finding that MTBOE relied upon the lack of training of ALJs and thereby had an unfair advantage in the DP case because it knew that the New Jersey system for special education dispute resolution is broken and skewed in favor of school districts;

H.    Finding that MTBOE should not have been permitted to benefit from the lack of training and knowledge of the provisions of IDEA, its regulations, or the New Jersey regulations for special education due process cases by the presiding ALJs in the DP case;

I.    Finding that Defendants are systemically violating parents' due process rights by failing to ensure proper training of ALJs before parents bring due process cases to hearing;

J.    Finding that Defendants have systemically violated IDEA's protections and requirements to ensure Plaintiffs' rights in exchange for receiving billions of dollars in federal funding;

K.    Finding that Plaintiffs are the prevailing parties in the DP case;

L.    An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

M.    An award of compensatory damages in the amount of $5 million;

N.    Injunctive relief that all ALJs that handle special education due process cases be thoroughly and adequately trained on the special education law and due process case regulations and rules, which would include training by both LEA-side and parents-side attorneys who have actually practiced special education law in New Jersey;

O.    Injunctive relief that until an ALJ that handles special education due process cases has been properly trained on special education law and due process cases as described above, such ALJ shall be removed as the presiding hearing officer over any and all special education cases *instanter*;

P.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

Q.    For such other and further relief as the Court deems equitable and just.

## COUNT ELEVEN – SYSTEMIC VIOLATION OF THE INDEPENDENCE OF THE ADJUDICATING BODY OF SPECIAL EDUCATION DISPUTES
### (All Defendants)

539.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

540.    NJDOE is an executive branch agency of the State of New Jersey.

541.    NJDOE is the SEA for New Jersey.  *See* 20 U.S.C. §1401(32).

542.    IDEA requires hearing officers conducting special education due process hearings may not be employees of the SEA or the LEA involved in the education or care of the child or a person having a conflict of interest.

543.    MTBOE is the LEA in the DP case.

544.    NJDOE has designated the OAL as the adjudicating body that provides the ALJs to preside over special education due process hearings.

545.    The OAL is an executive branch agency of the State of New Jersey.

546.    Although not technically employees of the NJDOE, ALJs are employees of the OAL.

547.    Upon information and belief, many ALJs assigned by the OAL to preside over special education due process hearings are former members of the school district bar, representing LEAs in special education due process cases in the State of New Jersey.

548.    Upon information and belief, none of the ALJs assigned by the OAL to preside over special education due process hearings formerly represented children with disabilities and their families in special education due process cases in the State of New Jersey.

549.    ALJs are employees of the State of New Jersey.

550.    Since the budget and salaries of NJDOE and OAL employees are subparts of and determined by the larger budget of the executive branch, they are beholden to the same pot of money.  This creates a personal and/or professional interest that conflicts with the ALJ's objectivity in special education due process hearings.

551.    A portion of the executive branch budget is funded by the U.S. Government through IDEA.

552.   Since LEAs, including MTBOE, receive funds from the New Jersey executive branch budget, the NJDOE, OAL, and ALJs assigned to special education due process hearings have a professional interest to preserve and protect those funds and that budget, which conflicts with the independence required by IDEA in special education due process hearings.  Specifically, the financial interest of these executive branch agencies and their employees conflicts with their objectivity in special education due process hearings, which is to comply with IDEA and the needs of students with disabilities and their families that might cost the State of New Jersey money.  This creates an "unholy alliance" between NJDOE, the OAL, the ALJs, and the LEAs.

553.   ALJs have a personal interest, namely that the State of New Jersey pays their wages, which conflicts with their objectivity in special education due process hearings as a decision in favor of a child with a disability and his/her family, *e.g.* Plaintiffs herein, might reduce or impact the availability of the State of New Jersey to pay those wages.

554.   NJDOE's method for resolving special education disputes is a systemic violation of IDEA and the civil rights of children with disabilities and their families.

555.    In the 2004 reauthorization and amendments of IDEA, Congress found "Parents and schools should be given expanded opportunities to resolve their disagreements in positive and constructive ways."  20 U.S.C. §1400(c)(8).

556.    To that end, one of the central purposes of IDEA is "to ensure that the rights of children with disabilities and parents of such children are protected," 20 U.S.C. §1400(d)(1)(B), i.e. to level the playing field between families and schools.

557.    With respect to the special education of J.A., Defendants were all acting under color of state law.

558.    As a direct and proximate result of this unholy alliance between Defendants, LEAs/school districts, and specifically MTBOE in the DP case, and their counsel get preferential treatment on motions and other matters in special education due process hearings from ALJs. This is evident by how the presiding ALJs in the DP case did not enforce any of the regulations against MTBOE and why Plaintiffs' numerous objections were either overruled or ignored.

559.    The preferential treatment discussed above is evident in the statistics that overall school districts in New Jersey prevail in 70% of the special education due process cases before the OAL and 93% when parents appeared *pro se*.  The statistics should be closer to 50%-50% if the system were fair, as it is unlikely that parents-side attorneys would take frivolous cases.

560.   As a direct and proximate result of these violations, Plaintiffs are harmed by this lack of independence of the adjudicating body in New Jersey special education due process hearings by the presiding ALJs in the DP case made every ruling in favor of MTBOE and against Plaintiffs, even when the facts, the law, and the regulations were clearly in Plaintiffs' favor.

561.   As a direct and proximate result of these violations, Plaintiffs are harmed by this lack of independence of the adjudicating body in New Jersey special education due process hearings because MTBOE unfairly benefitted from invalid rulings that enabled it to win the DP case.

562.   NJDOE's systemic violations of IDEA have caused Plaintiffs damages.  Specifically, Plaintiffs have been denied a FAPE for numerous legal errors in the DP case.  Plaintiffs are entitled to all appropriate relief as a result of this harm.

563.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs.

564.   As a direct and proximate result of these violations, Plaintiffs have been harmed because they had to go to an unfair hearing and have ALJ Tuohy issue her Final Decision on February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that Defendants violated Plaintiffs' due process rights;

C.    Finding that Defendants substantively denied J.A. a FAPE;

D.    Finding that Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

E.    Finding that there is an unholy alliance between Defendants creating a lack of independence of the adjudicating body in New Jersey special education due process hearings and thereby violating the basic tenets of IDEA and its regulations;

F.    Finding that because of the lack of independence of the adjudicating body in New Jersey special education due process hearings, MTBOE unfairly benefitted from erroneous rulings by the OAL and the presiding ALJs in the DP case;

G.    Finding that the lack of independence of the adjudicating body in New Jersey special education due process hearings caused Plaintiffs to lose the DP case;

H.    Finding that Defendants are in direct violation of IDEA, its

regulations, and the New Jersey regulations by creating a system that

lacks independence of the adjudicating body for special education due

process hearings;

I.    Finding that the OAL and all ALJs handling special education due

process hearings have an inherent conflict of interest in adjudicating

special education due process hearings;

J.    Finding that NJDOE has violated IDEA and its regulations by

designating the OAL, another executive branch agency, as the

adjudicating body for special education due process hearings due to

the inherent conflict of interest which existed *ab initio*;

K.    Finding that Defendants have systemically violated IDEA's

protections and requirements to ensure Plaintiffs' rights in exchange

for receiving billions of dollars in federal funding;

L.    Injunctive relief that the OAL and all ALJs cease and desist handling

New Jersey special education due process hearings *instanter*;

M.    Injunctive relief that NJDOE cease and desist transmitting special

education due process hearings to the OAL *instanter*;

N.    Injunctive relief that NJDOE immediately fund and create a truly

independent system for adjudicating special education due process

hearings in the State of New Jersey that ensures compliance with IDEA within 3 months;

O.    Finding that Plaintiffs are the prevailing parties in the DP case;

P.    An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

Q.    An award of compensatory damages in the amount of $20 million;

R.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

S.    For such other and further relief as the Court deems equitable and just.

## COUNT TWELVE – SYSTEMIC VIOLATION OF THE 45 DAY RULE
### (All Defendants)

565.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

566.    IDEA special education due process cases were not designed to be full civil litigations with discovery and motion practice.  They were designed by Congress to be a swift fact-finding hearing and decision proceeding so that a child with a disability's education could get back on course quickly.  This is why the IDEA regulation specifically requires a decision within 45 days.  The other Procedural Safeguards and regulations, *e.g.* the access to records regulation, the 10 Day Peremptory Hearing Date, the Five-Day Exchange Rule, and the Adjournment

Rule, were designed to work together in order to ensure compliance with the 45 Day Rule. (*See supra* ¶¶62-64, 101-03.)

567.   NJDOE's design and implementation of the special education dispute resolution system in the State of New Jersey is completely and systemically flawed.  State Defendants have been systemically violating the 45 Day Rule since at least 2010 such that due process cases don't receive final decisions for **312 days** on average.  (*See supra* ¶¶134-35, 146-57 and Exhs. E – H.)

568.   Because of the flawed system in New Jersey and its despicable implementation by State Defendants, it directly affected the DP case and the denial of Plaintiffs' due process rights.  Accounting for all adjournment requests by **parties**, the DP case did not get a final decision for **685 days**.  All Defendants connected to the DP case egregiously violated the 45 Day Rule and thereby harmed Plaintiffs, especially J.A.'s education.  (*See supra* ¶¶290, 292-93, 299-304, 307-08, 313-15, 319-20, 322, 325-26, 331-32, 337-40, 343-44, 346-48, 367-73, 377-84 and Exhs. J, L, M, R, U, V, W, AA, AB, AL, AM, and AN.)

569.   NJDOE has failed in its legal obligation to oversee the OAL and all ALJs to ensure they strictly enforce the 45 Day Rule and therefore has failed in ensuring compliance with IDEA and its regulations.  NJDOE is therefore systemically violating its oversight duties under IDEA.

570.   MTBOE did not negotiate in good faith during the 30 Day Resolution Period because it knew that the OAL and the ALJs assigned to the DP case would not enforce the 45 Day Rule and MTBOE could cause Plaintiffs to incur substantial fees and costs with the tactic of "bleeding them dry" and having to withdraw their due process complaints.

571.   MTBOE actively participated in causing delays in the DP case such that it violated the 45 Day Rule, such as filing motions, requesting lengthy briefing schedules on motions, and asking for the hearing dates to accommodate its attorney's municipal prosecution schedule.

572.   MTBOE relied upon State Defendants' known violations of the 45 Day Rule to its own advantage knowing that Plaintiffs would not be able to address the issue until appeal.

573.   As a direct and proximate result of these violations, J.A. has been denied a FAPE by these Defendants.

574.   As a direct and proximate result of these violations, Plaintiffs have been denied due process of law by these Defendants.

575.   As a direct and proximate result of these violations, J.A. is not at grade level with any of her core subjects.

576.   As a direct and proximate result of these violations, J.A. has been denied an education due to the delays in the dispute resolution system as described throughout this Complaint.

577.   As a direct and proximate result of these violations, J.A. has been matriculated to the next grades when she was not prepared for same.

578.   As a direct and proximate result of these violations, J.A.'s anxiety due to the school environment increased to a level requiring Plaintiffs to seek homebound instruction, where J.A. has been since the 2018-19 school year.

579.   As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded J.A.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to J.A., and caused a deprivation of educational benefits to J.A.

580.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP case.

581.   As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on  February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that these Defendants substantively denied J.A. a FAPE;

C.    Finding that these Defendants violated numerous procedural safeguards under IDEA that resulted in a denial of FAPE;

D.    Finding that these Defendants violated Plaintiffs' due process rights;

E.    Finding that MTBOE did not negotiate in good faith during the 30 Day Resolution Period because it knew that the New Jersey system for special education dispute resolution is broken and skewed in favor of school districts;

F.    Finding that these Defendants have systemically violated IDEA's protections and requirements to ensure Plaintiffs' rights in exchange for receiving billions of dollars in federal funding;

G.    Finding that State Defendants are systemically violating the 45 Day Rule;

H.    Finding that MTBOE actively participating in the violation of the 45 Day Rule and is complicit with State Defendants;

I.      Injunctive relief that State Defendants immediately implement a plan to bring due process cases into compliance with the 45 Day Rule;

J.      Injunctive relief that State Defendants issue decisions in all pending due process cases within 45 Days of this Court's Order *instanter*;

K.      Finding that Plaintiffs are the prevailing parties in the DP case;

L.      An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

M.      An award of compensatory damages in the amount of $20 million;

N.      An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

O.      For such other and further relief as the Court deems equitable and just.

## COUNT THIRTEEN – DECLARATORY JUDGMENT: FEDERAL PREEMPTION
### (All Defendants)

582.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

583.    The Federal Declaratory Judgment Act provides that "In a case of actual controversy within its jurisdiction, [exceptions omitted as inapplicable], any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration,

whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. §2201(a).

584.    There is an actual and justiciable controversy between Plaintiffs and Defendants in as to the interpretation and/or application of certain provisions of the New Jersey Administrative Code ("NJAC") in special education due process hearings.  Plaintiffs allege they have been harmed by both a wrongful interpretation and application of various provisions of the NJAC in the DP case.

585.    The Supremacy Clause of the U.S. Constitution states that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Constitution, Article VI, Clause 2.

586.    The U.S. Supreme Court has held that if there is a conflict between a federal law and state law, the federal law prevails.  *See Cipollone v. Liggett Group, Inc.*, 505 US 504, 516 (1992) ("Thus, since our decision in *McCulloch v. Maryland*, 4 Wheat. 316, 427 (1819), it has been settled that state law that conflicts with federal law is "without effect." *Maryland v. Louisiana*, 451 U. S. 725, 746 (1981).")

587.    Under the doctrine of federal preemption, which is rooted in the Supremacy Clause of the Constitution of the United States, state laws are invalid if

they "'interfere with, or are contrary to, federal law. There are three types of preemption: express preemption and two types of implied preemption, field preemption and conflict preemption. Conflict preemption is found where 'compliance with both federal and state regulations is a physical impossibility,' or where state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *R.B. v. Mastery Charter School*, 532 Fed. Appx. 136, Opinion at 12 (3rd Cir. 2013) [internal citations omitted].

588.    There is a direct conflict between the scheme under federal IDEA law for resolving special education disputes and NJDOE's system under the New Jersey Administrative Code for how New Jersey handles special education disputes as discussed at length in preceding allegations of this Complaint.

589.    As one example of this, Defendants treat the Uniform Administrative Procedure Rules ("UAPR") as found at N.J.A.C. §1:1 as the rules that govern special education due process hearings in New Jersey, but many provisions of the UAPR conflict with IDEA, not least of which is the conflict between briefing schedules for motions generally under N.J.A.C. §1:1-12.2 and motions for summary decision under N.J.A.C. §1:1-12.5(a) and the 45 Day Rule under IDEA.

590.    Another example of this is Defendants' treatment of an IDEA request for access to a student's records as a discovery request instead of an independent

Procedural Safeguard violation of which creates a claim for relief for a procedural violation of IDEA.

591.   Another example discussed *supra* is the lack of independence and training of ALJs which violates the requirements of hearing officers under IDEA.

592.   Federal IDEA law must prevail over the New Jersey Administrative Code and NJDOE's system for resolving special education disputes.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against all Defendants as follows:

A.   Declaring that federal IDEA law and its regulations prevail over any and all provisions of the New Jersey Administrative Code that conflict therewith, including without limitation N.J.A.C. §§1:1-12.2 and 1:1-12.5(a);

B.   Declaring that federal IDEA law and its regulations prevail over any and all interpretations of the New Jersey Administrative Code by Defendants that conflict therewith;

C.   Declaring that the rulings by the presiding ALJs in the DP case are void by operation of the federal preemption doctrine since they conflict with IDEA and its regulations;

D.   Declaring that ALJ Tuohy's February 22, 2021 Final Decision in the DP case is void by operation of the federal preemption doctrine since it conflicts in many respects with IDEA and its regulations;

E.   Declaring that NJDOE's system for adjudicating New Jersey special education due process hearings is void by operation of the federal preemption doctrine since it conflicts in many respects with IDEA and its regulations and thereby violates the basic tenets of IDEA;

F.   Declaring that Plaintiffs are the prevailing parties in the DP case;

G.   Declaring that the OAL should not be the adjudicating body for special education due process hearings in New Jersey by operation of the federal preemption doctrine since it conflicts in many respects with IDEA and its regulations and thereby violates the basic tenets of IDEA;

H.   An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

I.   An award of compensatory damages in the amount of $20 million;

J.   An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

K.   For such other and further relief as the Court deems equitable and just.

## COUNT FOURTEEN – MTBOE'S VIOLATIONS OF §504
### (Defendant MTBOE)

593.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

594.   Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §701 *et seq.* ("§504") prohibits discrimination of children with disabilities in school and ensures that their civil rights are not violated.

595.   Enforcing special education rights under IDEA, §504, the ADA, or other civil rights laws is a protected activity.

596.   Retaliation by a public entity or official when a parent or child with a disability engages in a protected activity such as enforcing special education legal rights is a violation of §504.  29 C.F.R. §33.13; 34 C.F.R. §100.7(e); 34 C.F.R. §104.61.

597.   J.A. is diagnosed with Autism, a mental impairment which substantially limits one or more major life activities, including but not limited to learning and communicating, which is a "disability" as defined in §504.  29 U.S.C. §705(20)(B).

598.   J.A. is an "individual with a disability" within the meaning of §504 because J.A.'s diagnosis of Autism substantially limits his ability to learn, communicate, and be educated.  29 U.S.C. §705(20)(A); 34 C.F.R. §104.3(j).

599.    J.A. is entitled to the protections against discrimination as provided by §504 and shall not, by reason of her disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 29 U.S.C. §794(a); 34 C.F.R. §§104.4, 104.31 and 104.33.

600.    MTBOE is a public entity that receives federal funding under IDEA.

601.    MTBOE has great animosity against Plaintiffs for asserting and enforcing their special education legal rights against it.

602.    As described above, Plaintiffs had filed two prior due process cases and were aggressively asserting their special education rights on behalf of J.A., which angered MTBOE and Bersh for challenging their "expertise" in special education.  This caused MTBOE, through Bersh, to retaliate against Plaintiffs by denying and reducing services to J.A. and by making them file for due process instead of convening another IEP meeting as requested by Plaintiffs.  (*See supra* ¶¶171-74, 212, 233-48, 268.)

603.    MTBOE has acted with discrimination against Plaintiffs because of J.A.'s disabilities and Plaintiffs engaging in protected activity.

604.    MTBOE's retaliatory and discriminatory actions are violations of §504.

605.   As a direct and proximate result of these violations, J.A. has been denied a FAPE by MTBOE.

606.   As a direct and proximate result of these violations, J.A. is not at grade level with any of her core subjects.

607.   As a direct and proximate result of these violations, J.A. has been matriculated to the next grades when she was not prepared for same.

608.   As a direct and proximate result of these violations, J.A.'s anxiety due to the school environment increased to a level requiring Plaintiffs to seek homebound instruction, where J.A. has been since the 2018-19 school year.

609.   As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded J.A.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to J.A., and caused a deprivation of educational benefits to J.A.

610.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP case.

611.   As a direct and proximate result of the violations of §504 and the regulations promulgated thereunder by MTBOE, Plaintiffs have suffered harm and serious damages including special and general damages according to proof.

612. As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against MTBOE as follows:

A. Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B. Finding that MTBOE violated §504 by discriminating against J.A. due to her disabilities;

C. Finding that MTBOE violated §504 by retaliating against Plaintiffs for engaging in a protected activity, namely asserting their special education rights;

D. Finding that Plaintiffs are the prevailing parties in the DP case;

E. An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

F. An award of compensatory damages in the amount of $5 million;

G. An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

H. For such other and further relief as the Court deems equitable and just.

## COUNT FIFTEEN – MTBOE'S VIOLATIONS OF THE ADA
### (Defendant MTBOE)

613.   Plaintiffs repeat and reallege the preceding allegations of this

Complaint and incorporate them herein by reference as if set forth in full.

614.   The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.

§12101 *et seq.* ("ADA") prohibits discrimination of children with disabilities in

school and ensures that their civil rights are not violated.

615.   Enforcing special education rights under IDEA, §504, the ADA, or

other civil rights laws is a protected activity.

616.   The ADA prohibits retaliation, coercion or threats against people who

file complaints under the ADA or otherwise engage in a protected activity.  42

U.S.C. §12203; 28 C.F.R. §35.134.

617.   As a child with Autism, J.A. has a "disability" as the disorder

substantially limits one or more major life activities, including but not limited to

learning and communicating, as set forth in the ADA. 42 U.S.C. §12102(1); 28

C.F.R. §35.104.

618.   J.A. is a "qualified individual with a disability" within the meaning of

the ADA. 42 U.S.C. §§12132 and 12182; 28 C.F.R. §§35.130 and 35.149.

619.   J.A. is entitled to the protections against discrimination as provided by

the ADA and shall not, by reason of her disability, be denied public

accommodations or excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity. 42 U.S.C. §§12132, 12181 and 12182; 28 C.F.R. §§35.130 and

35.149.

620.   MTBOE is a public accommodation that receives federal funding. 42

U.S.C. §12181(7)(j).

621.   MTBOE's retaliatory and discriminatory actions are violations of the

ADA.

622.   As a direct and proximate result of these violations, J.A. has been

denied a FAPE by MTBOE.

623.   As a direct and proximate result of these violations, J.A. is not at

grade level with any of her core subjects.

624.   As a direct and proximate result of these violations, J.A. has been

matriculated to the next grades when she was not prepared for same.

625.   As a direct and proximate result of these violations, J.A.'s anxiety due

to the school environment increased to a level requiring Plaintiffs to seek

homebound instruction, where J.A. has been since the 2018-19 school year.

626.   As a direct and proximate result of these violations, Plaintiffs have

been harmed because the procedural violations impeded J.A.'s right to a FAPE,

significantly impeded Plaintiffs' opportunity to participate in the decision-making

process regarding the provision of FAPE to J.A., and caused a deprivation of educational benefits to J.A.

627.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP case.

628.   As a direct and proximate result of the violations of the ADA and the regulations promulgated thereunder by MTBOE, Plaintiffs have suffered harm and serious damages including special and general damages according to proof.

629.   As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on  February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against MTBOE as follows:

A.   Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.   Finding that MTBOE violated the ADA by discriminating against J.A. due to her disabilities;

C.   Finding that MTBOE violated the ADA by retaliating against Plaintiffs for engaging in a protected activity, namely asserting their special education rights;

D.    Finding that Plaintiffs are the prevailing parties in the DP case;

E.    An award of compensatory education and/or an education fund for

private tutoring for J.A. that covers the school years from 2017-2020

to help J.A. achieve grade-level performance;

F.    An award of compensatory damages in the amount of $5 million;

G.    An award of attorney's fees and costs for Plaintiffs and granting

Plaintiffs the opportunity to file a fee petition for such award; and

H.    For such other and further relief as the Court deems equitable and just.

## COUNT SIXTEEN – MTBOE'S VIOLATIONS OF THE NJLAD
### (Defendant MTBOE)

630.    Plaintiffs repeat and reallege the preceding allegations of this

Complaint and incorporate them herein by reference as if set forth in full.

631.    The New Jersey Law Against Discrimination, N.J.S.A. §10:5-1 *et seq.*

("NJLAD") prohibits discrimination of children with disabilities in school and

ensures that their civil rights are not violated.

632.    J.A. has a "disability" as a result of her several diagnoses as defined in

the NJLAD.  N.J.S.A. §10:5-5(q).

633.    MTBOE, like all educational facilities under the supervision of the

NJDOE and receiving federal funds, is "a place of public accommodation."

N.J.S.A. §10:5-5(l).

634.   J.A. is entitled to the prohibitions against unlawful discrimination as provided by the NJLAD and shall not, by reason of her disabilities, be denied public accommodations or excluded from participation in or be denied the benefits of the services, programs, or activities of MTBOE or be subjected to discrimination by any such entity.  N.J.S.A. §10:5-12.

635.   In addition, under NJLAD, public schools and its employees are barred from discriminating on the basis of a person's disability.

636.   MTBOE failed in its responsibilities under the NJLAD to provide its services, programs and activities in a full and equal manner to J.A., a disabled person, as described hereinabove, and free of hostility towards J.A.'s disability.

637.   MTBOE further failed in its responsibilities under the NJLAD to provide its services, programs, and activities in a full and equal manner to J.A., a disabled person, as described hereinabove, by subjecting her to a hostile and dangerous educational environment.

638.   MTBOE further failed in its responsibilities under the NJLAD to provide its services, programs, and activities in a full and equal manner to J.A., a disabled person, by not recognizing the full extent of her disabilities and relying solely upon the anecdotal observations of MTBOE's classroom teachers which completely contradicted professional evaluations and the input of J.A.'s family.

639.    Plaintiffs reserve their rights to assert any other violations of NJLAD that resulted in discrimination by MTBOE against J.A.

640.    By retaliating against Plaintiffs, MTBOE violated Plaintiffs' legal rights under the NJLAD with malice and/or reckless indifference.

641.    As a direct and proximate result of these violations, J.A. has been denied a FAPE by MTBOE.

642.    As a direct and proximate result of these violations, J.A. is not at grade level with any of her core subjects.

643.    As a direct and proximate result of these violations, J.A. has been matriculated to the next grades when she was not prepared for same.

644.    As a direct and proximate result of these violations, J.A.'s anxiety due to the school environment increased to a level requiring Plaintiffs to seek homebound instruction, where J.A. has been since the 2018-19 school year.

645.    As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded J.A.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to J.A., and caused a deprivation of educational benefits to J.A.

646.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP case.

647.   As a direct and proximate result of the violations of the NJLAD and the regulations promulgated thereunder by MTBOE, Plaintiffs have suffered harm and serious damages including special and general damages according to proof.

648.   As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on  February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against MTBOE as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that MTBOE violated the NJLAD by discriminating against J.A. due to her disabilities;

C.    Finding that MTBOE violated the NJLAD by retaliating against Plaintiffs for engaging in a protected activity, namely asserting their special education rights;

D.    Finding that MTBOE acted with malice and/or reckless indifference towards Plaintiffs;

E.      Finding that Plaintiffs are the prevailing parties in the DP case;

F.      An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

G.      An award of compensatory damages in the amount of $5 million;

H.      An award of punitive damages in the amount of $50 million;

I.      An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

J.      For such other and further relief as the Court deems equitable and just.

## COUNT SEVENTEEN – STATE DEFENDANTS' VIOLATIONS OF §504
### (All Defendants except MTBOE and Doe ALJs 1-250)

649.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

650.   The findings and rulings of the presiding ALJs in the DP case were retaliation against Plaintiffs for exerting their rights under special education law and because they were challenging legal errors throughout the DP case.

651.   The findings and rulings of the presiding ALJs in the DP case were spiteful and an abuse of power as a hearing officer assigned to enforce IDEA, especially since the facts and law of the case supported Plaintiffs' due process complaints.

652.   As a direct and proximate result of these violations, Plaintiffs have been harmed because State Defendants violated their most basic due process rights in the DP case.

653.   As a direct and proximate result of these violations, Plaintiffs suffered harm by MTBOE not negotiating in good faith during the 30 Day Resolution Periods knowing that the OAL and the presiding ALJs in the DP case would stick with 'common practice' and that there would be "Settlement Thursdays" and delays in the case thereby causing Plaintiffs to incur substantial additional attorney's fees and costs.

654.   As a direct and proximate result of these violations, Plaintiffs suffered harm by having the DP case reassigned several times without a request to do so, their motions denied, their legal arguments for IDEA compliance ignored, and allowing MTBOE to present evidence in the DP case when it should have been barred from doing so.

655.   As a direct and proximate result of these violations, Plaintiffs have been harmed because MTBOE had the statutory burden of proof in the DP case and Plaintiffs should have won the case because MTBOE would not have met its burden of proof with no evidence to present.

656.   As a direct and proximate result of these violations, J.A. has been denied a FAPE by MTBOE.

657.   As a direct and proximate result of these violations, J.A. is not at grade level with any of her core subjects.

658.   As a direct and proximate result of these violations, J.A. has been matriculated to the next grades when she was not prepared for same.

659.   As a direct and proximate result of these violations, J.A.'s anxiety due to the school environment increased to a level requiring Plaintiffs to seek homebound instruction, where J.A. has been since the 2018-19 school year.

660.   As a direct and proximate result of these violations, Plaintiffs have been harmed because the procedural violations impeded J.A.'s right to a FAPE, significantly impeded Plaintiffs' opportunity to participate in the decision-making process regarding the provision of FAPE to J.A., and caused a deprivation of educational benefits to J.A.

661.   As a direct and proximate result of these violations, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in the DP case.

662.   As a direct and proximate result of the violations of §504 and the regulations promulgated thereunder by MTBOE, Plaintiffs have suffered harm and serious damages including special and general damages according to proof.

663.    As a direct and proximate result of these violations, Plaintiffs have been harmed because ALJ Tuohy issued her Final Decision on  February 22, 2021 in MTBOE's favor when MTBOE should have lost the case.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that these Defendants violated §504 by discriminating against J.A. due to her disabilities;

C.    Finding that these Defendants violated §504 by retaliating against Plaintiffs for engaging in a protected activity, namely asserting their special education rights;

D.    Finding that these Defendants acted with malice and/or reckless indifference towards Plaintiffs;

E.    Finding that Plaintiffs are the prevailing parties in the DP case;

F.    An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

G.    An award of compensatory damages in the amount of $5 million;

H.  An award of attorney's fees and costs for Plaintiffs and granting

Plaintiffs the opportunity to file a fee petition for such award; and

I.  For such other and further relief as the Court deems equitable and just.

## COUNT EIGHTEEN – STATE DEFENDANTS' VIOLATIONS OF THE ADA
### (All Defendants except MTBOE and Doe ALJs 1-250)

664.  Plaintiffs repeat and reallege the preceding allegations of this

Complaint and incorporate them herein by reference as if set forth in full.

665.  NJDOE, like all educational facilities receiving federal funds, is a

public accommodation. 42 U.S.C. §12181(7)(j).

666.  State Defendants provide the public accommodation of access to

administrative hearings for special education due process complaints.

667.  As a direct and proximate result of the violations of the ADA and the

regulations promulgated thereunder by these Defendants, Plaintiffs have suffered

serious damages including special and general damages according to proof.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order

and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.  Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final

Decision as error;

B.  Finding that these Defendants violated the ADA by discriminating

against J.A. due to her disabilities;

C.   Finding that these Defendants violated the ADA by retaliating against Plaintiffs for engaging in a protected activity, namely asserting their special education rights;

D.   Finding that these Defendants acted with malice and/or reckless indifference towards Plaintiffs;

E.   Finding that Plaintiffs are the prevailing parties in the DP case;

F.   An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

G.   An award of compensatory damages in the amount of $5 million;

H.   An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

I.   For such other and further relief as the Court deems equitable and just.

## COUNT NINETEEN –SYSTEMIC VIOLATIONS OF §1983 AND CIVIL RIGHTS
### (All Defendants)

668.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

669.   Congress intended that IDEA rights be enforceable under 42 U.S.C. §1983.

670.   Any person, including without limitation a school district, school board of education, local educational agency, state educational agency, and/or arm of the state government, who subjects or causes to be subjected a U.S. citizen to the deprivation of that citizen's Constitutional rights and/or privileges shall be liable to such citizen in an action at law, suit in equity, or other proceeding for redress. 42 U.S.C. §1983.

671.   Plaintiffs have a cause of action under §1983 if a school district, school board of education, local educational agency, state educational agency, and/or arm of the state government has a policy or custom that caused the violation of their constitutional rights, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), or, under the state-created danger theory.  *See Sanford v. Stiles,* 456 F. 3d 298 (3d Cir. 2006); *Kneipp v. Tedder,* 95 F. 3d 1199 (3d Cir. 1996).

672.   Defendants were acting within the course and scope of their employment and/or under the color of state law at all material times.

673.   Defendants have denied Plaintiffs their right to due process of law.

674.   Defendants have denied Plaintiffs their right to a determination of their special education claims against school districts and/or local education agencies by failing to comply with IDEA, its regulations, and the New Jersey regulations.

675.   Defendants have denied Plaintiffs their right to a determination of their special education claims against school districts and/or local education agencies by failing to enforce the regulatory timeline under IDEA.

676.   Defendants have denied Plaintiffs their right to timely assert other claims because of the delays and systemic flaws.

677.   Defendants violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by actions, including but not limited to, depriving Plaintiffs equal protection under the law on the basis of disability.

678.   Defendants violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution by actions, including but not limited to, acting with deliberate indifference to the risk of harm to Plaintiffs by delaying and/or failing to timely address special education problems in MTBOE and leaving J.A. in an outdated and inappropriate IEP and placement without adequate evaluation.

679.   Defendants violated Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution by actions, including but not limited to creating a flawed system for resolving special education disputes in the State of New Jersey; selecting the OAL as the adjudicative body for special education disputes and failing to ensure proper training and expertise of the OAL and the ALJs; allowing the unreasonable delay in special education cases to

continue without efforts to rectify the problem; allowing the repeated and consistent violation of the regulatory timeline for special education due process hearings; and failing to provide Plaintiffs an independent tribunal / adjudicatory body to resolve special education disputes in compliance with federal law.

680.   Defendants knew or should have known that they were denying Plaintiffs their rights in violation of statutory law.

681.   Defendants knew or should have known that they were denying Plaintiffs due process of law.

682.   Defendants knew or should have known that they were impeding, impairing, prejudicing, and/or violating Plaintiffs' constitutional rights to have a proper forum in which to enforce federal statutory law.

683.   Defendants acted intentionally, wantonly, and/or with deliberate indifference to Plaintiffs' clearly established constitutional rights.

684.   Plaintiffs are harmed because the education system and dispute resolution system for children with disabilities has broken down in the State of New Jersey.

685.   Plaintiffs are harmed because school districts, LEAs, and their counsel know that they can unfairly benefit from the unholy alliance as described above and outlast the cost and delays in litigating special education disputes due to the OAL's conflict of interest and preferential treatment of LEAs.

686.   Plaintiffs have exhausted their administrative remedies as required by IDEA because the DP case went to a final Decision.

687.   IDEA contemplates that "<u>the parents</u> or the local educational agency involved in such complaint shall have an opportunity for an <u>impartial due process hearing</u>, which <u>shall be conducted by the State educational agency</u>." 20 U.S.C. §1415(f)(1) ( emphasis added.)

688.   As discussed at length *supra*, Plaintiffs did not have an opportunity for an impartial due process hearing in the DP case.

689.   Defendants have violated Plaintiffs most fundamental rights under IDEA and its regulations.

690.   As a direct and proximate result of the violations of §1983 by these Defendants, Plaintiffs have suffered serious damages including special and general damages according to proof.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.   Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.   Finding that Defendants have a policy and/or custom of denying parents their due process rights in special education cases and, in particular, Plaintiffs herein;

C.    Finding that Defendants have a policy and/or custom of denying parents equal protection under the law in special education cases and, in particular, Plaintiffs herein;

D.    Finding that Defendants have a policy and/or custom of denying parents their rights under the Fourth Amendment to the U.S. Constitution in special education cases and, in particular, Plaintiffs herein;

E.    Finding that Defendants' policies and/or customs developed and are applied with malice and/or reckless indifference towards parents in special education cases and, in particular, Plaintiffs herein; in special education cases and, in particular, Plaintiffs herein;

F.    Finding that Plaintiffs are the prevailing parties in the DP case;

G.    An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

H.    An award of compensatory damages in the amount of $20 million;

I.    An award of punitive damages in the amount of $50 million;

J.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

K.    For such other and further relief as the Court deems equitable and just.

## COUNT TWENTY – SYSTEMIC MALICIOUS ABUSE OF PROCESS
### (All Defendants)

691.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

692.   An "action for abuse of process lies for the improper, unwarranted and perverted use of process after it has been issued . . . . Thus it is said, in substance . . . the malicious abuse is the employment of a process in a manner not contemplated by law." *Baglini v. Lauletta*, 768 A. 2d 825, 831 (App. Div. 2001).

693.   Plaintiffs do not contest that the process for resolving special education disputes under IDEA or other laws is proper.  However, Defendants have employed the process in an improper, unwarranted, and perverted manner.

694.   Defendants have an ulterior motive with respect to special education disputes in the State of New Jersey.  Specifically, despite the laws that protect students with disabilities and the mandate to comply with such laws, Defendants seek to protect their budgets from the costs of such compliance.

695.   Provision of special education services are expensive and with a growing population or identification of children with disabilities in the public school systems, that expense is growing faster than the public school budgets.

696.   Defendants also know that there is little to no oversight in their compliance with special education laws, as discussed at length *supra, e.g.* the systemic violation of the 45 Day Rule.

697.   The public school system in New Jersey seeks to protect non-essential expenses like extracurricular activities, administration salaries and benefits, and the purchase of new curriculum materials instead of recycling of existing materials and books.

698.   In addition, the system in New Jersey is designed to favor Defendants and extend litigation, when the purposes of special education law and the due process system is intended to restore the balance of interests and protect families of a child with a disability, like Plaintiffs herein, especially when they may bring a complaint *pro se* or with an attorney who is handling the case *pro bono* or on a reduced fee basis.

699.   Indeed, the public school systems in New Jersey are purchasing insurance to pay or pay out of pocket for defense fees and costs in special education cases to avoid incurring the expenses associated with special education services.

700.   In every respect, the system of special education due process cases in New Jersey is designed to protect the finances of Defendants to the detriment of Plaintiffs and families like them who simply want to enforce their legal rights under special education laws.  Thus, Defendants have this ulterior motive of protecting the education budgets, both locally and statewide, to the loss of special education services to J.A. and other students with disabilities.

701.   Defendants have exhibited this ulterior motive by repeatedly, not just in the DP case but upon information and belief in many other cases, by fighting special education due process cases with extraordinary vigor, similar to that of gun or tobacco litigation.  This methodology is completely out of sync with the letter and spirit of special education laws.

702.   The purpose of Defendants establishing this 'no-win' situation for Plaintiffs and families like them is that they know most parents cannot afford to fight long litigation battles and will either not file them initially or will give up before they are completed.  This accomplishes Defendants' ulterior motive in that the school budgets are saved from special education services.  Legal expenses can be accommodated and hidden in budgets in other ways.

703.   Defendants have created, enforced, and used the New Jersey system for resolving special education disputes to discourage Plaintiffs and families like them from pursuing their legal rights on behalf of J.A. and other students with disabilities by turning the cases into major litigations, when IDEA both expressly and implicitly requires them to be rapid, fact-finding hearings instead of large-scale civil actions.  Examples of this in the DP case include without limitation the extended Prehearing Orders; the allowance of discovery; the lengths and duplication of witness testimony; motion practice; and other violations detailed at length *supra*.

**Page 195 of 202**

704.   In essence, Defendants, particularly MTBOE, have used the special education due process hearing and the DP case other than as would be and should be proper under IDEA and its regulations.  Defendants have abused the process.

705.   As a direct and proximate result of Defendants abuse of process, Plaintiffs have suffered serious damages including special and general damages according to proof.

706.   As a direct and proximate result of Defendants abuse of process, Plaintiffs have been harmed because MTBOE has been permitted to deny MTBOE a FAPE; deny and reduce services to J.A.; force Plaintiffs to seek and obtain homebound services for J.A. and then make them enforce Stay Put knowing that, instead of the typical 60 days of homebound services, Plaintiffs would have to keep J.A. in homebound services for many months and years; and otherwise prosecute a special education due process case outside the boundaries of IDEA and its regulations, all with the imprimatur of Defendants.

707.   As a direct and proximate result of Defendants abuse of process, Plaintiffs have been harmed because Plaintiffs incurred substantial attorney's fees and costs in enforcing their special education legal rights against MTBOE who was wrongfully subverting them.

708.   As a direct and proximate result of Defendants abuse of process, Plaintiffs have been harmed because ALJ Tuohy's February 22, 2021 Final

Decision was in MTBOE's favor when MTBOE should have lost the case and erroneously granting MTBOE prevailing party status.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against these Defendants as follows:

A.    Overturning and/or vacating ALJ Tuohy's February 22, 2021 Final Decision as error;

B.    Finding that Defendants have maliciously abused the process of special education dispute resolution in the DP case;

C.    Finding that Defendants systemically and maliciously abuse the process of special education dispute resolution in New Jersey;

D.    Finding that Plaintiffs are the prevailing parties in the DP case;

E.    An award of compensatory education and/or an education fund for private tutoring for J.A. that covers the school years from 2017-2020 to help J.A. achieve grade-level performance;

F.    An award of compensatory damages in the amount of $20 million;

G.    An award of punitive damages in the amount of $50 million;

H.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

I.    For such other and further relief as the Court deems equitable and just.

## COUNT TWENTY-ONE – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Defendant MTBOE)

709.   Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

710.   MTBOE owed a duty to Plaintiffs, as a family with a child with a disability eligible for special education services, to abide by IDEA's Procedural Safeguards, respect Plaintiffs' rights to enforce IDEA, and not to harm them if and when Plaintiffs chose to assert those rights.

711.   MTBOE also owed a duty to Plaintiffs as a public school system, funded by both the federal and New Jersey governments, to operate with equal protection under the law and due process of law for J.A., as a child with a disability, and his family.

712.   MTBOE also owed a duty to Plaintiffs as a public school system, funded by both the federal and New Jersey governments, to accurately provide information regarding the education opportunities afforded Plaintiffs as a family with a child with a disability.

713.   MTBOE breached its duty owed to Plaintiffs by denying and reducing J.A. services that would have assisted her with her disabilities and requested by Plaintiffs.

714.    MTBOE also breached its duty owed to Plaintiffs by blocking and preventing Plaintiffs from asserting their legal rights and have equal protection under the law and due process of law.

715.    MTBOE also breached its duty owed to Plaintiffs by hiding information, whether negligently or intentionally, regarding the education opportunities and all alternatives afforded J.A., as a child with a disability, and her family.

716.    As a direct and proximate result of MTBOE's breaches of its duties owed to Plaintiffs, Plaintiffs have suffered serious damages including special and general damages according to proof.

717.    As a direct and proximate result of MTBOE's breaches of its duties owed to Plaintiffs, Plaintiffs have suffered severe emotional distress and serious mental injury due to the voraciousness of its contesting the due process complaints and the 'scorched earth' litigation tactics contrary to the express and implied purposes of IDEA and other civil rights laws.

718.    As a direct and proximate result of MTBOE's breaches of its duties owed to Plaintiffs, Plaintiffs have suffered severe emotional distress and serious mental injury due to the financial toll on their family from all of the litigation caused by MTBOE and enforce their legal rights.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against MTBOE as follows:

A.    Compensatory damages in the amount of $5 million;

B.    An award of attorney's fees and costs for Plaintiffs and granting Plaintiffs the opportunity to file a fee petition for such award; and

C.    For such other and further relief as the Court deems equitable and just.

## COUNT TWENTY-TWO – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Defendant MTBOE)

719.    Plaintiffs repeat and reallege the preceding allegations of this Complaint and incorporate them herein by reference as if set forth in full.

720.    MTBOE's conduct in response to Plaintiffs enforcing their legal rights was intentional and reckless.

721.    MTBOE's actions by hiding and/or misrepresenting information regarding education opportunities available to Plaintiffs in response to Plaintiffs enforcing their legal rights was intentional and reckless.

722.    MTBOE's actions by blocking and preventing Plaintiffs from asserting their legal rights and have equal protection under the law and due process of law was intentional and reckless.

723.    MTBOE's conduct against Plaintiffs, a family with a child with a disability, is so outrageous as to shock the conscience and which is not tolerated in

civilized society.  Indeed, MTBOE has a heightened responsibility to children like J.A. and their families to ensure that compliance with special education and anti-discrimination laws is full and precise and its failure to do so in this case is beyond contempt.

724.   As a direct and proximate result of MTBOE's conduct, Plaintiffs have suffered serious damages including special and general damages according to proof.

725.   As a direct and proximate result of MTBOE's breaches of its duties owed to Plaintiffs, Plaintiffs have suffered severe emotional distress and serious mental injury due to the voraciousness of its contesting the due process complaints and the 'scorched earth' litigation tactics contrary to the express and implied purposes of IDEA and other civil rights laws.

726.   As a direct and proximate result of MTBOE's breaches of its duties owed to Plaintiffs, Plaintiffs have suffered severe emotional distress and serious mental injury due to the financial toll on their family from all of the litigation caused by MTBOE and enforce their legal rights.

WHEREFORE, Plaintiffs demand that this honorable Court enter an Order and Judgment in favor of Plaintiffs and against MTBOE as follows:

A.    Compensatory damages in the amount of $5 million;

B.    Punitive damages in the amount of $20 million;

C.     An award of attorney's fees and costs for Plaintiffs and granting

Plaintiffs the opportunity to file a fee petition for such award; and

D.     For such other and further relief as the Court deems equitable and just.

THURSTON LAW OFFICES LLC

By:  /s/ *Robert C. Thurston*
         Robert C. Thurston, Esq.
         Attorney for Plaintiffs

Dated: March 23, 2021

Robert C. Thurston, Esq.
Attorney ID #008801988
Thurston Law Offices LLC
100 Springdale Road A3
PMB 287
Cherry Hill, NJ 08003
856-335-5291
Email: rthurston@schoolkidslawyer.com